David R. Fox (NV Bar No. 16536)
Christopher D. Dodge (*pro hac vice* forthcoming)
**Elias Law Group LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
(202) 968-4490
dfox@elias.law
cdodge@elias.law

Bradley S. Schrager (NV Bar No. 10217)
Daniel Bravo (NV Bar No. 13078)
**Bravo Schrager LLP**
6675 South Tenaya Way, Suite 200
Las Vegas, NV 89113
(702) 996-1724
bradley@bravoschrager.com
daniel@bravoschrager.com

*Attorneys for Proposed Intervenor-Defendants*
*Vet Voice Foundation and Nevada Alliance for Retired Americans*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

|  |  |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; NEVADA REPUBLICAN PARTY; DONALD J. TRUMP FOR PRESIDENT 2024, INC.; and DONALD J. SZYMANSKI, | Case No. 3:24-cv-00198-MMD-CLB |
| Plaintiffs, | |
| v. | **MOTION TO INTERVENE AS DEFENDANTS** |
| CARI-ANN BURGESS, *in her official capacity as the Washoe County Registrar of Voters*; JAN GALASSINI, *in her official capacity as the Washoe County Clerk*; LORENA PORTILLO, *in her official capacity as the Clark County Registrar of Voters*; LYNN MARIE GOYA, *in her official capacity as the Clark County Clerk*; FRANCISCO AGUILAR, *in his official capacity as Nevada Secretary of State*, | |
| Defendants. | |

Pursuant to Rule 24(a), Vet Voice Foundation ("Vet Voice") and the Nevada Alliance for Retired Americans ("Alliance") (together, "Proposed Intervenors") move to intervene as a matter of right. Alternatively, the Proposed Intervenors move to intervene permissively under Rule 24(b). Their motion should be granted for the reasons below.

## INTRODUCTION

Nevada law includes a commonsense measure under which mail ballots are counted as long as they are "[p]ostmarked on or before the day of the election;" and "[r]eceived by the clerk not later than 5 p.m. on the fourth day following the election." NRS 293.269921(1). This provision avoids disenfranchising eligible and qualified voters who cast their mail ballots in timely fashion on or before election day, but whose ballots do not arrive until shortly after. More than twenty states and territories have adopted similar laws.

Plaintiffs—the Republican National Committee, Nevada Republican Party, Donald J. Trump for President 2024, Inc., and Donad J. Syzmanski ("RNC Plaintiffs")—seek to strike down this sensible and fair rule by arguing that it conflicts with the federal Election Day Statutes, 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1, and, as a result, violates Plaintiffs' constitutional rights to vote and stand for office. *See* Compl. ¶¶ 62–82. They ask this Court to order that Nevada election officials *must reject and refuse to count* any and all ballots that arrive in the mail after election day, despite their being timely cast by qualified and eligible Nevada voters. There is no legal basis for that demand.

RNC Plaintiffs have tried this gambit before. Just months ago, they filed a nearly identical complaint in Mississippi challenging that state's similar ballot receipt deadline. *See generally Republican National Committee v. Wetzel*, Case No. 1:24-cv-25 (S.D. Miss. Jan. 6, 2024), ECF No. 1.[1] Prior to that suit, four different courts—including yet another case where the RNC was plaintiff—rejected the precise claims the RNC Plaintiffs raise here, either on standing, the merits,

---

[1] The parties in that case—which include Vet Voice and the Alliance's Mississippi affiliate, who were granted intervention to participate as defendants—have fully briefed cross-motions for summary judgment and are currently awaiting a decision from the Court.

MOTION TO INTERVENE AS DEFENDANTS

or both.[2] Undeterred by this uniform record of failure, the RNC Plaintiffs now ask this Court to be the first in the nation to strike down such a ballot receipt law.

If Plaintiffs are successful, the voters most likely to be disenfranchised are active and former members of the Armed Services and their families, as well as older and disabled voters, all of whom rely heavily on mail ballots to exercise their right to vote. Proposed Intervenors—Vet Voice and the Alliance—are non-partisan, non-profit organizations that serve those communities, and seek to intervene to represent the rights of those voters, as well as their own interests as groups whose missions depend on enfranchising their members and supporters. For that reason, Vet Voice and the Alliance's Mississippi chapter successfully intervened in *Wetzel*—the RNC's parallel suit in Mississippi—to defend against an identical attack on mail ballot deadline rules. They should similarly be granted intervention here, whether as of right under Federal Rule of Civil Procedure 24(a)(2) or permissively under Rule 24(b).

Proposed Intervenors readily meet the requirements for intervention as a matter of right. *First*, their motion is timely, filed days after suit was commenced and before any substantive proceedings have occurred. *Second*, both organizations have an interest in the subject of the action and their ability to protect that interest will be impaired if Plaintiffs obtain the relief they seek. Vet Voice's mission focuses on increasing turnout among veterans, active servicemembers, and military families, including in Nevada. Extended receipt deadlines like the law at issue here play a critical role in enfranchising those voters. *See, e.g.*, *Splonskowski*, 2024 WL 402629, at *4 n.3 (observing that plaintiffs' requested relief is likely to "impinge upon the voting rights of members of the United States military" in dismissing similar challenge); *see also* Br. for U.S. as Amicus Curiae at 6, *Bost v. Ill. State Bd. Of Elections*, No. 23-2644 (7th Cir. Dec. 6, 2023), ECF No. 21 ("U.S. Amicus Curiae Br.") (explaining that late "ballot receipt deadlines . . . protect military and

---

[2] *See, e.g.*, *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 348–49 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *Bost v. Ill. State Bd. of Elections*, No. 22-CV-02754, 2023 WL 4817073, at *4 (N.D. Ill. July 26, 2023), *appeal pending* No. 23-2644 (7th Cir.); *Splonskowski v. White*, No. 1:23-CV-00123, 2024 WL 402629, at *4 (D.N.D. Feb. 2, 2024); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 366 (D.N.J. 2020); *see also Donald J. Trump for President, Inc. v. Way*, No. 20-10753 (MAS) (ZNQ), 2020 WL 6204477, at *11 (D.N.J. Oct. 22, 2020).

overseas voters' right to vote"); Statement of Interest of U.S. at 15, *Republican Nat'l Comm. v. Wetzel*, No. 1:24-cv-00025-LG-RPM (S.D. Miss. Apr. 11, 2024), ECF No. 84 (same). Furthermore, many of Vet Voice's constituents are veterans who contend with service-related disabilities that may cause them to struggle to access in-person voting, and rely on voting by mail as a result. The same is true of the Alliance, an organization that seeks to promote the interests of retirees, including by ensuring their ability to participate in elections. As older voters—many with disabilities—the Alliance's members also rely heavily on voting by mail. Granting Plaintiffs' requested relief would severely impair these significant interests Proposed Intervenors have in Nevada's mail ballot receipt deadline. *Finally*, the organizations' interests are not adequately represented in this suit. Plaintiffs actively seek to undermine those interests, and Defendants do not have the same focus on protecting the rights of the specific voter populations that Vet Voice and the Alliance serve, nor do they have any interest in avoiding the diversion of resources that the organizations would have to redirect away from other mission-critical efforts, should Plaintiffs succeed in obtaining an order that would suddenly require Nevada to reject any and all timely-cast ballots received after election day.

The Court should grant Proposed Intervenors' motion.

## BACKGROUND

### I.     Nevada's mail ballot voting laws.

Voting by mail is extremely popular in Nevada. In the most recent full federal election cycle, over half of Nevada voters cast mail ballots in both the primary and general elections.[3] In the recent February 6 primary election, nearly eighty percent of Nevada voters cast mail ballots.[4]

Nevada has adopted a comprehensive statutory scheme that governs the administration of mail ballot voting in the state, which includes numerous safeguards to ensure that only timely ballots cast by eligible voters are counted. For "every election," the county clerk sends a mail ballot to "each active registered voter in the county and each person who registers to vote or updates his

---

[3] *See* Nev. Sec'y of State, *Voter Turnout*, https://silverstateelection.nv.gov/vote-turnout/ (last accessed May 9, 2024) (showing 56.7% of primary voters cast mail ballots and 51.21% of general election voters).

[4] *See supra* n.3.

MOTION TO INTERVENE AS DEFENDANTS

or her voter registration information not later than the 14 days before the election," unless the voter chooses to opt out of receiving a mail ballot. NRS 293.269911. Along with the mail ballot, the county clerk sends each eligible voter a return envelope with "postage prepaid by first-class mail," a secrecy envelope, and instructions. NRS 293.269913. The county clerk is also required to record the date the mail ballot is issued, the name of the voter to whom it is issued, along with their precinct or district and political affiliation, and the number of the mail ballot. *Id.*

To cast their vote by mail ballot, a voter must then (1) mark and fold the mail ballot; (2) deposit the mail ballot in and seal the return envelope; (3) affix their signature on the return envelope in the space provided; and (4) mail or deliver the return envelope in a manner authorized by law. *See* NRS 293.269917.[5] In addition, if the voter opts to return their ballot by mail, it must be "[m]ailed to the county clerk, and: (1) [p]ostmarked on or before the day of the election; and (2) [r]eceived by the clerk not later than 5 p.m. on the fourth day following the election." NRS 293.269921(1)(b). "If a mail ballot is received by mail not later than 5 p.m. on the third day following the election and the date of the postmark cannot be determined, the mail ballot shall be deemed to have been postmarked on or before the day of the election." NRS 293.269921(2). This section—NRS 293.269921—is the provision at issue in this suit, *e.g.*, Compl. ¶¶ 3, 5, 69, and is referred to as the "Mail Ballot Receipt Deadline."

The current version of the Mail Ballot Receipt Deadline was enacted in 2021. *See* Act of June 2, 2021, Ch. 248, 2021, 2021 Nev. Laws 1213, 1214. It shortened the pre-existing mail ballot receipt deadline by three days, from "5 p.m. on the seventh day following the election" to 5 p.m. on the *fourth* day following the election. *Id.* As the law's sponsor, Assemblyman Frierson, explained, this change represented "the epitome of compromise." Assembly Comm. on Leg.

---

[5] Subject to certain statutory exceptions, the voter must mark and sign their own ballot. *See* NRS § 293.269919. There are additional requirements for first-time voters who did not provide proof of identification with their voter registration application. Those voters must include a copy of a valid photo identification that includes their address, and a secondary form of identification such as a utility bill, paycheck, or bank statement, inside their mail ballot return envelope. *See* NRS 293.2725. Failure to do so results in their ballot being treated as a provisional ballot, which will not be counted, unless the voter satisfactorily responds to the county clerk, who must contact the voter and allow them to provide the necessary proof of identification "before 5 p.m. on the sixth day following the election[.]" NRS 293.269915(3)(b)(2).

MOTION TO INTERVENE AS DEFENDANTS

Operations & Elections, April 1, 2021 Meeting Minutes at 5, available at https://www.leg.state.nv.us/Session/81st2021/Minutes/Assembly/LOE/Final/663.pdf. Far from being an outlier, Nevada is one of over twenty states and territories that have similar laws that allow ballots mailed by voters by election day to be counted if they are received within a certain period after election day.[6] Among these states and territories, Nevada's Mail Ballot Receipt Deadline is relatively modest—most allow even *more* time for timely-cast ballots to arrive after election day.[7]

Ballots that are timely received are then subject to a signature confirmation process. *See* NRS 293.269927. If at least two reviewers believe there is a reasonable question of fact as to whether the signature on the ballot envelope matches the voter's signature on their voter registration application, the clerk "shall contact the voter and ask the voter to confirm whether the signature used for the mail ballot belongs to the voter." *Id.* (3)(b). "For the mail ballot to be counted, the voter must provide a signature or a confirmation, as applicable, not later than 5 p.m. on the sixth day following the election." *Id.*(6). Nevada's signature confirmation process therefore contemplates certain administrative acts—such as a voter curing a signature flagged as a possible mismatch—occurring after election day. And many other key acts of election administration also happen after election day by both necessity and statutory design. *E.g.*, NRS 293.387(1) ("The canvass must be completed on or before the 10th day following the election."); NRS 293.413 (election contest must be filed no later than 14 days after election); NRS 293.403 (recount must be requested no later than three days after canvass); NRS 293.391 (requiring preservation of ballots for certain period of time and two week notice before their destruction).

---

[6] *See Tbl. 11: Receipt & Postmark Deadlines for Absentee/Mail Ballots*, Nat'l Conf. of State Legs. (Mar. 18, 2024), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots; Alaska Stat. § 15.20.081(e), (h) (must be received within 10 days of election day); Cal. Elec. Code § 3020 (7 days); 10 Ill. Comp. Stat. § 5/19-8(c) (14 days); Kan. Stat. § 25-1132 (3 days); Md. Code, Elec. Law § 9-309 (10 days); Mass. Gen. Laws ch. 54, § 93 (3 days); Miss. Code Ann. § 23-15-637 (5 business days); N.J. Stat. § 19:63-22 (6 days); N.Y. Elec. Law § 8-412 (7 days); Ohio Rev. Code § 3509.05 (4 days); Or. Rev. Stat. § 253.070 (7 days); Tex. Elec. Code § 86.007 (1 day); Utah Code § 20A-3a-204 (7–14 days); Va. Code § 24.2-709 (3 days); Wash. Rev. Code § 29A.40.091 (no specific receipt deadline); W. Va. Code §§ 3-3-5, 3-5-17 (5 days); D.C. Code § 1-1001.05(a)(10A) (7 days); P.R. Code Ann. tit. 16 § 4736 (day of canvass); V.I. Code tit. 18, § 665 (10 days).

[7] *See* supra n.6.

MOTION TO INTERVENE AS DEFENDANTS

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

The election-related activities that occur in Nevada after election day also include the actual counting of mail ballots. Each county clerk is required to appoint a mail ballot central counting board, which is responsible for publicly counting mail ballots. *See* NRS 293.269931. This board must complete its count by the *seventh* day following the election—three days after the Mail Ballot Receipt Deadline. *Id.*[8] Once the mail ballot central counting board completes its tally, it must certify and submit the mail ballot vote results to the county clerk, who then adds the results to the votes that were not cast by mail ballot. NRS 293.269935. This must be completed by the *tenth* day after the election. *See* NRS 293.387(1).

As explained below, the Mail Ballot Receipt Deadline is critical to ensuring that the Proposed Intervenor-Defendants' members and constituents—including military voters and their families, as well as senior and disabled voters—can have their ballots counted. And it forms just one part of Nevada's comprehensive mail balloting scheme, much of which contemplates certain events occurring in the days following the election.

**II.     Proposed Intervenor-Defendants.**

Proposed Intervenor-Defendants Vet Voice and the Nevada Alliance for Retired Americans are non-profit, non-partisan organizations dedicated to supporting the voting rights of their members and constituents. Both groups have significant organizational and associational interests at stake in this litigation and they represent members and constituents who will be acutely harmed by Plaintiffs' efforts to eliminate Nevada's common-sense Mail Ballot Receipt Deadline. Both Vet Voice and the Nevada Alliance's sister organization in Mississippi were recently granted intervention in a nearly identical challenge to Mississippi's mail ballot receipt deadline that was also brought by the RNC and its state affiliate. *See Republican Nat'l Comm. v. Wetzel*, No. 1:24-cv-25-LG-RPM, 2024 WL 988383, at *1 (S.D. Miss. Mar. 7, 2024) (noting Vet Voice and the Mississippi Alliance for Retired Americans were granted intervention on March 4, 2024).

---

[8] The mail ballot central counting board must be appropriately staffed to handle the volume of mail ballots sent to each active registered voter in each county, and the election board officers for the mail ballot central counting board "must not all be of the same political party." NRS 293.269929(2). These board members serve "under the direction of the clerk," *id.* 293.269929(4), and Nevada law does not guarantee any political party the right to place its own handpicked members on the board or to control their efforts.

MOTION TO INTERVENE AS DEFENDANTS

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

***Vet Voice***. Vet Voice is a national non-profit, non-partisan organization dedicated to empowering veterans across the country to become civic leaders and policy advocates. *See* Ex. 1, Declaration of Janessa Goldbeck ¶¶ 3, 5 ("Goldbeck Decl."). It has over 1.5 million subscribers who receive Vet Voice communications, including thousands here in Nevada. *Id.* ¶ 4. Beyond those who affirmatively subscribe to its communications, Vet Voice's constituency broadly includes active servicemembers, including those deployed away from home, as well as military veterans, many of whom are older or have physical disabilities (oftentimes attributable to their time in service) that make voting in person difficult. *Id.* ¶¶ 8–9. Increasing voter turnout among military and veteran voters, as well as their families, is critical to Vet Voice's mission. *Id.* ¶ 5. Vet Voice strongly believes that turning out the "veteran vote" benefits all Americans by engaging people who have served their country in the civic process, and aims to promote turnout among all veterans, regardless of their political beliefs. *Id.* ¶¶ 5–6, 13.

Military voters and veterans often face challenges in exercising their right to vote. For example, active-duty servicemembers and their families are oftentimes deployed away from home, making it physically impossible for them to appear in person at their local polling sites on election day. *Id.* ¶ 8. Such servicemembers are highly reliant on mail voting to exercise the franchise. *Id.* Vet Voice's CEO, Janessa Goldbeck, has firsthand knowledge of these challenges. During her seven years in the U.S. Marine Corps, she personally had to rely on mail voting to cast her ballot on several occasions, including in 2012 when she was not able to leave officer training school at Marine Corps Base Quantico. *Id.* ¶¶ 7, 11. Veteran voters also often face obstacles voting in person, either due to age or disability. *Id.* ¶ 9.

Roughly three-quarters of America's 1.4 million active servicemembers are eligible to vote by mail. *Id.* ¶ 8. Despite this right, active servicemembers vote at significantly lower rates than the national population. *Id.* ¶ 10. These voters depend heavily on mail ballot voting, *id.*, which they are permitted to use under Nevada law, *see* NRS 293.269911(1). As the Department of Justice has repeatedly noted, laws like the Mail Ballot Receipt Deadline are particularly important to guard against the systemic disenfranchisement of military voters and their families due to obstacles such as long mail transit times. *See* U.S. Amicus Curiae Br. at 23–28 (discussing challenges faced by

MOTION TO INTERVENE AS DEFENDANTS

military and overseas voters and the importance of extended ballot receipt deadlines to such voters); Statement of Interest of U.S. at 1, 10–15, *Splonskowski v. White*, No. 1:23-cv-00123-DMT-CRH (D.N.D. Sept. 11, 2023), ECF No. 19 (explaining extended ballot receipt deadlines "can be vital in ensuring that military and overseas voters are able to exercise their right to vote"); Statement of Interest of U.S. at 15, *Republican Nat'l Comm. v. Wetzel*, No. 1:24-cv-00025-LG-RPM (S.D. Miss. Apr. 11, 2024), ECF No. 84 (same); Goldbeck Decl. ¶¶ 10–12.

Vet Voice dedicates significant resources, including money, personnel time, and volunteer effort, to improving military and veteran voter turnout rates. Goldbeck Decl. ¶ 14. It has developed a first-of-its kind military voter file containing approximately 14 million records of veterans and military family members, including records for over 120,000 voters in Nevada. *Id.* ¶ 6. Vet Voice uses this voter file to directly reach out to military voters, often by facilitating veteran-to-veteran communications—including in Nevada. *Id.* ¶ 15. In the 2020 general election, Vet Voice sent over 2.5 million texts to 1.5 million military voters and saw a substantial increase in turnout among contacted voters versus non-contacted voters. *Id.* Vet Voice is actively building this voter file to prepare for voter education and mobilization efforts in the 2024 general election, including in Nevada. *Id.* ¶ 16. On top of this, Vet Voice also engages in more traditional forms of voter engagement, including direct mailers, phone banking, rural radio advertising, and digital advertising. *Id.* ¶ 19. Given the importance of mail voting to Vet Voice's constituencies, these contacts often focus on educating military voters about how to vote by mail, including by providing information about eligibility requirements, application deadlines, and deadlines for submitting ballots. *Id.* ¶ 21.

Nevada is a particularly critical state for Vet Voice. *Id.* ¶ 17. According to the U.S. Census Bureau, as of 2022, 8.3 percent of Nevada's population served in the military, placing it seventh in the country in terms of veteran share of the population. *Id.*[9] Vet Voice has already identified and plans to target approximately 10,000 individual veteran and military-affiliated voters in Nevada to mobilize them to vote in the 2024 elections using direct mail and text messages. *Id.* ¶ 18. And Vet

---

[9] *See also* Alice Feng, *Mapped: The U.S. states with the highest and lowest shares of veterans*, Axios (Nov. 10, 2023), https://www.axios.com/2023/11/10/map-where-veterans-live-us.

MOTION TO INTERVENE AS DEFENDANTS

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

Voice already has staff on the ground in Nevada. *Id.*

If successful, Plaintiffs' challenge will make it harder for Vet Voice's supporters and constituents—including active-duty servicemembers and veterans—to successfully cast a mail ballot in Nevada. *Id.* ¶ 22. Mail ballot voters—and in particular active-duty servicemembers deployed overseas, in combat zones, or on ships and submarines—lack control over the mail, which is oftentimes unreliable for deployed members. *Id.* ¶¶ 12, 23. In addition to threatening Vet Voice's supporters and constituents, Plaintiffs' challenge also frustrates Vet Voice's effort to effectively plan voter engagement and mobilization efforts in Nevada—a mission-critical state for the organization—ahead of the 2024 election. *Id.* ¶¶ 16–22. Vet Voice must understand the relevant legal landscape before preparing its voter education efforts. *Id.* ¶ 21. It seeks to intervene in this case to protect the voting rights of its supporters and constituencies, settle the legal landscape for its voter education efforts ahead of the 2024 election, and protect its own significant expenditure of resources in promoting mail ballot voting. *Id.* ¶¶ 21–24.

***The Alliance***. The Alliance for Retired Americans is a non-partisan 501(c)(4) membership organization with over 4.4 million members nationwide. Ex. 2, Declaration of Thomas Bird ¶ 3 ("Bird Decl."). Its mission is to ensure the social and economic justice and full civil rights that retirees have earned after a lifetime of work, with a particular emphasis on safeguarding the right to vote. *Id.* ¶ 4. The Alliance's Nevada chapter, the Nevada Alliance for Retired Americans, has approximately 20,000 members comprising retirees from numerous public and private sector unions, members of community organizations, and individual activists. *Id.* ¶ 3. It works with 20 affiliated chapters—comprised of other union and community groups—across Nevada. *Id.* ¶ 5. A major focus of the Alliance's work is attending these chapter meetings to speak with members about key policy goals, such as preserving Social Security and Medicare. *Id.*

Ensuring access to the ballot is also a critical piece of the Alliance's mission, and accordingly it dedicates significant effort to voter registration and voter education efforts. *Id.* ¶¶ 4, 6, 8–9. The Alliance, its members, and volunteers undertake numerous activities to register and educate voters about how to vote, including door knocking, phone banking, Zoom meetings, postcard parties, and appearing at community events like health fairs and labor union conventions.

*Id.* ¶ 9. The Alliance often partners with other non-partisan organizations to host these voter education events across Nevada. *Id*. The Alliance also hosts retirement forums and conventions, during which it provides speakers and presentations about registering to vote and voting, including on the mechanics of voting by mail. *Id*. In addition to appearing at community events, many of the Alliance's members and volunteers also speak with family, friends, neighbors, and others about voting. *Id.* ¶ 10. The Alliance frequently answers questions related to voting, and strives to be a central information source for voters so that if the Alliance isn't aware of the answer to a particular question, the Alliance will help track it down and report back. *Id.* The Alliance's members are a very engaged group and are likely to have a lot of questions that require time and resources to address. *Id.* The Alliance also helps educate its members by sharing articles and posting information and resources on social media posts. *Id.*

The Alliance's members are highly reliant on mail ballot voting. *Id.* ¶ 6. Thomas Bird, the President of the Alliance, estimates that a majority of the group's membership votes by mail. *Id*. These members choose to vote by mail for many reasons: they may lack transportation to make it to the polls, not be comfortable standing in long lines at polling places, have a disability or injury that makes in-person voting difficult, prefer for health reasons not to wait a long time in-person to vote, lack spousal support, want to avoid potential voter intimidation or harassment at the polls, or simply prefer to spend more time with their ballot while completing it from the comfort of their kitchen table. *Id.* Many of the Alliance's members are also concerned with increasing mail delays, which can impact everything from their timely receipt of prescription medication by mail or their ability to successfully vote a mail ballot. *Id.* ¶ 7.

If Plaintiffs' suit is successful, the Alliance's members will face increased risk of having their mail ballots rejected. *Id.* ¶ 6. As a result, the Alliance would divert its limited resources to help its members sign up for various mail tracking systems, ranging from the U.S. Postal Service's informed delivery service to the state of Nevada's ballot tracking service (Ballottrax), so they can keep track of the timing of their mail ballot. *Id.* ¶ 8. Many of the Alliance's members are not comfortable with technology and have concerns with fraud, and will require individualized assistance in signing up for these services. *Id.* The Alliance will also have to fundamentally reshape

- 10 -

1   their voter education activities to emphasize the risk of mail ballots not being counted, at the

2   expense of other mission-critical issues. *Id.* ¶ 9.

3       The Alliance seeks to intervene in this case to protect its members' right to cast mail ballots

4   under Nevada law, as well as their right to vote generally. *Id.* ¶ 6. It also seeks to protect its ongoing

5   voter education efforts. *Id.* ¶¶ 4, 8, 10.

6   **STANDARD OF LAW**

7       "Rule 24 traditionally receives liberal construction in favor of applicants for intervention."

8   *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003); *see also W. Expl. LLC v. U.S. Dep't of*

9   *Interior*, No. 3:15-cv-00491-MMD-VPC, 2016 WL 355122, at *2 (D. Nev. Jan. 28, 2016) (noting

10   Rule 24's liberal construction and "focus[] on practical considerations rather than technical

11   distinctions").

12       The Ninth Circuit "require[s] applicants for intervention as of right pursuant to Rule

13   24(a)(2) to meet a four-part test":

14           (1) the motion must be timely; (2) the applicant must claim a
15           "significantly protectable" interest relating to the property or
        transaction which is the subject of the action; (3) the applicant must
16           be so situated that the disposition of the action may as a practical
        matter impair or impede its ability to protect that interest; and (4)
17           the applicant's interest must be inadequately represented by the
        parties to the action.

18   *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010) (quoting *Cal. ex rel.*

19   *Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006)).

20       "Rule 24(b) permits the Court to allow anyone to intervene who submits a timely motion

21   and 'has a claim or defense that shares with the main action a common question of law or fact.'"

22   *Nevada v. United States*, No. 3:18-cv-569-MMD-CBC, 2019 WL 718825, at *2 (D. Nev. Jan. 14,

23   2019) (quoting Fed. R. Civ. P. 24(b)(1)(B)). In addition to a common question of law or fact,

24   permissive intervention under Rule 24(b) also requires (1) a timely motion and (2) an independent

25   basis for the court's jurisdiction. *See Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998).

26

27

28

Finally, Rule 24(c) requires that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c).[10]

## ARGUMENT

**I.    Vet Voice and the Alliance are entitled to intervene as of right under Rule 24(a).**

**A.    The motion is timely.**

This motion is timely, filed mere days after Plaintiffs initiated this suit and before any Defendant has appeared in the case or any substantive activity has occurred. "In determining whether a motion for intervention is timely, [courts in this Circuit] consider three factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997) (cleaned up). Each of these considerations supports a finding of timeliness here.

*First*, these proceedings are at their earliest stages. Plaintiffs filed their complaint on May 3, 2024; this motion follows just seven days later. Plaintiffs have not yet filed proof of service; Defendants have not yet appeared or filed a responsive pleading; and no case schedule has been set. *See, e.g.*, *Nevada*, 2019 WL 718825, at *2 (granting motion to intervene filed several weeks after action commenced); *W. Expl.*, 2016 WL 355122, at *2 (granting motion to intervene filed nearly two months after action commenced).

*Second*, permitting Proposed Intervenors to participate poses no risk of prejudice or delay to the existing parties. Proposed Intervenors will agree to any schedule stipulated to by the principal parties and, of course, will abide by all deadlines and schedules set by the Court. *See, e.g.*, *Portfolio FB-Idaho, LLC v. Fed. Deposit Ins. Corp. as Receiver for First Bank of Idaho*, No. 1:10-CV-377-BLW, 2010 WL 5391442, at *4 (D. Idaho Dec. 17, 2010) (finding no risk of prejudice where "discovery has yet to commence, no original deadlines have expired, and [intervenor] represents that it can quickly file a responsive brief").

---

[10] In compliance with Rule 24(c), Proposed Intervenors attach a proposed Answer to this Motion. Proposed Intervenors believe, however, that the Complaint should be dismissed under Federal Rule of Civil Procedure 12(b), and intend to file a Rule 12(b) motion by no later than the named Defendants' deadline to respond to the Complaint.

MOTION TO INTERVENE AS DEFENDANTS

*Finally*, "the reason for and length of the delay" has no relevance here because there has been no delay whatsoever. *See, e.g.*, *W. States Trucking Ass'n v. Schoorl*, No. 2:18-CV-1989-MCE-KJN, 2018 WL 5920148, at *1 (E.D. Cal. Nov. 13, 2018) (finding there had "been no delay" where party "sought to intervene [at] the very outset of litigation").

Proposed Intervenors' motion thus satisfies the first requirement for intervention as of right: it is timely.

> **B.** **The case threatens Proposed Intervenors' significant interests in promoting and protecting their members' and constituents' voting rights and in avoiding diversion of mission-critical resources.**

Vet Voice and the Alliance also satisfy the second and third requirements for intervention because they have significant protectable interests in this lawsuit, and the action threatens to impair their ability to protect those interests. Under the liberal standard governing intervention, Proposed Intervenors need only show that their interests would be "'substantially affected in a practical sense by the determination made in an action.'" *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001) (quoting Fed. R. Civ. P. 24 advisory committee note to 1966 amendment). They need not show that impairment is "an absolute certainty." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 900 (9th Cir. 2011). Notably, Rule 24(a)'s interest requirement is less stringent than Article III's standing requirements, and the threatened impairment of Proposed Intervenors' practical interests in the case also need not rise to the level of an injury-in-fact. *See Yniguez v. Arizona*, 939 F.2d 727, 735 (9th Cir. 1991). Generally, after determining the applicant has a protectable interest, courts have "little difficulty concluding" that the disposition of the case may affect such interest. *Lockyer*, 450 F.3d at 442 (citing *Berg*, 268 F.3d at 822).

Vet Voice and the Alliance easily satisfy these requirements. Plaintiffs' challenge to the Mail Ballot Receipt Deadline seeks to restrict the ability of Vet Voice's and the Alliance's members, supporters, and constituents to successfully cast a mail ballot in Nevada's elections. *See* Compl. at 16 (seeking to enjoin § 293.269921). Both Vet Voice and the Alliance serve communities that rely heavily on mail ballots to vote. Vet Voice, for example, spends significant resources to promote voting among active service members and military family members, many

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

MOTION TO INTERVENE AS DEFENDANTS

of whom are often stationed away from their permanent homes and depend on mail ballots to participate in elections. Goldbeck Decl. ¶¶ 14, 20. Similarly, many veterans in Nevada rely on mail voting as well. *Id.* ¶ 9. Vet Voice's military voter file includes over 120,000 Nevada servicemembers, veterans, and military family members, *id.* ¶ 6, and Vet Voice has over 14,000 Nevada subscribers whom the group seeks to mobilize in furtherance of its mission, *id.* ¶ 4. Vet Voice's mission is to ensure that all of these voters have full access to the ballot box and that military voters are heard at the polls. *Id.* ¶¶ 5–6.

Similarly, the Alliance has many members in Nevada who rely on mail voting due to the greater obstacles they face voting in person, whether due to age or disability. Bird Decl. ¶ 6. They vote by mail because, among other reasons, they lack transportation or are not comfortable standing in long lines at polling places. *Id.* Nevada historically has long wait times on election day, making the option to vote by mail critical to the Alliance's members, many of whom have more difficulty overcoming such obstacles. *Id.* If Plaintiffs succeed, the Alliance's members will accordingly face heightened risks of having their mail ballots rejected. *Id.* Ensuring access to the ballot is a critical piece of the Alliance's mission. *Id.*

Plaintiffs expressly seek a federal judicial order that would prohibit Nevada from counting any mail ballots that are received after election day, even if they were timely cast, and even where events outside of the voter's control delay arrival of their ballots. This directly threatens the voting rights of the communities Vet Voice and the Alliance serve, as well as the Alliance's individual members. Goldbeck Decl. ¶¶ 22–24; Bird Decl. ¶¶ 6–7. Accordingly, Proposed Intervenors have an important protectable interest that they may assert on behalf of their members, supporters, and constituents where, as here, litigation threatens to "abrogate[]" their "right to vote in elections" by mail. *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 434–35 (5th Cir. 2011) (reversing denial of intervention and concluding voting right interest was "a sufficient interest to satisfy Rule 24(a)(2)"); *see also Texas v. United States*, 805 F.3d 653, 658–59 (5th Cir. 2015) (explaining the "interest in vindicating [the] personal right to vote was sufficiently concrete and specific to support intervention" (citing *City of Boerne*, 659 F.3d at 434)); *Powell v. Benson*, No. 20-CV-11023, 2020 WL 5229104, at *5 (E.D. Mich. Sept. 2, 2020) (concluding voter's legal

MOTION TO INTERVENE AS DEFENDANTS

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

interest in protecting her right to vote "established her substantial legal interest" warranting intervention).

Indeed, courts within this Circuit have recognized an organization's interest in protecting its members voting rights *satisfies even the "more stringent" requirement of Article III*, which "compels the conclusion that [such organizations] have an adequate interest" for purposes of Rule 24. *Yniguez*, 939 F.2d at 735; *see also Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *29–32 (D. Ariz. Feb. 29, 2024) (finding organizations had standing to protect members' voting rights); *March for Our Lives Idaho v. McGrane*, No. 1:23-CV-00107-AKB, 2023 WL 6623631, at *7 (D. Idaho Oct. 11, 2023) (similar); *cf. Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096–97 (9th Cir. 2021) (holding that organizations may sue on behalf of non-member constituents even under the more-demanding Article III test); *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 573–74 (6th Cir. 2004) (holding risk that some voters will be disenfranchised confers standing upon labor organizations and political parties).

Both groups also have significant protectable interests in this lawsuit independent from their associational interest in their members' and constituents' voting rights, because the relief Plaintiffs seek will impact how Vet Voice and the Alliance allocate their resources, including financial resources as well as volunteer and staff time, as they prepare to educate and turn out their members and constituents for the 2024 elections. *See, e.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) ("[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose."). Both Vet Voice and the Alliance are in the process of preparing their voter engagement and get-out-the-vote campaigns for 2024, and plan to devote significant resources to encourage their members and supporters in Nevada to apply for mail ballots, and to assist them in successfully casting those ballots. Goldbeck Decl. ¶¶ 18–21; Bird Decl. ¶¶ 4, 8–11. Those political expenditures are themselves a "legally protectable interest" warranting intervention. *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022) ("*LUPE*") (holding political parties had a "legally protectable interest" sufficient to intervene in an action challenging restrictions on poll watchers because they "expend significant resources in

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

MOTION TO INTERVENE AS DEFENDANTS

the recruiting and training of volunteers and poll watchers who participate in the election process").

Plaintiffs' suit seeks to "change[] the legal landscape," *id.*, for Vet Voice's and the Alliance's resource-intensive efforts to encourage and assist voters casting mail ballots. Goldbeck Decl. ¶¶ 21–23; Bird Decl. ¶¶ 4, 8–11. They seek to intervene, in part, to avoid the disruption that Plaintiffs' requested relief would cause to their voter education and engagement plans for the upcoming general election. *See Cnty. of San Miguel v. MacDonald*, 244 F.R.D. 36, 47 (D.D.C. 2007) (granting intervention where plaintiffs' requested relief would require "the expenditure of additional time and resources" by intervenors (internal citation omitted)); *cf. Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018) (finding standing where law required organization "to retool [its] [get-out-the-vote] strategies and divert [] resources"), *rev'd on other grounds sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc).

Vet Voice's and the Alliance's abilities to protect their interests, as well as the interests of their members and constituents, will be significantly impaired if they are not permitted to intervene. Because Proposed Intervenors "have a significant protectable interest," the court should have "little difficulty concluding that the disposition of the case may, as a practical matter, affect it." *Citizens for Balanced Use*, 647 F.3d at 898 (cleaned up). Plaintiffs do not seek relief impacting themselves alone. Rather, they seek immediate injunctive and declaratory relief that, if granted, will likely determine the rules for *all* Nevada mail ballot voters in the forthcoming 2024 general election and beyond. Many of the people served by Vet Voice and the Alliance, as well as the Alliance's members, plan to vote by mail in the 2024 general election, and both organizations are currently preparing their voter outreach and get-out-the-vote strategies for that election in Nevada. Goldbeck Decl. ¶¶ 18–21; Bird Decl. ¶¶ 4, 6. This case will likely set the rules of the road for those efforts, and Vet Voice, the Alliance, and the communities they serve in Nevada will have no other opportunity to weigh in on Plaintiffs' attempt to rewrite state election law. Simply put, the law Plaintiffs seek to overturn—NRS 293.269921—"grants rights to [the Proposed Intervenors] and their members that could be taken away if the plaintiffs prevail." *LUPE*, 29 F.4th at 307 (holding political committees "established that their interest may be impaired" where litigation impacted "election landscape"). And, if Plaintiffs succeed and Section 293.269921 is struck down, "the

MOTION TO INTERVENE AS DEFENDANTS

proposed intervenors will have no alternative forum in which they might contest" that result. *Lockyer*, 450 F.3d at 443.

Further, as shown by its parallel suit in Mississippi, this suit is part of a nationwide effort by the RNC and its allies to roll back laws meant to make it easier for voters to cast mail ballots. *See supra* 1–2; *see also* Goldbeck Decl. ¶ 24. Vet Voice and the Alliance's Mississippi chapter successfully intervened in that litigation to defend the same interests at stake here. Denying their intervention in this case would imperil the interests Proposed Intervenors are already actively defending in Mississippi, rewarding the RNC for filing a multiplicity of lawsuits as part of its nationwide attack on similar mail ballot deadline rules.

### C. Proposed Intervenors' interests are not adequately represented by the existing parties in this case.

Proposed Intervenors will not be assured adequate representation in this matter if they are denied intervention. "[T]he requirement of inadequacy of representation is satisfied if the applicant shows that representation of its interests '*may b*e' inadequate," and therefore "the burden of making this showing is minimal." *W. Expl.*, 2016 WL 355122, at *3 (quoting *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983)) (emphasis added); *see also Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). Accordingly, courts are "liberal in finding" this requirement to be met because "there is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests." 7C Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1909 (3d ed. 2023). The Ninth Circuit "stress[es] that intervention of right does not require an absolute certainty . . . that existing parties will not adequately represent [an intervenor's] interests." *Citizens for Balanced Use*, 647 F.3d at 900. Here, neither Plaintiffs nor Defendants are assured to adequately represent Proposed Intervenors' interests. As to Plaintiffs, little needs to be said: Plaintiffs seek to abridge the period of time in which a mail ballot may be received by Nevada election officials on the cusp of a major general election. Proposed Intervenors strongly oppose that result.

While the Secretary of State and various county official defendants may oppose relief, it does not follow that they will adequately represent Proposed Intervenors' interests. Courts have

MOTION TO INTERVENE AS DEFENDANTS

"often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003); *accord Citizens for Balanced Use*, 647 F.3d at 899 ("[T]he government's representation of the public interest may not be 'identical to the individual parochial interest' of a particular group just because 'both entities occupy the same posture in the litigation.'" (quoting *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 996 (10th Cir. 2009))). Courts within this District have often reached the same conclusion in election cases. *See, e.g.*, *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM (VCF), 2020 WL 5229116, at *1 (D. Nev. Aug. 21, 2020) (granting intervention as of right because Secretary did not adequately represent organization's interests, despite both wishing to defend against suit); *Paher v. Cegavske*, No. 3:20-CV-00243-MMD-WGC, 2020 WL 2042365, at *3 (D. Nev. Apr. 28, 2020) (similar, even where intervenors and named defendant "presumably share[d] the goal of protecting the all-mail election provisions . . . being challenged"); *Fair Maps Nev. v. Cegavske*, No. 3:20-CV-00271-MMD-WGC, 2020 WL 8188427, at *3 (D. Nev. May 20, 2020) (similar).

The Supreme Court itself has recently emphasized that executive officials will not often be adequate representatives for partisan or private actors who seek to intervene under Rule 24. *See Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 194–97 (2022). In *Berger*, the Supreme Court reiterated its longstanding instruction that even when state agents pursue "related" interests to proposed intervenors, those interests are not properly considered "identical." *Id.* at 197 (quoting *Trbovich*, 404 U.S. at 538–39). The Court then explained that, "[w]here 'the absentee's interest is similar to, but not identical with, that of one of the parties,' that normally is not enough to trigger a presumption of adequate representation." *Id.* (quoting Wright & Miller, *supra*, § 1909). In particular, the Court stressed that whereas actors like the named Defendants must "bear in mind broader public-policy implications," *id.* at 196, Proposed Intervenors' sole interest rests in protecting the ability of their members and constituents to vote. *See, e.g.*, Goldbeck Decl. ¶ 22; Bird Decl. ¶¶ 4, 6. Proposed Intervenors and the named Defendants do not "share the same 'ultimate objective.'" *Citizens for Balanced Use*, 647 F.3d at 898.

It is therefore immaterial that Vet Voice and the Alliance would "fall on the same side of the dispute" as the existing Defendants—which is always the case with intervention. *Issa v. Newsom*, No. 22-CV-1044-MCE-CKD, 2020 WL 3074351, at *3 (E.D. Cal. June 10, 2020). "While Defendants' arguments turn on their inherent authority as state executives and their responsibility to properly administer election laws, the Proposed Intervenors are concerned with ensuring their . . . members [and supporters] . . . have the opportunity to vote" by mail and in "allocating their limited resources to inform voters about the election procedures." *Id.*; *cf. Democratic Party of Va. v. Brink*, No. 3:21-cv-756-HEH, 2022 WL 330183, at *2 (E.D. Va. Feb. 3, 2022) (observing that the "[state's] interests are to defend [the state's] voting laws no matter the political repercussions while [intervenor's] interest is to defend the voting laws when doing so would benefit its" members or supporters).

## II. Alternatively, the Court should grant permissive intervention under Rule 24(b).

Vet Voice and the Alliance also satisfy the requirements for permissive intervention. Under Rule 24(b), the Court may "allow anyone to intervene who submits a timely motion and 'has a claim or defense that shares with the main action a common question of law or fact.'" *Nevada*, 2019 WL 718825, at *2 (quoting Fed. R. Civ. P. 24(b)).[11] If these conditions are met, the court may then consider other factors in making its discretionary decision, including:

> the nature and extent of the intervenors' interest, their standing to raise relevant legal issues, the legal position they seek to advance, and its probable relation to the merits of the case. The court may also consider whether changes have occurred in the litigation so that intervention that was once denied should be reexamined, whether the intervenors' interests are adequately represented by other parties, whether intervention will prolong or unduly delay the litigation, and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.

---

[11] The Ninth Circuit has explained that "a district court has discretion to permit intervention when the movant presents (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action." *Callahan v. Brookdale Senior Living Comm'ys, Inc.*, 42 F.4th 1013, 1022 (9th Cir. 2022) (quotation marks omitted). However, an independent ground for jurisdiction "is unnecessary where, as here, in a federal question case the proposed intervener raises no new claims." *Nevada*, 2019 WL 718825, at *2 (citing *Freedom from Religion Found. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011)).

MOTION TO INTERVENE AS DEFENDANTS

1   *Callahan*, 42 F.4th at 1022 (citation omitted).

2          Courts routinely grant permissive intervention to voting rights and other advocacy

3   organizations in actions involving burdens on voting rights. *See, e.g.*, *Pub. Int. Legal Found., Inc.*

4   *v. Winfrey*, 463 F. Supp. 3d 795, 802 (E.D. Mich. 2020) (permitting voting rights organization to

5   intervene in an action brought to compel local election officials to purge the voter rolls of ineligible

6   voters); *Kobach v. U.S. Election Assistance Comm'n*, No. 13-CV-4095-EFM-DJW, 2013 WL

7   6511874, at *5 (D. Kan. Dec. 12, 2013) (allowing voting rights, civil rights, and other advocacy

8   organizations to intervene in an action brought to compel voter registration applications to submit

9   proof-of-citizenship documents); *see also League of Women Voters of N.C. v. North Carolina*, No.

10  1:13CV660, 2014 WL 12770081, at *3 (M.D.N.C. Jan. 27, 2014) (permitting individual voters to

11  intervene in action challenging a series of restrictions on voting). Indeed, one district court granted

12  permissive intervention to organizations that, like Vet Voice and the Alliance, "engage in voter

13  advocacy and education to increase voting participation in elections" in a case raising substantially

14  similar legal questions about the meaning of the federal election day statutes. *Donald J. Trump for*

15  *President, Inc. v. Murphy*, No. CV-20-10753 (MAS) (ZNQ), 2020 WL 6573382, at *2 (D.N.J.

16  Sept. 23, 2020).

17          As discussed above, the motion to intervene is timely, Plaintiffs' challenge to Nevada law

18  threatens significant harm to Vet Voice's and the Alliance's legally protected interests, and Vet

19  Voice and the Alliance cannot rely on Defendants to adequately protect their interests. Vet Voice

20  and the Alliance raise arguments against Plaintiffs' claims that are likely to share common

21  questions of law and fact with the main action, including with respect to the Plaintiffs' flawed

22  standing theories and the discredited reading of federal law upon which Plaintiffs base their entire

23  suit. *See generally* Ex. 3, Proposed Intervenors' Proposed Answer. And intervention will result in

24  neither prejudice nor undue delay. As shown by their prompt effort to intervene, Vet Voice and

25  the Alliance have an interest in swift resolution of this action to ensure that every eligible

26

27

28

1   Nevadan—and particularly those in the communities the two organizations serve—is able to cast

2   a ballot and have that ballot counted in the coming election.[12]

3          Finally, Vet Voice and the Alliance were granted intervention in a substantively identical

4   challenge to Mississippi's mail ballot receipt deadline brought by the RNC just a few months

5   ago,and have fully briefed cross-motions for summary judgment in that case. Proposed Intervenors

6   have a strong interest in ensuring that Plaintiffs do not simply pull up stakes from Mississippi and

7   move to Nevada to achieve the same ultimate end—a nationwide roll back of laws that permit

8   timely-cast ballots to count if they arrive shortly after the election. Vet Voice and the Alliance—

9   and their counsel—are also fully acquainted with the factual and legal issues likely to arise in this

10  litigation as a result of their efforts in Mississippi. Accordingly, Proposed Intervenors'

11  participation in this this case "will significantly contribute to full development of the underlying

12  factual issues in the suit and to the just and equitable adjudication of the legal questions presented."

13  *Callahan*, 42 F.4th at 1022 (citation omitted).

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26

27  _____

[12] Moreover, Vet Voice and the Alliance agree to be bound by any case schedule set by the Court
28  or agreed to by the principal parties.

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

MOTION TO INTERVENE AS DEFENDANTS

- 21 -

**CONCLUSION**

For the reasons stated above, Vet Voice and the Alliance respectfully request that the Court grant their motion to intervene as a matter of right under Rule 24(a)(2) or, in the alternative, permit them to intervene under Rule 24(b). A proposed pleading—Vet Voice and the Alliance's Proposed Answer—is attached hereto. *See* Ex. 3.

Dated this 10th day of May, 2024.

**BRAVO SCHRAGER LLP**

By:      */s/ Bradley S. Schrager*
BRADLEY S. SCHRAGER, ESQ. (SBN 10217)
DANIEL BRAVO, ESQ. (SBN 13078)
6675 South Tenaya Way, Suite 200
Las Vegas, Nevada 89113

DAVID R. FOX, ESQ. (SBN 16536)
CHRISTOPHER D. DODGE, ESQ. (*pro hac vice forthcoming*)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001

*Attorneys for Proposed Intervenor-Defendants,*

MOTION TO INTERVENE AS DEFENDANTS

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of May, 2024, a true and correct copy of Proposed Intervenors' Motion to Intervene as Defendants was served via the United States District Court's CM/ECF system on all parties or persons requiring notice.

By:     */s/ Dannielle Fresquez*
Dannielle Fresquez, an Employee of
BRAVO SCHRAGER LLP

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

MOTION TO INTERVENE AS DEFENDANTS