Kevin J. Hamilton, WA Bar No. 15648*
Heath L. Hyatt, WA Bar No. 54141*
Margo S. Jasukaitis, WA Bar No. 57045*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone:     206.359.8000
KHamilton@perkinscoie.com
HHyatt@perkinscoie.com
MJasukaitis@perkinscoie.com

Devon T. Reese, NV Bar No. 7496
Nathan R. Ring, NV Bar No. 12078
Alex Velto, NV Bar No. 14961
REESE RING VELTO, PLLC
200 S. Virginia Street, Suite 655
Reno, Nevada 89501
Telephone:     775.446.8096
devon@rrvlawyers.com
nathan@rrvlawyers.com
alex@rrvlawyers.com

*Attorneys for the Democratic National Committee*
*\*Admitted to practice in this case under LR IA 11-2*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; NEVADA REPUBLICAN PARTY; DONALD J. TRUMP FOR PRESIDENT 2024, INC.; and DONALD J. SZYMANSKI, <br><br> Plaintiffs, <br><br> v. <br><br> CARI-ANN BURGESS, in her official capacity as the Washoe County Registrar of Voters; JAN GALASSINI, in her official capacity as the Washoe County Clerk; LORENA PORTILLO, in her official capacity as the Clark County Registrar of Voters; LYNN MARIE GOYA, in her official capacity as the Clark County Clerk; FRANCISCO AGUILAR, in his official capacity as Nevada Secretary of State, <br><br> Defendants. | Case No. 3:24-cv-00198 <br><br> **INTERVENOR-DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS

167315016.9

**MOTION TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Proposed Intervenor-Defendant the Democratic National Committee ("DNC") moves to dismiss the complaint filed by the Republican National Committee ("RNC"), Nevada Republican Party, Donald J. Trump for President 2024, Inc. ("Trump Campaign"), and Donald J. Szymanski ("Plaintiffs").

**POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

This suit advances the same theory floated—and rejected—in a string of lawsuits over the last four years. Plaintiffs contend that states cannot count ballots that are mailed on or before election day, and arrive shortly after election day, because this would purportedly violate federal laws establishing a single national election day. Every court that has considered this claim has rejected it. This Court should do the same.

Like many states that accept mail-in ballots, Nevada has adopted a commonsense rule that allows time for ballots to arrive in the mail. Nevada law recognizes that votes are cast upon mailing, which must happen on or before election day, and provides that these ballots will be counted as long as election officials receive them within four days after the election. This approach is consistent with longstanding election administration practice. For more than a century, states have used frameworks like Nevada's, which require ballots to be mailed by election day but permit them to be received and counted afterward. Those statutes remain prevalent today—a majority of states and the District of Columbia allow election officials to count mail-in ballots that arrive after election day—with a principal beneficiary being members of the military serving our country abroad. Embracing Plaintiffs' unconventional theory would

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 1

167315016.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

create a seismic shift in American elections, changing the way tens of millions of Americans vote in nearly every state. There is no reason to disrupt this settled practice.

Contrary to Plaintiffs' argument, federal law establishing a single election day does not set a deadline for states to receive ballots cast on or before election day. Federal law requires only that the voters' choice occur (i.e., the votes be cast) on or before election day. That leaves states free to adopt a mailbox rule like Nevada's, which accepts votes cast before election day but received afterward. Plaintiffs' argument finds no support from any court, from a plain reading of the relevant statutes, or from historical practices of states and the federal government alike. Plaintiffs' constitutional claims fail for the additional reason that Nevada's mail voting law places no burden on Plaintiffs' constitutional rights. Indeed, the law secures, not impairs, those rights. That is fatal. If Plaintiffs' relief were granted, thousands of Nevadans would be stripped of their right to vote. If that were not enough, adopting Plaintiffs' far-fetched theories would also reverberate throughout the American political system and undermine the fundamental right to vote.

Plaintiffs' claims find utterly no support in the law. The DNC respectfully requests that this Court dismiss Plaintiffs' complaint.

## II.    BACKGROUND

### A.    The Federal Election Day Statutes

For almost a hundred years, "each State" was free to fix its federal elections "upon a different day." *See Foster v. Love*, 522 U.S. 67, 74 (1997) (citation omitted). But this practice caused two significant problems. *See id.* at 73–74. First, when states could set different election days, states that held elections earlier could "influence later voting in other States" and, thus, held an "undue advantage" in influencing federal elections. *Id*. This practice threatened to (and

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 2

167315016.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  did) "distort[]" the voting process. *Id.* at 73. Second, when a state held congressional elections on

2  a different day than presidential elections, residents were burdened with turning out for two

3  different federal election days in a single year. *Id.* at 73–74.

4        In 1872, Congress set a specific date for federal elections to curb these adverse effects.

5  Today, federal law establishes the Tuesday after the first Monday in November "as the day for

6  the election" of members of Congress in every even-numbered year (2 U.S.C. §§ 1, 7) and the

7  day for the "appoint[ment]" of presidential electors in every fourth year (3 U.S.C. §§ 1, 21).[1]

8      **B.**    **Nevada law**

9        Nevada law likewise requires that general elections "be held throughout the State on the

10  first Tuesday after the first Monday of November in each even-numbered year." NRS 293.12755.

11        In 2021, the Nevada Legislature adopted universal mail voting. 2021 N.V. AB 321

12  (June 14, 2021). The new law took effect January 1, 2022. *Id*. State law requires county clerks

13  and registrars to mail every active registered voter a ballot with some limited exceptions. NRS

14  293.269911(1), (2). Voters who receive a ballot may return it either by mail or by dropping it in

15  a designated drop box. NRS 293.269921(1). To be counted, mail ballots must be postmarked on

16  or before election day and received no later than 5:00 p.m. on the fourth day after election day.

17  NRS 293.269921(1)(b). When the date of a ballot's postmark cannot be determined, Nevada law

18  presumes the ballot was timely submitted as long as it is received before 5:00 p.m. on the third

19  day after election day. NRS 293.269921(2).[2]

20

21

22

---

23     [1] 2 U.S.C. §§ 1, 7 and 3 U.S.C. §§ 1, 21 are referred to collectively as the "Federal Election Day Statutes."

24     [2] NRS 293.269921 is hereinafter referred to as the "Ballot Receipt Deadline."

25  INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

26

### C.   Plaintiffs' lawsuit

Plaintiffs seek to enjoin the portions of Nevada law that allow election officials to count ballots received up to four days after election day. *See generally* ECF No. 1. Plaintiffs specifically allege that the Ballot Receipt Deadline runs afoul of the Federal Election Day Statutes because it permits state officials to count ballots received after election day. The problem, Plaintiffs insist, is that "[t]here is only one federal election day," and Nevada violates federal law "[b]y holding voting open beyond the federal election day." *Id.* at 6, ¶ 46.

Plaintiffs also bring two claims under 42 U.S.C. § 1983. The first contends that Nevada has deprived Plaintiffs of their constitutional rights by "forcing Plaintiffs to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns." *Id.* at ¶ 74. The second claims that Nevada's statutory scheme counts illegitimate votes and, thus, dilutes "honest votes." *Id.* at ¶¶ 79–80.

Among other relief, Plaintiffs seek to enjoin the Ballot Receipt Deadline in the "November 2024 general election" that is less than six months away. *Id.* at 16, ¶ B.

### D.   Prior failed challenges to mail ballot receipt deadlines

The RNC, the Trump Campaign, and a state Republican Party first advanced this theory in *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354 (D.N.J. 2020), which challenged a New Jersey law authorizing the counting of ballots received shortly after election day. That case was dismissed for lack of standing, but not before the court determined the plaintiffs failed to establish a reasonable probability of success on the merits "because the Federal Election Day Statutes are silent on methods of determining the timeliness of ballots." *Id.* at 368, 372.

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 4

167315016.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Two years later, Republican plaintiffs raised claims nearly identical to those here in *Bost v. Illinois State Board of Elections*, No. 22-cv-2754, ECF No. 1 at 7–10 (N.D. Ill. May 25, 2022). That case, too, was dismissed.[3] In addition to determining the plaintiffs lacked standing, the *Bost* court found the ballot receipt statute at issue in that case, which allowed ballots to be received and counted for up to fourteen days after election day, "operates harmoniously with the federal statutes that set the timing for federal elections." *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023). Plaintiffs also "fail[ed] to allege a plausible claim that the Statute affects their rights to vote and stand for office." *Id.* at *12.

Most recently, the RNC, state Republican Party, and two individuals filed a suit essentially identical to this one in Mississippi, seeking to permanently enjoin implementation of a state law that allows ballots mailed on or before election day to be received up to five business days after election day. *RNC v. Wetzel*, No. 1:24cv25 LG-RPM, ECF No. 1, ¶¶ 3, 5. Motions for Summary Judgment are pending in that litigation.[4]

## III.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard requires Plaintiffs do more than provide "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Even though the Court must accept all factual allegations as true, those allegations must "raise a right to relief above the speculative level." *Id.* Dismissal is appropriate where there is

---

[3] The case is currently on appeal before the Seventh Circuit. *See* No. 23-2644 (7th Cir. Aug. 21, 2023).

[4] The Libertarian Party of Mississippi filed another suit that was later consolidated with this case. *See* Order Consolidating Cases, *Libertarian Party of Mississippi v. Wetzel*, Case No. 1:24-cv-37-LG-RPM, ECF No. 17 (Mar. 14, 2024).

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 5

167315016.9

"either (1) the lack of a cognizable legal theory or (2) the absence of sufficient facts alleged under a cognizable legal theory." *Newlands Asset Holding Trust v. SFR Invs. Pool 1, LLC*, Case No. 3:17-cv-00370-LRH-WGC, 2017 WL 5559956, at *2 (D. Nev. Nov. 17, 2017) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

## IV.   ARGUMENT

### A.   Plaintiffs' claims rely on a fundamental misinterpretation of Nevada law and the Federal Election Day Statutes.

Plaintiffs' claims rest on the assertion that Nevada's Ballot Receipt Deadline conflicts with the Federal Election Day Statutes. Their lawsuit boils down to two flawed assertions: (1) a ballot is not lawfully cast until it is *received* by election officials, ECF No. 1 at ¶ 67, and (2) by accepting mail-in ballots up to four days after election day, Nevada law allows a ballot to be "cast" after election day, *id.* at ¶ 69. Therefore, Plaintiffs argue, the Ballot Receipt Deadline violates the Federal Election Day Statutes.

This premise is fundamentally and irretrievably flawed: There is no conflict between the state and federal provisions at issue. Moreover, Plaintiffs' theory that ballots may only be counted if they are *received* by election day finds no support in federal law—that requirement does not appear in the text of any federal statute and has never been endorsed by any federal court. Such a theory would be inconsistent with a plain reading of federal statutes, longstanding state election procedures nationwide, and the purpose of the Federal Election Day Statutes. In all events, indulging Plaintiffs' theory would lead to absurd results. The claims should be dismissed.

#### 1.   Plaintiffs' position conflicts with the plain language of the Federal Election Day Statutes and other federal law.

Reading a statute "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative

purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). In claiming that federal law requires all votes be *received* by election day, Plaintiffs ignore the plain text of the Federal Election Day Statutes. By the statutes' terms, the "election" of members of Congress (2 U.S.C. §§ 1, 7) and "appointment" of presidential electors (3 U.S.C. § 1) occur once all citizens *choose* their preferred candidates, even if state law permits those votes (i.e., those choices) to be *received* after election day.

<blockquote>

(a)     **"Election" of a member of Congress occurs when a voter chooses that candidate.**

</blockquote>

The term "election" in the Federal Election Day Statutes refers to the "combined actions of voters and officials" that make a "final selection of an officeholder." *Foster*, 522 U.S. at 71 (citation omitted). In other words, the "election" is the voters' act of choosing a candidate through a process managed by election officials. In providing that "the election" of a Senator or Representative must take place on election day, federal law requires that the "act of choosing a person to fill an office" occur by the close of election day. *Id.* That it might take some time to determine which officeholder has been elected (e.g., time to receive ballots, count votes, and certify results) is of no import. *E.g.*, *Millsaps v. Thompson,* 259 F.3d 535, 546 (6th Cir. 2001) (explaining "official action to confirm or verify the results of the election extends well beyond federal election day"). The *choice* of officeholder is made once all voters *submit* their votes. At that point, the "election" has been completed.

Other provisions in Title 2 also equate the "election" of an officeholder with that officeholder having been chosen. 2 U.S.C. § 1a (requiring "the executive of the State from which any Senator has been chosen to certify his election"); § 381 (defining "election" to mean "an official general or special election to choose" a Representative). Section 1 itself employs this phrasing by tying the date on which a Senator "shall be elected" to the date of "the regular

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

election" at which a "Representative" is to be "chosen." *Id*. § 1. Each of these provisions suggest the core of an "election" is choice. And the only choice involved in mail voting is the voter's completion and submission of their ballot. Voters' collective choice is made once all voters submit their votes.

Other federal election statutes also recognize that states may impose ballot receipt deadlines that postdate election day. *Bost*, 2023 WL 4817073, at *11 ("[E]ven federal laws governing elections allow ballots received after election day to be counted."). This, in fact, is the established position of the United States. *Bost v. Illinois*, Civil Action No. 1:22-cv-02754, ECF No. 47 at 1 (N.D. Ill. Aug. 31, 2022) ("Permitting the counting of otherwise valid ballots cast by election day even though they are received thereafter does not violate federal statutes setting the day for federal elections. This practice not only complies with federal law but can be vital in ensuring that military and overseas voters are able to exercise their right to vote."). Thus, federal law does not conflict with state laws governing when officials must complete the ministerial acts of receiving and counting the votes that were submitted by election day.

> **(b)    "Appointment" of a presidential elector refers to when they are chosen.**

Federal statutes providing that the "appointment" of presidential electors must occur on election day similarly refer to when those electors are finally chosen, irrespective of ministerial efforts before or after that choice. *See* 3 U.S.C. §§ 1, 21. The term "appoint[ment]" was first introduced into the statutory provisions in 1845, at which time "appointment" meant "designation to office." N. Webster, An American Dictionary of the English Language at 46 (1844). "Appointment" is the designation of a person to hold an office—a definition that parallels *Foster*'s definition of "election" as the "final selection" of an officeholder. *See Foster*, 522 U.S. at 71. "Designation," "selection," and "choice" all describe the same portion of the

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

electoral process: the submission of votes. This means that, when votes are submitted for the electors, those electors have received the "appointment" required under Section 1 of Title 3.

Surrounding portions of Title 3 confirm the proper interpretation of "appointed" as used in that provision. In particular, 3 U.S.C. § 5 distinguishes the "appointment" of electors from the "ascertainment of appointment of electors," with the latter occurring some period of time after election day pursuant to state canvassing laws. Section 5 requires that each state's executive must "issue a certificate of ascertainment of appointment of electors" not later than "6 days before" the "meeting of the electors." 3 U.S.C. § 5(a)(1). The certificate must set forth "the names of the electors appointed and the canvass or other determination under the laws of such State of the number of votes given or cast for each person for whose appointment any and all votes have been given or cast." *Id.* § 5(a)(2)(A). Reading Section 1 and Section 5 together, it is clear the "appointment" of electors refers to the choice of a candidate through the casting of ballots, and that choice occurs when a vote is "given." By contrast, "ascertainment" of the winning candidate occurs through the separate process of counting ballots.

### 2. Federal Election Day Statutes and Nevada law complement, rather than conflict with, one another.

To prevail on any of their claims, Plaintiffs must establish that the Ballot Receipt Deadline conflicts with federal law. *See Foster*, 522 U.S. at 69. They cannot.

Under the U.S. Constitution, states are responsible for "the mechanics" of federal elections. *Foster*, 522 U.S. at 69. Pursuant to that authority, forty-six states and the District of Columbia have established periods for early voting.[5] Some states allow mail balloting for

---

[5] *See, e.g.*, Alaska Stat. § 15.20.064 (allowing voting for fifteen days before an election); Ark. Code § 7-5-418 (same); Ariz. Rev. Stat. § 16-541 (requiring elections "provide for early voting"); Fla. Stat. § 101.657 (requiring early voting ten days before an election); 10 Ill. Comp. stat. 5/19A-15 (providing for early voting forty days before an election); Kan. Stat. Ann. § 25-

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

specific reasons,[6] while others allow for no-excuse mail voting or, like Nevada, have adopted an

all-mail elections system.[7] Some states require that mail ballots be received by election day,

while others require only that mail ballots be postmarked by election day.[8]

Nevada's Ballot Receipt Deadline easily fits within this broader structure and certainly

does not "conflict" with the Federal Election Day Statutes. Indeed, they "operate harmoniously."

*Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012). The Federal Election Day Statutes set

the date by which voters must *cast* their ballots in federal elections. But they do not say anything

about when election officials must receive those ballots to be counted.[9] *See Bognet v. Sec'y*

*Commonwealth of Pa.*, 980 F.3d 336, 353 (3d Cir. 2020) ("Federal law does not provide for

when or how ballot counting occurs."); *Way*, 492 F. Supp. 3d at 372 (finding New Jersey law

permitting canvassing of ballots lacking a postmark but "received within forty-eight hours of the

---

1119 (providing for advance voting); Md. Code Ann., Elec. Law § 10-301.1 (allowing early voting); Neb. Rev. Stat. § 32-938 ("A registered voter shall be permitted to vote early . . . ."); N.J. Stat. Ann. § 19:15A-1 (same); N.M. Stat. Ann. § 1-6-5.7 (allowing early voting twenty-eight days before an election); N.Y. Elec. Law § 8-600 (allowing early voting ten days before an election); N.C. Gen. Stat. § 163-166.40 (allowing early voting "the Third Thursday before an election"); S.C. Code Ann. § 7-13-25 (providing for early voting); Tenn. Code Ann. § 2-6-102 (allowing early voting twenty days before an election); Tex. Elec. Code § 85.0001 (allowing early voting seventeen days before an election); Utah Code Ann. § 20A-3a-601 (allowing early voting fourteen days before an election); W. Va. Code § 3-3-3 (allowing early voting thirteen days before an election).

[6] *See, e.g.*, Conn. Gen. Stat § 9-135; Del. Code Ann. Tit. 15 § 5502; Ind. Code § 3-11-10-24; LSA-R.S. 18:1303; Mo. Rev. Stat. § 115.277 (all specifying reasons someone may vote by absentee ballot).

[7] *See, e.g.*, NRS 293.269911; Colo. Rev. Stat § 1-5-401; Hawaii Rev. Stat. § 11-101; Or. Rev. Stat. § 254.465; Vt. Stat. Ann. Tit. 17 § 2537a; Wash. Rev. Stat. § 29A.40.010 (all of which create universal mail voting systems).

[8] *Compare, e.g.*, Ala. Code § 17-11-18 (requiring mail ballots be received by noon on election day) *with, e.g.*, Cal. Elec. Code § 3020 (requiring mail ballots be received no later than seven days after election day if postmarked on or before election day).

[9] To be sure, other state laws (e.g., canvassing deadlines) and federal law (e.g., the Electoral Count Reform and Presidential Transition Improvement Act of 2022's certification deadline) provide limits on setting the receipt deadline far beyond election day. But those issues are not implicated here.

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   closing of the polls is not preempted by the Federal Election Day Statutes because the Federal

2   Election Day Statutes are silent on methods of determining the timeliness of ballots").

3        Nevada's Ballot Receipt Deadline does not change the date on which ballots must be

4   "cast." In fact, it is designed to ensure compliance with the federal requirement that votes be

5   "cast" by election day. Nevada law counts mail ballots received after election day under just two

6   circumstances: (1) when the mail ballot is postmarked on or before election day and received

7   before 5:00 p.m. on the fourth day after election day and (2) when the mail ballot's postmark

8   cannot be determined (because it is missing or illegible) but the ballot is received by 5:00 p.m.

9   on the third day following election day. NRS 293.269921(1)(b), (2). These provisions guarantee

10  that only ballots filled out and submitted on or before election day are counted. They ensure that

11  all ballots cast on or before election day are counted by allowing for the possibility a timely cast

12  ballot may be mailed on election day or its delivery may be delayed by the postal service.[10]

13       Both prongs of the Ballot Receipt Deadline reflect precisely the type of discretion that

14  federal law allows. *See Bost*, 2023 WL 4817073, at *11 (holding similar Illinois law "operates

15  harmoniously with the federal statutes that set the timing for federal elections"); *Way*, 492 F.

16  Supp. 3d at 372 (upholding New Jersey law permitting canvassing of ballots lacking a postmark

17  but "received within forty-eight hours of the closing of the polls").

18       All courts that have considered this question reached the same conclusion with respect to

19  comparable provisions enacted in other states. *See, e.g.*, *Bost*, 2023 WL 4817073, at *11; *Way*,

---

[10] This is precisely why Nevada provides a shorter acceptance period (of three days instead of four) for ballots that lack a discernible postmark. Because voters have no control over whether the post office will put a postmark on their ballot, there is no opportunity for gamesmanship. *See Way*, 492 F. Supp. 3d at 371 ("The Court finds, with a high degree of confidence, that ballots lacking a postmark and received within forty-eight hours of the closing of the polls are timely cast.").

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 11

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

492 F. Supp. 3d at 372; *cf. Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 n.23 (Pa. 2020). In each case, state law required all ballots be cast by election day, but permitted those ballots to be received and/or counted later. Every court to analyze the question held that the state statutes complied with federal law. *Bost* concluded that Illinois law "operates harmoniously" with the Federal Election Day Statutes, despite allowing for ballots received after election day to be counted, because in all events votes must be cast by election day. *Bost*, 2023 WL 4817073, at *11. *Boockvar*, 238 A.3d at 368 n.23, reached the same conclusion ("[A]llowing the tabulation of ballots received after election day does not undermine the existence of a federal election day"), as did *Way*, 492 F. Supp. 3d at 372. No court has held otherwise.

The court in *Way* reached the same conclusion specifically with respect to ballots lacking a postmark. 492 F. Supp. 3d at 372 ("Plaintiffs direct the Court to no federal law regulating methods of determining the timeliness of mail-in ballots or requiring that mail-in ballots be postmarked."). There, the court specifically found that a New Jersey "law permitting the canvassing of ballots lacking a postmark if they are received within forty-eight hours of the closing of the polls is not preempted by the Federal Election Day Statutes because the Federal Election Day Statutes are silent on methods of determining the timeliness of ballots." *Id.* at 371–72.[11]

In their complaint, Plaintiffs repeatedly cite *Foster v. Love*, but that case undercuts, rather than supports, their claims. As explained in Section IV.A.1.a, above, *Foster* stands for the proposition that the "election" consists of the voters' act of choosing a candidate, and that such

---

[11] This rule makes good sense as it provides an outcome neutral rule for election officials to consistently apply when they have to make routine decisions on a ballot's validity. That is, in part, why other states have adopted rules like Nevada's. *See, e.g.*, Cal. Elec. Code § 3020(a)(2); 10 Ill. Comp. Stat. § 5/19-8, 5/18A-15; Md. Code Ann. Elec. Law § 9-309; N.J. Rev. Stat. § 19:63-22; N.Y. Elec. Law § 9-209(3)(b); Wash. Rev. Code § 29A.40.110(4).

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

choice is made once all voters submit their votes—a proposition consistent with Nevada's Ballot

Receipt Deadline. Nor do the particular facts of *Foster* help Plaintiffs. In *Foster*, the Supreme

Court addressed a Louisiana "open primary" system under which the election of candidates for

Congress could be concluded as a matter of law before the federally mandated "election day."

522 U.S. at 70. Under that system, if any candidate received a majority of the votes cast in the

open primary, they would be "elected," and no general election would be held on the federal

election day. *Id.* The court concluded this system was inconsistent with the Federal Election Day

Statutes, but emphasized its ruling was narrow, holding "only that if an election does take place,

it may not be consummated prior to federal election day." *Id.* at 72 n.4. The case did not purport

to "isolate[e] precisely what acts a State must cause to be done on federal election day . . . in

order to satisfy the [Federal Election Day Statutes]." *Id.* at 72. Nevada's Ballot Receipt Deadline

is entirely consistent with the holding in *Foster*. Unlike the Louisiana primary system, Nevada's

Ballot Receipt Deadline does not "consummate[]" an election before election day or set a

competing date on which "a contested selection of candidates for a [federal] office []is concluded

as a matter of law." *Id.* at 72. Just the opposite. The Ballot Receipt Deadline *ensures* that the

election is not "consummated prior to federal election day." *Id.* at 72 n.4.

### 3. Plaintiffs' interpretation of the law contradicts historical practices.

"[T]he long history of congressional tolerance, despite the federal election day statute[s],

of absentee balloting and express congressional approval of absentee balloting," including when

those ballots are received after the election, further requires rejecting Plaintiffs' theory. *Voting

Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001). Courts may not "read the

federal election day statutes in a manner that would prohibit . . . a universal, longstanding

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

practice." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 776 (5th Cir. 2000). Yet

accepting Plaintiffs' unsupported theory of the Federal Election Day Statutes would do just that.

States have permitted absentee balloting for "[m]ore than a century." *Bomer*, 199 F.3d at

776 (citing Edward B. Moreton, Jr., *Voting by Mail*, 58 S. CAL. L. REV. 1261, 1261–62 (1985)).

"Absentee voting began during the Civil War as a means of providing soldiers the ability to vote.

Vermont became the first state to accord absentee voting privileges to civilians in 1896. States

have continued to provide for and expand absentee voting since." *Keisling*, 259 F.3d at 1175.

Indeed, all but four states had some form of absentee voting provisions by 1924. P. Orman Ray,

*Absent-voting Laws*, 18 AM. POL. SCI. REV. 321, 321 (1924). Many states permitted votes

submitted by election day to be received and counted at a later date. And some states even

imposed explicit ballot receipt deadlines. P. Orman Ray, *Absent-voting Laws*, 12 AM. POL. SCI.

REV. 251, 253–54 (1917).

Several states allowed Civil War soldiers to "vote in the field" and extended the "time for

canvassing the votes" thereafter received in the relevant state. J.H. Benton, *Voting in the Field*,

317–18 (1915).[12] Even fifty years after the Civil War, many states allowed soldiers to vote in the

field on election day and have their vote counted in their home state at a later time. *See* Ray,

*supra*, at 468–69.

While federal law in subsequent years sought to help uniformed servicemembers and

citizens living abroad, Congress ultimately enacted the Uniformed and Overseas Citizens

Absentee Voting Act of 1986 ("UOCAVA"). *See* Cong. Research Serv., RS20764, *The*

*Uniformed and Overseas Citizens Absentee Voting Act: Overview & Issues* (2016),

---

[12] Many northern states did not extend the time for counting ballots because there was already a sufficient period between "the day of the election, which was the day on which the soldiers were to vote in the field, and the counting of the votes." *Id*. at 318.

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

167315016.9

https://crsreports.congress.gov/product/pdf/RS/ RS20764; *see also Bomer*, 199 F.3d at 777

(discussing purposes behind UOCAVA, including how it requires states to provide absentee

ballots to certain voters). Congress's enactment of UOCAVA is especially relevant here for two

reasons: (1) the plain language of UOCAVA emphasizes the distinction between the date a ballot

is cast and the date it is counted and (2) Congress has not invalidated laws in many states that

allow counting of UOCAVA ballots cast on election day, but received at a later date.

First, Congress established procedures for the collection and delivery of absentee ballots

to state election officials. *See* 52 U.S.C. § 20304. The law requires states to "process[] and

accept[] . . . marked absentee ballots of absent overseas uniformed services voters" and to

"facilitate the delivery" of such ballots "to the appropriate State election official" by "the date by

which an absentee ballot must be received in order to be counted in the election" under state law.

52 U.S.C. §§ 20302(a)(10), 20304(b)(1). These provisions recognize that the "election" itself

occurs on a particular date, and further recognize that the date by which a ballot must be received

to be counted may be a different date. *Id*. In other words, the act of receiving the votes is not a

part of the election itself. The "election" is the voters' choice of a candidate, and the process of

receiving and counting ballots is a ministerial act aimed at identifying the results of the election.

Second, in passing—and amending—UOCAVA, Congress has repeatedly recognized and

approved of states setting their own receipt deadlines for absentee ballots, a substantial portion of

which postdate election day. *See, e.g.*, *Bognet*, 980 F.3d at 354 ("[M]any States also accept

absentee ballots mailed by overseas uniformed servicemembers that are received after election

day, in accordance with UOCAVA."); *Boockvar*, 238 A.3d at 368 n.23 (pointing to "the

procedure under federal and state law allowing for the tabulation of military and overseas ballots

received after election day" to explain why "allowing the tabulation of ballots received after

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 15

167315016.9

election day does not undermine the existence of a federal election day"). This reflects the entirely reasonable assumption that mailed ballots will take some time to arrive from overseas, and it serves as an important protection for the franchise of military voters stationed abroad.

Moreover, the Attorney General is authorized to enforce UOCAVA. 52 U.S.C. § 20307(a) (providing enforcement authority). Exercising that authority, the government has sued states on several occasions and secured orders that require states to extend their deadlines for receipt of absentee ballots—sometimes several days after election day—to prevent disenfranchisement of military members serving overseas. *See Cases Raising Claims Under the Uniformed and Overseas Citizen Absentee Voting Act*, U.S. DEP'T OF JUST., https://www.justice.gov/crt/cases-raising-claims-under-uniformed-and-overseas-citizen-absentee-voting-act (last visited May 9, 2024) (collecting cases). Jurisdictions in the Ninth Circuit sued on this basis include Arizona, New Mexico, and Guam.[13] These facts cannot be reconciled with Plaintiffs' claim that the Federal Election Day Statutes require all ballots be received as of election day.

Today, a majority of the states and the District of Columbia permit mailed ballots to arrive after election day for at least some voters.[14] *See Bost*, 2023 WL 4817073, at *11 (noting

---

[13] *See United States v. Arizona*, Case No. 2:18-cv-00505-DLR, ECF No. 8 (D. Ariz. Feb. 15, 2018) (consent decree providing additional time for receipt of UOCAVA ballots to ensure eligible military and overseas voters have sufficient time to vote); *United States v. Guam*, Civil Case No. 1–cv-00025, ECF No. 27 (D. Guam July 13, 2012) (consent decree requiring Guam extend deadline for receipt of absentee ballots from military and overseas voters until November 15, 2010); *United States v. New Mexico*, Case 1:10-cv-00968-MV-ACT, ECF No. 12 (D.N.M. Aug. 1, 2011) (consent decree requiring state to extend deadline for accepting and counting UOCAVA ballots by four days).

[14] See Ala. Code § 17-11-18(b); Alaska Stat. § 15.20.081; Ark. Code. Ann. § 7-5-411(a)(1)(A)(ii); Cal. Elec. Code § 3020(b); D.C. Code § 1-1001.05(a)(10B); Fla. Stat. § 101.6952(5); Ga. Code Ann. § 21-2-386(a)(1)(G); 10 Ill. Comp. Stat. 5/19-8, 10 Ill. Comp. Stat. 5/18A-15; Ind. Code § 3-12-1-17(b); Kan. Stat. Ann. 25-1132(b); Md. Code Ann., Elec. Law § 9-302(c)(1); Mass. Gen. Laws ch. 54 § 93; Miss. Code Ann. § 23-15-637; Mo. Rev. Stat. §

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

167315016.9

1   "[d]espite these ballot receipt deadline statutes being in place for many years in many states,

2   Congress has never stepped in and altered the rules."). Even when states do not permit all late-

3   arriving ballots to be counted, they will often count late-arriving votes from UOCAVA voters.[15]

4         Congress's enactment of the "election day" statutes in 1872 must be construed against

5   this unbroken historical practice. The uniform understanding of elections was that the receiving

6   of votes was something that could occur after the election itself. Accepting Plaintiffs' argument

7   would invalidate those statutes and disenfranchise mail-in voters, including members of the

8   military and citizens living abroad who vote in Nevada. Plaintiffs' unsupported construction of

9   federal law cannot be reconciled with longstanding historical practice and must be rejected.

10         **4.**    **Plaintiffs' theory would lead to absurd results.**

11         Plaintiffs' interpretation of federal law would lead to absurd results and have a profound

12   effect on voting in the United States. Statutes should be interpreted to reach "a sensible

13   construction that avoids attributing to [Congress] either an unjust or an absurd conclusion."

14   *United States v. Granderson,* 511 U.S. 39, 56 (1994) (quotation marks omitted). Requiring all

15   votes be submitted *and* received as of election day would work enormous chaos, regardless of

16   whether that requirement was based on the meaning of "casting" a vote or on some requirement

17   that votes be cast and received as of election day.

18

19

20   115.920(1); NRS 293.269921(1)(b), (2); N.J. Stat. Ann. § 19:63-22(a); N.Y. Elec. Law § 8-412(1); N.C. Gen. Stat. § 163A-1310; N.D. Cent. Code Ann. § 16.1-07-09; Ohio Rev. Code Ann.

21   § 3509.05(D)(2)(a); Or. Rev. Stat. § 254.470(6)(e)(B); 25 Pa. Cons. Stat. § 3511(a); R.I. Gen. Laws § 17-20-16; S.C. Code Ann. § 7-15-700(A); Tex. Elec. Code Ann. § 86.007(a)(2); Utah

22   Code Ann. § 20A-3a-204(2)(a); Va. Code Ann. § 24.2-709(B); Wash. Rev. Code Ann. § 29A.40.091; W. Va. Code § 3-3-5(g)(2) (tied to day of canvassing, which is five days after

23   election).

24      [15] *See, e.g.,* Ala. Code § 17-11-18(b); Ark. Code. Ann. § 7-5-411(a)(1)(A)(ii); Fla. Stat. § 101.6952(5); Ga. Code Ann. § 21-2-386(a)(1)(G); Ind. Code § 3-12-1-17(b).

25   INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 17

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

26   167315016.9

To start, Plaintiffs offer no meaningful basis for distinguishing between votes received *after* election day and votes received *before* election day. If counting a ballot received after election day "holds voting open after election day," *see* ECF No. 1 at ¶ 69, it would seem to follow that counting a ballot received *before* election day would likewise extend the "election" to a period before the congressionally prescribed day. That would, however, mean that only mail ballots submitted and received on election day itself would be valid, leading to an absurdly difficult (if not impossible) system for voting by mail. Worse still, Plaintiffs' theory that "the combined actions of voters and officials" must take place on *a single election day* would also invalidate early voting across the United States. That would mean the forty-six states that currently offer some form of early voting are doing so in direct violation of federal law. Such a conclusion would require nothing short of a seismic change in the administration of elections, all premised on the thin reed of a theory that no court has ever credited. This Court should not be the first to embrace such a radical reimagining of American election law.

In response to this problem, Plaintiffs might contend (atextually) that the "election" must be complete and *final* as of election day, but can begin taking place before election day. But elections are *never* final as of election day. *See Millsaps,* 259 F.3d at 546 (recognizing and explaining in detail how "official action to confirm or verify the results of the election extends well beyond federal election day"). Extensive counting, canvassing, and certification efforts occur after election day, and Plaintiffs make no claim that those efforts improperly hold open the day for elections. Nor could they. Requiring election officials to tally millions of votes by midnight, mere hours after the polls close on election day, or be in violation of federal election

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

law would be absurd.[16] It would also require Plaintiffs to draw a meaningful distinction between receipt of votes and counting of votes, which they have not done. Instead, the only reasonable understanding of the "final selection" language in *Foster* is the plain meaning of the statutory language as articulated above: The relevant *choice* must conclude by election day. Surrounding ministerial efforts, whether before or after the election, are irrelevant.

There is no credible argument that Congress intended such absurd results.

### 5.     Rejecting ballots cast before, but received after, election day would frustrate the purposes of federal law.

Plaintiffs' interpretation cannot be squared with the purpose of the Federal Election Day Statutes. In passing the Federal Election Day Statutes, "Congress was concerned . . . with the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other states." *Foster*, 522 U.S. at 73; *Way*, 492 F. Supp. 3d at 368 ("[T]he primary concern when enacting the [Federal Election Day Statutes] appears to be the reporting of final election results in some states before other states had yet to open the polls.") (citation omitted); *see also Millsaps*, 259 F.3d at 541–42.

The Ballot Receipt Deadline does not "foster either of the primary evils identified by Congress as reasons for passing the federal statutes[.]" *Bomer*, 199 F.3d at 777. Nothing about that statute establishes two (or more) election days; every vote must be submitted as of election day. *See id*. Plaintiffs' allegation that Nevada law "holds open" election day ignores the clear

---

[16] This interpretation would also result in serious constitutional and statutory problems. For example, the inevitable inability to count all votes submitted on election day by midnight would create Equal Protection problems—treating similarly situated voters differently by the pure happenstance of whether officials were able to count their votes in time. It would also be in tension with 52 U.S.C. § 10502(d), which requires states to provide absentee voting for presidential elections and to hold open the deadline for receipt of those votes at least until election day. If states were unable to count all votes received on election day, Plaintiffs' theory would bar them from doing so after election day, in violation of federal law.

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 19

1  operation of the statute, which guarantees that, to be counted, every vote must be cast by election

2  day. NRS 293.269921(1)(b)–(2). Moreover, ballots arriving later cannot create results that might

3  distort other elections.

4        Finally, declining to count ballots cast on or before, but received after, election day

5  would disenfranchise large numbers of Nevada voters. In fact, Plaintiffs admit that is why they

6  brought this suit. They believe the Ballot Receipt Deadline will "disproportionately" break for

7  Democrats, cutting into "fragile" "early Republican leads in close races." ECF No. 1 at ¶¶ 58–59.

8  They accordingly seek to enjoin Defendants from counting ballots cast on or before election day

9  by qualified voters because those voters are (allegedly) likely to vote for Plaintiffs' political

10  opponents. But that cannot be what Congress intended with the Federal Election Day Statutes.

11  As the Fifth Circuit said in *Bomer*, "[W]e cannot conceive that Congress intended the Federal

12  Election Day Statutes to have the effect of impeding citizens in exercising their right to vote. The

13  legislative history of the statutes reflects Congress's concern that citizens be able to exercise

14  their right to vote." 199 F.3d at 777 (citing Cong. Globe, 42d Cong., 2d Sess. 3407–08 (1872)).

15  Plaintiffs' argument runs directly contrary to this recognized purpose and denigrates the very

16  constitutional rights that Plaintiffs claim they seek to safeguard.

17        In short, Plaintiffs' interpretation would stretch the Federal Election Day Statutes far

18  beyond, and even contradict, their purpose.

19        **B.     Plaintiffs' constitutional claims fail.**

20        Plaintiffs also assert constitutional claims based on the right to vote and the right to stand

21  for election. These claims also fail as a matter of law. At the outset, each of these claims

22  expressly depends on Plaintiffs' misreading of the Federal Election Day Statutes; they therefore

23  fail for the same reasons as Plaintiffs' preemption claim.

24

25  INTERVENOR-DEFENDANT'S
    MOTION TO DISMISS – 20

26  167315016.9

The constitutional claims also fail for an independent reason: Nothing about Nevada law burdens Plaintiffs' or their members' and supporters' right to vote or stand for office, and there are no allegations in the complaint that plausibly claim otherwise. The Ballot Receipt Deadline in no way burdens the right to vote. Indeed, it is *Plaintiffs* who seek to burden Nevadans' right to vote through this lawsuit.

Burdens on the right to vote and to stand for office are reviewed under the *Anderson-Burdick* test. *See Arizona Democratic Party v. Hobbs*, 976 F.3d 1081, 1085 (9th Cir. 2020). The first step is to determine whether the right to vote has been impacted at all. *Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018) ("[A] court faced with a constitutional challenge to a state election law must first consider the character magnitude of the asserted injury . . . .") (internal quotation marks omitted). Laws that do not make it harder to vote do not implicate the right to vote. *See id.* at 677. The same is true of laws that do not impede a candidate's ability to stand for office. *See Bates v. Jones,* 131 F.3d 843, 846–47 (9th Cir. 1997).

Nothing about the Ballot Receipt Deadline makes it harder for voters to exercise their right to vote. It simply ensures that qualified voters do not have their timely cast ballots rejected. The law thus protects the right to vote; the right to vote will only be impeded if Plaintiffs succeed. Plaintiffs' theory, on its face, fails to plead a claim under *Anderson-Burdick*. *See Short*, 893 F.3d at 677 (affirming dismissal of challenge to law that "does not burden anyone's right to vote" and instead "makes it easier for some voters to cast their ballots by mail").

Nor are Nevadans' votes "diluted" when state officials count legally cast votes received after election day. *See* ECF No. 1 at ¶¶ 4, 50–52. Dilution occurs only when certain votes are given less value than others. *See Bost*, 2023 WL 4817073, at *7. Even if votes received after

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 21

167315016.9

election day were invalid—which they are not—"an increase in the pool of voters generally does not constitute vote dilution." *Id.*

Similarly, Plaintiffs fail to allege any basis for finding that the Ballot Receipt Deadline makes it harder to run for office. *See Bost*, 2023 WL 4817073, at *14 (finding congressman failed to plausibly allege "right to stand for office" claim where law did not prevent him "from standing for office at all"). Indeed, Plaintiffs do not provide even threadbare allegations as to how the Ballot Receipt Deadline violates these rights. Because these arguments hinge entirely on whether ballots received after election day are in fact "unlawful," they too fail.

By contrast, Nevada has strong interests both in ensuring that qualified voters who have already cast their votes have those votes counted and in avoiding the voter confusion that would follow if the law were suddenly changed. Indeed, the Ballot Receipt Deadline and the Federal Election Day Statutes share common purposes in expanding the franchise and protecting the right to vote. "These state interests constitute the very backbone of our constitutional scheme—the right of the people to cast a meaningful ballot." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1084 (10th Cir. 2018); *Riddell v. Nat'l Democratic Party*, 508 F.2d 770, 778 (5th Cir. 1975) (noting "avoidance of voter confusion is a worthwhile objective").

The Ballot Receipt Deadline sets a clear, predictable rule so that voters know when they must mail their ballots to ensure that they are counted, allowing them to vote with as much information as possible and without having to project whether they may encounter significant mail delays, which have plagued previous elections. Because Plaintiffs fail to state a cognizable constitutional claim, those claims must also be dismissed, as a matter of law.

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 22

167315016.9

**C.    Plaintiffs' request for relief in the 2024 general election is barred by laches.**

Finally, and regardless of the merits, Plaintiffs' claims are in all events barred by laches. "Laches is an equitable defense that prevents a plaintiff, who with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950–51 (9th Cir. 2001) (internal quotation marks and citation omitted). "To demonstrate laches, the 'defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.'" *Id.* at 951 (quoting *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000)). Those criteria are easily satisfied here.

**1.    Plaintiffs delayed filing suit over a known election process until six months before a presidential election.**

The Ballot Receipt Deadline was enacted in June 2021 and took effect January 1, 2022. 2021 N.V. AB 321 (June 14, 2021). It has been on the books for almost two and a half years, during which time there have been multiple statewide elections in Nevada, including an election for the U.S. Senate and this year's Presidential Preference Primary. Yet Plaintiffs waited until now, just six months before a presidential election, to raise concerns about a purported conflict between the statute and federal law.

**2.    Defendants are prejudiced by Plaintiffs' delay.**

Plaintiffs' unreasonable delay prejudiced Intervenor-Defendants because parties "took actions [they] would not have, had the plaintiff brought suit promptly." *Danjaq*, 263 F.3d at 955. Specifically, the Ballot Receipt Deadline was part of a statutory amendment that transitioned Nevada to universal mail voting. To educate Nevada voters about these new procedures, the DNC necessarily changed the messages it shared with Nevada voters. Had Plaintiffs timely challenged the Ballot Receipt Deadline, the DNC would not have invested significant time and resources in planning voter education and assistance programs focused on getting voters to

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 23

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  submit their ballots *by* election day; the programs would instead focus on getting voters to

2  submit their ballots *well before* election day.

3      The state has an even larger interest in conducting orderly elections. *See Crookston v.*

4  *Johnson*, 841 F.3d 396, 399 (6th Cir. 2016). The state and the DNC have trained untold numbers

5  of staff and volunteers on Nevada's election statutes, including the one Plaintiffs now contend is

6  unconstitutional. Revising and reprinting all voter resources and retraining everyone who

7  interacts with voters on behalf of the state or various party organizations would require

8  significant investment that could have been avoided if Plaintiffs had flagged this statute as

9  potentially conflicting with federal law earlier. Requiring the parties to make such an investment

10  now significantly prejudices them.

11      Because Plaintiffs unreasonably delayed in filing suit, and that delay prejudices

12  Defendants, Plaintiffs' requested relief for the 2024 general election is barred by the laches

13  doctrine and should be denied.

14  **V.    CONCLUSION**

15      For the foregoing reasons, the DNC respectfully requests that the Court dismiss

16  Plaintiffs' complaint.

17

18

19

20

21

22

23

24

25  INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 24

26  167315016.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Dated:  May 30, 2024

PERKINS COIE LLP


By: */s/Alex Velto*
    Kevin J. Hamilton, WA Bar No. 15648*
    KHamilton@perkinscoie.com
    Heath L. Hyatt, WA Bar No. 54141*
    HHyatt@perkinscoie.com
    Margo S. Jasukaitis, WA Bar No. 57045*
    MJasukaitis@perkinscoie.com
    1201 Third Avenue, Suite 4900
    Seattle, WA 98101-3099
    Telephone: +1.206.359.8000
    Facsimile: +1.206.359.9000

    Devon T. Reese, NV Bar No. 7496
    Nathan R. Ring, NV Bar No. 12078
    Alex Velto, NV Bar No. 14961
    REESE RING VELTO, PLLC
    200 S. Virginia Street, Suite 655
    Reno, Nevada 89501
    Telephone:     775.446.8096
    devon@rrvlawyers.com
    nathan@rrvlawyers.com
    alex@rrvlawyers.com

    *Admitted to practice in this case under LR IA 11-2*

INTERVENOR-DEFENDANT'S
MOTION TO DISMISS – 25

167315016.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

## <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on the 30th day of May 2024, a true and correct copy of the foregoing,

3  **INTERVENOR-DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

4  was transmitted to all parties by operation of the Court's electronic filing system:

5

6                                                    */s/Rachael L. Chavez*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  INTERVENOR-DEFENDANT'S
    MOTION TO DISMISS – 26

26  167315016.9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000