AARON D. FORD
  Attorney General
LAENA ST-JULES (BAR NO. 15156)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
T: (775) 684-1265
E: lstjules@ag.nv.gov

*Attorneys for Secretary of State*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; NEVADA REPUBLICAN PARTY; DONALD J. TRUMP FOR PRESIDENT 2024, INC.; and DONALD J. SZYMANSKI, <br><br> Plaintiffs, <br><br> vs. <br><br> CARI-ANN BURGESS, *in her official capacity as the Washoe County Registrar of Voters;* JAN GALASSINI, *in her official capacity as the Washoe County Clerk;* LORENA PORTILLO, *in her official capacity as the Clark County Registrar of Voters;* LYNN MARIE GOYA, *in her official capacity as the Clark County Clerk;* FRANCISCO AGUILAR, *in his official capacity as Nevada Secretary of State,* <br><br> Defendants. | Case No. 3:24-cv-00198-MMD-CLB <br><br> **DEFENDANT SECRETARY OF STATE'S MOTION TO DISMISS** |

Defendant Francisco Aguilar, in his official capacity as Nevada Secretary of State ("Secretary of State"), moves to dismiss Plaintiffs Republican National Committee ("RNC"), Nevada Republican Party ("NVGOP"), Donald J. Trump for President 2024, Inc. (together with the RNC and NVGOP, the "Organizational Plaintiffs"), and Donald J. Szymanski's (together with the Organizational Plaintiffs, "Plaintiffs") Complaint for Declaratory and Injunctive Relief (Complaint) (ECF No. 1) pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

1    **I.     INTRODUCTION**

2         This lawsuit is another in a line of failed lawsuits challenging reasonable laws

3    allowing the counting of ballots cast by election day but received shortly thereafter.[1]   In

4    fact, this is the second time that the Organizational Plaintiffs have challenged Nevada law

5    allowing for the counting of mail ballots mailed on or before election day but received after

6    election day.   The Organizational Plaintiffs lost their prior lawsuit based on a lack of

7    standing, *see Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev.

8    2020), and are therefore barred by issue preclusion from re-litigating the issue.

9         Even without issue preclusion, Plaintiffs fail to establish standing.   Their theories of

10   injury are generalized, speculative, not fairly traceable to the challenged laws, and would

11   not be redressed by a favorable ruling.   Plaintiffs also fail to state any claim.

12        Plaintiffs are incorrect that the challenged laws are preempted.   Federal law does

13   not require cast ballots to be received by any specific date to be counted, and consistent

14   with this conclusion, a majority of states have similarly enacted laws that allow for the

15   counting of at least some ballots received after election day.   Furthermore, Plaintiffs fail to

16   allege any violation of a constitutional right.   Nevada's challenged laws—counting ballots

17   cast by election day but received shortly thereafter—do not at all burden a voter's ability

18   to exercise the fundamental right to vote, but rather enhance it.

19        Plaintiffs make no secret that they seek to prevent the counting of Democratic votes.

20   *See* Compl. ¶¶ 56–60.   Their attempt to disenfranchise voters from a different political

21   party should be rejected, and the Complaint should be dismissed.

22   **II.    BACKGROUND**

23        **A.     Federal Law**

24        The U.S. Constitution "invests the States with responsibility for the mechanics of

25   [federal] elections, but only so far as Congress declines to preempt state legislative choices."

26   *See Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted).   For congressional elections,

27

28        [1] *See Bost v. Illinois State Bd. of Elections*, 684 F. Supp. 3d 720 (N.D. Ill. 2023); *Donald J. Trump for President, Inc. v. Way*, Civil Action No. 20-10753 (MAS) (ZNQ), 2020 WL 6204477 (D.N.J. Oct. 22, 2020).

states have the authority to regulate their "Times, Places, and Manner."  U.S. Const. art. I, § 4, cl. 1.   For presidential elections, states establish the "Manner" of choosing Presidential electors, *id.* art. II, § 1, cl. 2, and Congress may "determine the Time of chusing the Electors, and the Day on which they shall give their Votes," *id.* art. II, § 1, cl. 4. Encompassed within the manners of elections that states are authorized to regulate is the "counting of votes." *See Smiley v. Hohn*, 285 U.S. 355, 366 (1932).

The date for the election of representatives and delegates to Congress is "[t]he Tuesday next after the 1st Monday in November, in every even numbered year." 2 U.S.C. §§ 1, 7.   And presidential electors are appointed on "election day," 3 U.S.C. § 1 (together with 2 U.S.C. §§ 1, 7, the "Federal Election Day Statutes"), which is the "Tuesday next after the first Monday in November, in every fourth year," 3 U.S.C. § 21(1).

## B.   Nevada Law

Beginning on January 1, 2020, Nevada law provided for county clerks[2] to count (1) ballots postmarked on or before election day and received within seven days after election day; and (2) ballots with no or illegible postmarks that were received no more than 3 days after election day based on a presumption that they were mailed by election day.  *See* Assembly Bill 345 of the 80th (2019) Session of the Nevada Legislature[3] ("AB 345") §§ 45 (1)(b), (2), 48(2), 152(2)(b) (sections 45 and 48 repealed by Assembly Bill 321 of the 81st (2021) Session of the Nevada Legislature ("AB 321") § 91); AB 321[4] §§ 8(1)(b), 8(2), 92(3). These provisions initially applied only to absent ballots, AB 345 §§ 45, 48, but they were extended in 2020 to all mail ballots cast in an election held during a declared state of emergency in response to the COVID-19 pandemic, *see* Assembly Bill 4 of the 32nd (2020) Special Session of the Nevada Legislature ("AB 4")[5] §§ 8,(1), 20(1)(b), 20(2).   Effective January 1, 2022, AB 321 § 92(3), the provisions apply to all elections and provide:

---

[2] Elections in Washoe and Clark County are administered by each county's registrar of voters. Registrars of voters are included in the definition, and are thus "synonymous with," "county clerks" in NRS chapter 293.  *See* NRS 293.040, 293.044; *see also* NRS 244.164.  This Motion's reference to county clerks includes registrars of voters.

[3] Available at https://www.leg.state.nv.us/Session/80th2019/Bills/AB/AB345_EN.pdf.

[4] Available at https://www.leg.state.nv.us/Session/81st2021/Bills/AB/AB321_EN.pdf.

[5] Available at https://www.leg.state.nv.us/Session/32nd2020Special/Bills/AB/AB4_EN.pdf.

1.   Except as otherwise provided in subsection 2 and chapter 293D of NRS, in order for a mail ballot to be counted for any election, the mail ballot must be:

      ***

      (b)  Mailed to the county clerk, and:

          (1)  Postmarked on or before the day of the election; and

          (2)  Received by the clerk not later than 5 p.m. on the fourth day following the election.

      2.   If a mail ballot is received by mail not later than 5 p.m. on the third day following the election and the date of the postmark cannot be determined, the mail ballot shall be deemed to have been postmarked on or before the day of the election.

NRS 293.269921 (the "Mailbox Deadlines").

## C.   The Organizational Plaintiffs' Prior Lawsuit

In 2020, Donald J. Trump for President, Inc., the RNC, and the NVGOP sued then Nevada Secretary of State Barbara K. Cegavske in the U.S. District Court for the District of Nevada in connection with the implementation of AB 4.   *See* Am. Compl. for Decl. and Inj. Relief, *Donald J. Trump for President, Inc. v. Cegavske*, Case No. 2:20-cv-01445-JCM-VCF (D. Nev. Aug. 20, 2020), ECF No. 29 ("Cegavske Amended Complaint").   Among other things, AB 4 provided that mail ballots would be counted if they were (1) "[p]ostmarked on or before the day of the election" and "[r]eceived by the clerk not later than 5 p.m. on the seventh day following the election," AB 4 § 20(1)(b), and (2) "received by mail not later than 5 p.m. on the third day following the election and the date of the postmark cannot be determined," *id.* § 20(2).

The plaintiffs in the 2020 action challenged the legality of AB 4 § 20(2) because it "allow[ed] absent ballots to be cast after Election Day but still be counted as lawfully cast in the 2020 general election" in violation of, among other things, the Federal Election Day Statutes.   *See* Cegavske Amended Complaint ¶ 119.   They also claimed that AB 4 §§ 20(1)(b) and 20(2) "require[d] counties to accept and count ballots received after Election Day—including ballots that may have been mailed after Election Day," in violation of the right to vote.   *See id.* ¶ 167.   Because maximizing opportunities for voters to vote should not be a partisan issue, the Republican Secretary of State moved to dismiss, and the court granted ///

the motion because the plaintiffs did not have either associational or direct organizational standing.  *See generally Cegavske*, 488 F. Supp. 3d 993.

### D.    This Lawsuit

Plaintiffs challenge Nevada's laws providing for the counting of mail ballots cast by election day but received up to four days after election day.  *See e.g.*, Compl. ¶¶ 3–5.  They assert three claims.  In Count I, Plaintiffs claim the Federal Election Day Statutes preempt the Mailbox Deadlines.  *Id.* ¶¶ 62–71.  In Count II, Plaintiffs assert violations of the First and Fourteenth Amendments because Plaintiffs must "spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns."  *Id.* ¶¶ 72–76.  In Count III, Plaintiffs claim the Mailbox Deadlines violate the Fourteenth Amendment because they allow the counting of "illegitimate votes," leading to vote dilution.  *Id.* ¶¶ 77–82.

Plaintiffs request a declaratory judgment that the Mailbox Deadlines violate the Fourteenth Amendment, 2 U.S.C. §§ 1, 7, and 3 U.S.C. § 1.  Compl. at 16.  Furthermore, Plaintiffs request preliminary and permanent injunctions prohibiting Defendants from enforcing the Mailbox Deadlines for the November 5, 2024 general election, which is just over 5 months away.  *See id.*

## III.   LEGAL STANDARDS

### A.    Subject-Matter Jurisdiction

Article III, § 2 of the U.S. Constitution limits federal court jurisdiction to "Cases" and "Controversies."  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016).  "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citations omitted).  To establish the irreducible constitutional minimum of standing, "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision."  *Spokeo, Inc.*, 578 U.S. at 338 (citations omitted).

///

"[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (citation and emphasis omitted). "[T]he subject matter jurisdiction of the district court is not a waivable matter and may be raised at anytime by one of the parties, by motion or in the responsive pleadings, or *sua sponte* by the trial or reviewing court." *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1194 n.2 (9th Cir. 1988) (citations omitted).

## B.    Failure to State a Claim

Fed. R. Civ. P. 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief may be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It must also contain "more than labels and conclusions, and a formulaic recitation of a cause of action's elements." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level" and "nudge[] [a plaintiff's] claims across the line from conceivable to plausible." *Id.* at 555, 570 (citations omitted). Courts will "discount[] conclusory statements, which are not entitled to the presumption of truth, before determining whether a claim is plausible." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (citation omitted).

## IV.    ARGUMENT

### A.    Plaintiffs Lack Standing

Plaintiffs advance several theories of standing. The Organizational Plaintiffs claim associational standing, *see* Compl. ¶¶ 13, 17, 19, and organizational standing based on a diversion of resources and competitive harm, *id.* ¶¶ 5, 14, 49. Plaintiffs also claim vote dilution as an alleged injury. *Id.* ¶¶ 4, 50–51, 56–60. The Organizational Plaintiffs, however, are precluded from re-litigating standing after the *Cegavske* court found they did not have standing in a lawsuit challenging the counting of mail ballots received after election day. Even if they were not precluded, their theories fare no better this time around.

1

2

**1.      The Organizational Plaintiffs Are Precluded from Challenging the Counting of Mail Ballots Received After Election Day**

3      Issue preclusion applies where: "(1) the issue at stake was identical in both

4  proceedings; (2) the issue was actually litigated and decided in the prior proceedings;

5  (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary

6  to decide the merits." *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019) (citations

7  omitted).  The question of the Organizational Plaintiffs' standing to challenge the counting

8  of mail ballots received after election day has already been litigated and decided.  In

9  *Cegavske*, the court held that the Organizational Plaintiffs did not have associational or

10 organizational standing to challenge the counting of mail ballots received after election

11 day.[6]  *See generally* 488 F. Supp. 3d 993.  Issue preclusion therefore applies and bars re-

12 litigation of the Organizational Plaintiffs' standing.

13      The issue of standing is identical between the two cases.  In *Cegavske*, the court held

14 (1) the organizations lacked associational standing, *id.* at 1001; (2) the organizations failed

15 to assert a cognizable injury based on a diversion of resources, *id.* at 1001–03; (3) the

16 organizations' alleged injury of vote dilution was generalized and speculative, *id.* at 1000;

17 and (4) the organizations did not have competitive standing, *id.* at 1003.  These are the

18 same theories of injury that Plaintiffs advance here to again challenge the counting of mail

19 ballots received after election day.  Even if Plaintiffs claim they are raising new arguments

20 to support standing, issue preclusion still applies.  The issue the Organizational Plaintiffs

21 seek to re-litigate here is standing, and standing was finally and necessarily decided by the

22 *Cegavske* court.  *See Paulo v. Holder*, 669 F.3d 911, 918 (9th Cir. 2011) ("If a party could

23 avoid issue preclusion by finding some argument it failed to raise in the previous litigation,

24 the bar on successive litigation would be seriously undermined. . . .  The issue sought to be

25

26      [6] While it is Donald J. Trump for President 2024, Inc. that is a plaintiff in this lawsuit and it was
Donald J. Trump for President, Inc. that was a plaintiff in *Cegavske*, issue preclusion still applies.  Apart
27 from focusing on different election years, the two organizations are identical.  Both organizations have been
"the principal committee for President Donald J. Trump's" campaign, Compl. ¶ 18; Cegavske Amended
28 Complaint ¶ 11, and they have the exact same interests.  *See In re Schimmels*, 127 F.3d 875, 881 (9th Cir.
1997) ("'Privity' . . . is a legal conclusion 'designating a person so identified in interest with a party to former
litigation that he represents precisely the same right in respect to the subject matter involved.'").

relitigated in this case is Paulo's eligibility for § 212(c) relief, which was decided in the previous proceeding by the district court.").

Standing was also actually litigated and decided in the prior litigation after a full and fair opportunity to litigate the issue, and the court's decision on standing was the basis for dismissal of the prior action.  There can be no question that issue preclusion applies where a case is dismissed for lack of standing.  *Love v. Villacana*, 73 F.4th 751, 755 (9th Cir. 2023).  It even applies where the decision finding a lack of standing was erroneous.  *Id.* Together with claim preclusion, the purpose of issue preclusion is to "protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decision.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (citation omitted).  The Organizational Plaintiffs' attempt to continue litigating the question of standing should be rejected.

### 2.   Even if Issue Preclusion Does Not Apply, the Organizational Plaintiffs Do Not Articulate a Cognizable Injury

Even absent issue preclusion, the Organizational Plaintiffs have not established standing.

### a.   Diversion of Resources for Representational and Observational Purposes Is Not Adequately Alleged in the Complaint

To claim direct organizational standing, the Organizational Plaintiffs would need to show "both a diversion of [their] resources and a frustration of [their] mission[s]."  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (citation omitted).  The Organizational Plaintiffs appear to concede that they cannot assert a theory of diversion of resources based on education of voters or combatting voter fraud.  *See* Compl. ¶ 6.  Instead, they claim they will need "to divert resources to conduct election activities beyond election day."  *Id.* Specifically, they point to Nevada law that allows Republican representation on mail ballot central counting boards and observation of the handling and counting of mail ballots.  *Id.* ¶ 48.

1    But the Organizational Plaintiffs do not explain how this alleged diversion of

2  resources results in a cognizable injury.  They must "show that [they] would have suffered

3  some other injury if [they] had not diverted resources to counteracting the problem."  *La*

4  *Asociacion*, 624 F.3d at 1088.  They "cannot manufacture the injury by . . . simply choosing

5  to spend money fixing a problem that otherwise would not affect [them] at all."  *Id.* (citation

6  omitted).  Nothing in the Complaint explains how the Organizational Plaintiffs would

7  suffer any injury if they did not expend resources on representation and observation.  The

8  use of resources for these purposes is not fairly traceable to the challenged laws allowing

9  for the counting of mail ballots received after election day; the Organizational Plaintiffs

10  would instead be expending those resources as a result of their "own budgetary choices."

11  *United Poultry Concerns v. Chabad of Irvine*, 743 F. App'x 130, 131 (9th Cir. 2018) (citation

12  omitted); *see also Donald J. Trump for President, Inc. v. Way*, Civil Action No. 20-10753

13  (MAS) (ZNQ), 2020 WL 6204477, at *11 (D.N.J. Oct. 22, 2020) ("*Way II*") (in challenge to

14  law allowing for the counting of mail ballots arriving after election day, holding Plaintiffs'

15  assertion of needing to hire and educate poll watchers unavailing because Plaintiffs "cannot

16  manufacture standing merely by inflicting harm on themselves based on their fears of

17  hypothetical future harm that is not certainly impending").

18    Furthermore, as the Organizational Plaintiffs acknowledge, mail ballots must be

19  counted "on or before the seventh day following the election."  Compl. ¶ 39 (quoting

20  NRS 293.269931).  Presumably, with or without the challenged laws, the Organizational

21  Plaintiffs would expend resources to be represented on counting boards and observe the

22  counting of ballots.  They offer nothing to suggest that absent the challenged laws, the

23  counting of mail ballots would be completed faster.  For instance, absent the Mailbox

24  Deadlines, individuals who would otherwise mail their ballots on election day might mail

25  their ballots earlier, resulting in no decrease in ballots to be counted.  It would be

26  speculative to claim that the Mailbox Deadlines have an impact on the time it takes to

27  count mail ballots.  And as discussed below, any risk of vote dilution is speculative and not

28  certainly impending, and the Organizational Plaintiffs cannot "manufacture standing" by

incurring costs in response to that speculative risk. *Clapper*, 568 U.S. at 416 ("Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."); *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 380–81 (W.D. Pa. 2020) ("[S]pending money in response to [a] speculative harm cannot establish a concrete injury.")

   **b.** **Diversion of Resources for Voter Education Is Not Adequately Alleged in the Complaint**

   Next, while the Organizational Plaintiffs appear to repudiate reliance on a theory of diversion of resources based on voter education because it was already rejected in *Cegavske*, *see* Compl. ¶ 6, they also claim they will need to divert funds they would use for in-person, election day get-out-the-vote activities to "mail-ballot-specific get-out-the-vote operations," *id.* ¶ 49. As the *Cegavske* court held, educating voters on voting rights is not a cognizable diversion of resources injury. *See* 488 F. Supp. 3d at 1001–02. The Organizational Plaintiffs do not allege that absent voter outreach and education, their voters would not vote. *See id.* at 1002 ("If plaintiffs did not expend any resources on educating their voters on AB 4, their voters would proceed to vote in-person as they overwhelmingly have in prior elections."). They do not explain what problem they would be counteracting by diverting resources to educating voters about mail voting as opposed to in-person, election-day voting. The goal is to get voters to vote by election day, and it does not matter whether the Organizational Plaintiffs want to encourage in-person voting as opposed to mail-ballot voting.

   At bottom, Plaintiffs' "diversion of resources in response to . . . unpostmarked ballots is 'more of a generalized grievance, than an organizational injury.'" *Way II*, 2020 WL 6204477, at *11 (citation omitted). "Finding a cognizable injury because an organization spends money on routine costs such as hiring, training, and educating staff in response to

a new law 'would be to imply standing for organizations with merely "abstract concerns with a subject that would be affected by an adjudication."'" *Id.* (quoting *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012)).  "A finding along those lines would imply that a sincere plaintiff could bootstrap standing by expending its resources merely in response to the actions of another."  *Id.*  "Such a rule would not comport with the case or controversy requirement of Article III of the Constitution."  *Id.* (citation omitted).

### c.  The Organizational Plaintiffs Fail to Allege a Cognizable Competitive Electoral Harms Injury

The Organizational Plaintiffs also claim "competitive electoral harms," Compl. ¶ 6, presumably based on their assertions that Democratic voters tend to vote later than Republican voters, *id.* ¶¶ 56–60.  Competitive standing was already considered and rejected in *Cegavske*.  The court explained that the Organizational Plaintiffs' competitive standing theory failed because "their candidates face no harms that are unique from their electoral opponents."  *Cegavske*, 488 F. Supp. 3d at 1003.  The Mailbox Deadlines do not create any uneven playing field; all voters are afforded the same opportunities to vote, and all candidates are afforded the same opportunities to receive votes.  In any event, as discussed below, Plaintiffs' theory of vote dilution based on the Mailbox Deadlines is deficient.

### d.  The Organizational Plaintiffs Do Not Have Associational Standing

Associational standing requires organizations to have members who "would otherwise have standing to sue in their own right."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  For the same reasons Plaintiffs do not have standing based on vote dilution (as discussed below), the Organizational Plaintiffs also do not have associational standing.

### 3.  Vote Dilution Is Impermissibly Generalized and Speculative

Plaintiffs claim that Republican candidates and voters are disproportionately injured based on a theory of vote dilution.  *See* Compl. ¶¶ 56–60.  The *Cegavske* court already concluded that the Organizational Plaintiffs' theory of vote dilution as a basis for

standing failed because it was generalized and speculative. *Cegavske*, 488 F. Supp. 3d at 1000 ("Plaintiffs' alleged injury of vote dilution is impermissibly 'generalized' and 'speculative' at this juncture."). Nevertheless, because vote dilution appears to be the only theory of standing for the individual plaintiff, the Secretary of State addresses it separately here.

> ### a. The Individual Plaintiff's Alleged Vote Dilution Injury Is Not Cognizable

As to Plaintiff Szymanski, his "right to vote is 'individual and personal in nature,'" and only "voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Gill v. Whitford*, 585 U.S. 48, 65–66 (2018) (citations omitted). But as this Court has recognized, a "[p]laintiff['s] purported injury of having [his] vote[] diluted due to ostensible election fraud may be conceivably raised by any Nevada voter." *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020) (Du, J.). "Such claimed injury therefore does not satisfy the requirement that [the plaintiff] must state a concrete and particularized injury." *Id.* (citations omitted). Vote dilution as a theory of standing has been rejected in a "veritable tsunami" of decisions. *O'Rourke v. Dominion Voting Sys. Inc.*, Civil Action No. 20-cv-03747-NRN, 2021 WL 1662742, at *9 (D. Colo. Apr. 28, 2021), *aff'd* No. 21-1161, 2022 WL 1699425 (10th Cir. May 27, 2022); *see also Wood v. Raffensberger*, 981 F.3d 1307, 1314–15 (11th Cir. 2020) (vote dilution where "'no single voter is specifically disadvantaged' if a vote is counted improperly" is "a paradigmatic generalized grievance that cannot support standing"); *Bost v. Illinois State Bd. of Elections*, 684 F. Supp. 3d 720, 732 (N.D. Ill. 2023) ("Plaintiffs suggest the dilution posed by the Ballot Receipt Deadline Statute violates the Elections Clause, but . . . Plaintiffs do not allege an injury beyond the general grievance that all Illinois voters would share if that were the case.").

Plaintiff Szymanski therefore does not have standing.

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

b.    The Organizational Plaintiffs' Alleged Vote Dilution Injury Is Not Cognizable

The Organizational Plaintiffs' attempt to distinguish Republican candidates and voters as disproportionately impacted, *see* Compl. ¶¶ 14, 56, 60, is also unsupported.  This is an extension of the Organizational Plaintiffs' competitive electoral harms theory of standing that has already been rejected, as explained above.  It is also entirely unlike the kind of vote dilution that can be a basis for standing.  For example, vote dilution can be a basis for standing where there are "irrationally favored" voters, such as where voters from one county are disfavored based on malapportionment.  *See Baker v. Carr*, 369 U.S. 186, 207–08 (1962).  All voters and candidates have the exact same opportunities under the laws here, and the Mailbox Deadlines do not irrationally favor any voter or candidate.  The Organizational Plaintiffs' theory of vote dilution is too generalized and is not particularized.

Even if the Organizational Plaintiffs' theory of disproportionate impact to Republican voters and candidates could be a basis for standing, the Organizational Plaintiffs fail to allege any non-speculative harm.  They allege that (1) Democratic voters cast more mail ballots than Republican voters, *id.* ¶¶ 56, 57, 59, and (2) Democratic voters vote later than Republican voters, *id.* ¶ 58.  But nothing they cite supports that mail ballots arriving after election day "disproportionately break for Democrats."  *See id.* ¶ 56.  First, in the 2022 general election, Democratic voters cast 239,924 mail ballots, and Republican voters cast 153,155 ballots.   Nev. Sec'y of State, *2022 General Election Turnout*, https://perma.cc/N7G7-RUQ9.  Republican voters cast a massive amount of mail ballots in the last general election, and the gap between Republican and Democratic voters voting by mail has been narrowing significantly over time.  *Cf.* Nev. Sec'y of State, *2020 General Election Turnout*, https://perma.cc/Z6F3-SM4N (319,149 Democratic mail ballots and 181,003 Republican mail ballots cast in the 2020 general election); Nev. Sec'y of State, *2024 Presidential Preference Primary Turnout: Cumulative Presidential Preference Primary Election Turnout – Final* (Feb. 20, 2024), https://perma.cc/7USY-5NMY (107,987

Democratic mail ballots, representing 80.1% of Democratic votes cast, and 60,862 Republican mail ballots, representing 75.1% of Republican votes cast, cast in the 2024 presidential preference primary election).[7]  Plaintiffs' theory that Republican voters will cast fewer mail ballots in the 2024 general election compared to Democratic voters is speculative.  *See Way II*, 2020 WL 6204477, at *6 ("It is difficult—and ultimately speculative—to predict injury from evidence of past injury.").

Second, Plaintiffs cite nothing to suggest that mail ballots that arrive after election day are more likely to come from Democratic voters.  Their only citation for this proposition is an article from 2020 that says nothing about mail ballots arriving after election day coming more from Democratic voters than Republican voters.  *See* Compl. ¶ 58 (quoting Ed Kilgore, *Why Do the Last Votes Counted Skew Democratic?*, Intelligencer (Aug. 10, 2020), https://perma.cc/R78D-3Q58).[8]  The article explains that Democratic votes tend to be counted later than other votes, a phenomenon that is in part explained by Democratic voters casting more "provisional ballots" and because mail ballots tend to be counted later than in-person ballots.  *See* Ed Kilgore, *Why Do the Last Votes Counted Skew Democratic?*, Intelligencer (Aug. 10, 2020), https://perma.cc/R78D-3Q58.  The article also theorizes, based on one individual's speculation, not actual facts, that Democratic voters may vote by mail later in an election cycle, but there is no indication that Democratic voters disproportionately cast mail ballots that arrive after election day.  *See id.*  Moreover, Plaintiffs do not allege how many mail ballots were received and counted after election day for any election, and certainly nothing suggesting that late-arriving mail ballots could change the results of an election.  Plaintiffs fail to allege any injury that is "certainly

---

[7] Plaintiffs rely on the Secretary of State's 2020 and 2022 general election reports and 2024 primary election report in their Complaint.  *See* Compl. ¶¶ 57, 59.  The agency reports are therefore incorporated by reference and subject to judicial notice, and they can be considered in this motion to dismiss without converting it to a motion for summary judgment.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999, 1001–02 (9th Cir. 2018); Fed. R. Evid. 201(b)(1)-(2).

[8] This article is also incorporated by reference and can be considered on this motion to dismiss.  *See Khoja*, 899 F.3d at 1002 ("[I]ncoproation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself.  The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims.").

impending" or that there is a "substantial risk" that injury will occur, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), and their theory is therefore too speculative to support standing.

### c.   Plaintiffs Do Not Establish that Their Requested Relief Would Redress Their Alleged Vote Dilution Injury

Finally, it is, at best, speculative that Plaintiffs' requested relief would redress their supposed injuries. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"). They do not so much as allege that, absent the challenged laws, Democratic voters would fail to cast valid votes or that election results would be different. This is a further, independent basis that Plaintiffs fail to establish standing. Rather than wasting money on litigation to try to disenfranchise voters, Plaintiffs' efforts would likely be better spent on remedying their own self-inflicted wound of discouraging Republican voters from voting by mail. *See* Ed Kilgore, *Why Do the Last Votes Counted Skew Democratic?*, Intelligencer (Aug. 10, 2020), https://perma.cc/R78D-3Q58) (noting Donald Trump's "intense efforts to demonize voting by mail").

### B.   Plaintiffs Fail to State a Claim

In addition to failing to establish standing, the Complaint also fails to state a claim upon which relief can be granted. It must therefore be dismissed.

### 1.   The Federal Election Day Statutes Do Not Preempt the Mailbox Deadlines

In their first claim, Plaintiffs assert that the Federal Election Day Statutes preempt the Mailbox Deadlines. *See* Compl. ¶ 69. Not so. Congress originally enacted the Federal Election Day Statutes in 1872 "to remedy more than one evil arising from the election of members of Congress occurring at different times in the different States." *Foster*, 522 U.S. at 69, 73 (*quoting Ex parte Yarbrough*, 110 U.S. 651, 661 (1884)). "Congress was concerned both with the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States, and with the burden

on citizens forced to turn out on two different election days to make final selection of federal officers in Presidential election years." *Id.* (citation omitted).  Neither of those concerns are implicated by the Mailbox Deadlines.

### a.    Plaintiffs' Allegation that There Is Only One Federal Election Day Is Inconsistent with Federal Law, as Voting Before Election Day Is Clearly Permitted

Federal laws speaking of an "election" of a Senator or Representative "plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster*, 522 U.S. at 71.  As the Ninth Circuit has held, election day is the "'consummation' of the process rather than any day during which voting takes place." *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1176 (9th Cir. 2001).  Thus, a state can allow voting to occur before election day without violating federal election day statutes. *Id.*; *see also Millsaps v. Thompson*, 259 F.3d 535, 547 (6th Cir. 2001) ("An 'election' under the federal statutes requires more than just voting, and the Early Voting Statutes do not create a regime of combined action meant to make a final selection on any day other than federal election day."); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 777 (5th Cir. 2000) ("In short, the Texas Early Voting statutes further the important federal objective of reducing the burden on citizens to exercise their right to vote by allowing them to vote at a time convenient to them, without thwarting other federal concerns.").

### b.    Counting Ballots After Election Day Is Also Permitted by Federal Law

Just as the Federal Election Day Statutes do not preclude a voter from casting a vote before election day, the Federal Election Day Statutes also do not foreclose the counting of ballots cast by election day.  There is nothing requiring that all election activities cease on election day; indeed, "official action to confirm or verify the results of the election extends well beyond federal election day." *See Millsaps*, 259 F.3d at 546 n.5.  For instance, the counting of mail ballots extends through the seventh day after an election, NRS 293.269931, and boards of county commissioners canvass returns on or before the

10th day following the election, NRS 293.387(1).  Federal law even specifies that official activities relating to the appointment of presidential electors may continue beyond election day; each state's executive can wait until "6 days before the time fixed for the meeting of the electors" to "issue a certificate of ascertainment of appointment of electors."  3 U.S.C. § 5(a)(1).  The counting of ballots is part of "the mechanics" that states retain authority over unless preempted, *see Foster*, 522 U.S. at 69, and the Federal Election Day Statutes do not provide for the counting of all ballots on election day.

### c.  Federal Statutes Are Silent on When Ballots May Be Received and Counted

Similarly, the Federal Election Day Statutes do not set a date for when an official must receive mail ballots.  *See Bost*, 684 F. Supp. 3d at 736 ("There is a notable lack of federal law governing the timeliness of mail-in ballots."); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020) ("*Way I*") ("The Court finds that New Jersey's law permitting the canvassing of ballots lacking a postmark if they are received within forty-eight hours of the closing of the polls is not preempted by the Federal Election Day Statutes because the Federal Election Day Statutes are silent on methods of determining the timeliness of ballots.").  This conclusion is bolstered by Congress's choice not to establish a ballot-receipt deadline despite a widespread practice of states permitting ballots to arrive after election day.  *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67 (1989) ("The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to 'stand by both concepts and to tolerate whatever tension there [is] between them.'"); *Keisling*, 259 F.3d at 1175 ("What persuades us of the proper outcome in this difficult case is the long history of congressional tolerance, despite the federal election day statute, of absentee balloting and express congressional approval of absentee balloting when it has spoken on the issue."); *Bomer*, 199 F.3d at 776 ("We are unable to read the federal election day statutes in a manner that would prohibit such a universal, longstanding practice of which Congress was obviously aware.").

The District of Columbia and most states count at least some ballots that arrive after election day.[9]  *See Bost*, 684 F. Supp. 3d at 736 ("Despite these ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules.").

### d.   Congress Has Recognized that Ballots Can Be Received After Election Day

Congress also enacted the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), which provides for absentee ballots in federal elections for specified voters.  *See* 52 U.S.C. §§ 20301-20311.  Notably, UOCAVA provides for the delivery of absentee ballots but does not require that the absentee ballots be delivered by election day.  Instead, UOCAVA requires the "implement[ation] of procedures that facilitate the delivery of marked absentee ballots . . . not later than the date by which an absentee ballot must be received in order to be counted in the election."  52 U.S.C. § 20304(b)(1).  Congress therefore recognized that absentee ballots cast pursuant to UOCAVA could be received after election day if a state's law so provided.  And the executive branch has similarly sought to ensure that UOCAVA voters are not disenfranchised by seeking court-ordered extensions of ballot-receipt deadlines.  *Bost*, 684 F. Supp. 3d at 737; *see also* U.S. Dep't of Justice, *Cases Raising Claims Under the Uniformed And Overseas Citizen Absentee Voting Act*, https://www.justice.gov/crt/cases-raising-claims-under-uniformed-and-overseas-citizen-absentee-voting-act (collecting UOCAVA cases, including cases where extensions of ballot-receipt deadlines were requested).  "The[] longstanding efforts by Congress and the executive branch to ensure that ballots cast by Americans living overseas are counted, so long as they are cast

---

[9] *See* Ala. Code § 17-11-18(b); Alaska Stat. § 15.20.081(h); Ark. Code Ann. § 7-5-411(a)(1)(A)(ii)(a); Cal. Elec. Code § 3020(b); D.C. Code § 1-1001.05(a)(10B); Fla. Stat. § 101.6952(5); Ga. Code Ann. § 21-2-386(a)(1)(G); 10 Ill. Comp. Stat. 5/19-8(c), 5/18A-15(a); Ind. Code § 3-12-1-17(b); Kan. Stat Ann. 25-1132(b); Md. Code Ann., Elec. Law § 9-309; Md. State Bd. of Elections, *Mail-in Voting: Information and Instructions for the 2024 Elections*, https://elections.maryland.gov/voting/absentee.html ("How do I return my voted ballot?); Mass. Gen. Laws ch. 54 § 93; Mich. Comp. Laws § 168.759a(18); Miss Code Ann. § 23-15-637; Mo. Rev. Stat. § 115.920(1); NRS 293.269921(1)(b), (2); N.J. Stat. Ann. § 19:63-22(a); N.Y. Elec. Law § 8-412(1); N.D. Cent. Code Ann. § 16.1-07-09; Ohio Rev. Code Ann. § 3509.05(D)(2)(a); Or. Rev. Stat. § 254.470(6)(e)(B); 25 Pa. Cons. Stat. § 3511(a); R.I. Gen. Laws § 17-20-16; S.C. Code Ann. § 7-15-700; Tex. Elec. Code Ann. § 86.007(a)(2); Utah Code Ann. § 20A-3a-204(2)(a); Va. Code Ann. § 24.2-709(B); Wash. Rev. Code Ann. § 29A.40.091(4); W. Va. Code § 3-3-5(g)(2).

by Election Day, strongly suggest that statutes like the one at issue here are compatible with the" Federal Election Day Statutes. *Id.*

Nothing in the Federal Election Day Statutes preempts the counting of mail ballots received after election day.  The question of preemption here is whether the Mailbox Deadlines authorize mail ballots to be cast after election day.  They do not.  Under NRS 293.269921(1)(b) and (2), mail ballots must still be cast by election day.  While Plaintiffs nakedly allege that NRS 293.269921 allows ballots to be cast after election day, *see* Compl. ¶¶ 69, 73, 78, the Complaint contains no allegation, plausible or otherwise, supporting the contention that ballots counted under the Mailbox Deadlines are not cast by election day. *See Way I*, 492 F. Supp. 3d at 372 ("The Court finds, with a high degree of confidence, that ballots lacking a postmark and received within forty-eight hours of the closing of the polls are timely cast."); *Gallagher v. New York State Bd. of Elections*, 477 F. Supp. 3d 19, 44 (S.D.N.Y. 2020) ("[T]he Court concludes with a high degree of confidence that ballots received by the NYCBOE on June 25 were mailed on June 23 or earlier.").  Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted).  Plaintiffs' first claim fails.

### 2. The Mailbox Deadlines Do Not Violate the Right to Stand for Office

In their second claim, Plaintiffs allege that the Mailbox Deadlines violate the First and Fourteenth Amendments with respect to the right to stand for office.  They assert that they will be forced "to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns." Compl. ¶ 74.

Plaintiffs offer nothing more than "naked assertions devoid of further factual enhancement," and their Complaint consequently does not suffice. *Iqbal*, 556 U.S. at 678 (cleaned up).  As discussed above, the Mailbox Deadlines are not "unlawful" as they are not preempted by Federal law.  Plaintiffs' second claim is therefore as baseless as their first.  Further, Plaintiffs do not plausibly allege that the Mailbox Deadlines would cause them to

expend additional resources or otherwise modify their actions.  With or without the Mailbox Deadlines, Plaintiffs almost certainly would still choose to be represented on mail ballot central counting boards and to observe the handling and counting of mail ballots.  *See* Compl. ¶ 48.  They also already will spend money on voter outreach, and they do not explain why they would need to spend money differently based on the Mailbox Deadlines since the goal is to get voters to vote.  *See id.* ¶ 49.  At bottom, "[s]pending time and money on campaigning is an inevitable feature of running for office, and Plaintiffs do not contend that the extra time and money they might have to spend due to the [Mailbox Deadlines] prevents them from standing for office at all."  *Bost*, 684 F. Supp. 3d at 739.

Even if Plaintiffs had included sufficient plausible allegations in support of their claim, the claim would still fail.  Electoral process regulations are evaluated under the *Anderson/Burdick* standard, which comes from the Supreme Court's decisions in *Burdick v. Takushi*, 504 U.S. 428 (1992) and *Anderson v. Celebrezze*, 460 U.S. 780 (1983).  "The *Anderson/Burdick* framework arose out of the Supreme Court's resolution of competing constitutional commands and the practical realities of voting laws."  *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1186 (9th Cir. 2021).  The framework recognizes that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process."  *Id.* at 1186–87 (citation omitted).  Courts "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"  *Id.* at 1887 (citation omitted).  Where a law imposes a "[l]esser burden[], . . . a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'"  *Id.* (citation omitted).

Here, Plaintiffs have not explained how the Mailbox Deadlines, which make voting and receiving votes easier, would violate the Constitution.  *See Short v. Brown*, 893 F.3d

671, 677–78 (9th Cir. 2018) ("[T]he appellants [have not] cited any authority explaining how a law that makes it easier to vote would violate the Constitution."). Even if the Mailbox Deadlines could be construed as imposing some kind of burden, they impose "no unequal weighting of votes, no discrimination among voters, and no obstruction or impediment to voting." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1027 (9th Cir. 2016) (citations omitted). All voters are entitled to take advantage of the Mailbox Deadlines and all candidates are entitled to receive votes that are cast consistent with the Mailbox Deadlines. Far from obstructing or impeding voting and the receipt of votes, the Mailbox Deadlines make voting and receiving votes easier. Any burden therefore is not severe. Accordingly, the Mailbox Deadlines are easily justified by Nevada's important regulatory interests in encouraging and allowing as many voters to exercise their fundamental right to vote as possible.

### 3. The Mailbox Deadlines Do Not Violate the Right to Vote

Plaintiffs' third claim that the Mailbox Deadlines violate the Fourteenth Amendment is entirely predicated on the incorrect assertion that mail ballots received after election day are illegitimate. *See* Compl. ¶¶ 79–80. As discussed above, the Federal Election Day Statutes do not preempt the Mailbox Deadlines, and Plaintiffs offer nothing else to suggest that mail ballots counted pursuant to the Mailbox Deadlines are illegitimate. The third claim therefore fails.

### C. Laches Bars Plaintiffs' Request for Injunctive Relief Prohibiting Defendants from Enforcing the Mailbox Deadlines for the 2024 General Election

"Laches is an equitable defense that prevents a plaintiff, who with full knowledge of the facts acquiesces in a transaction and sleeps upon his rights." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950–51 (9th Cir. 2001) (citation and internal quotations omitted). "To demonstrate laches, the defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself." *Id.* at 951 (citation and internal quotations omitted). Laches applies in the election context, even if a plaintiff can make out a constitutional violation.

*See Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1181 (9th Cir. 1988). The critical questions for the application of laches in elections cases are "1) whether [the plaintiffs] knew the basis of their alleged . . . claim sufficiently in advance of the election that they had ample opportunity to seek preelection relief; and 2) whether [the plaintiffs] have advanced an adequate explanation for their failure to seek preelection relief." *See id.*

The Organizational Plaintiffs have had Nevada's laws on counting mail ballots received after election day on their radar since 2020 when they filed the *Cegavske* lawsuit. *See* Complaint for Declaratory and Injunctive Relief, *Donald J. Trump for President, Inc. v. Cegavske*, Case No. 2:20-cv-01445-JCM-VCF (D. Nev. August 8, 2020), ECF No. 1 ¶ 98 ("Section 20.2 of AB4 conflicts with 3 U.S.C. § 1 by permitting absent ballots that have not been postmarked to be counted if they are received by 5:00 pm three days after Election Day (based on a presumption that those ballots were mailed on or before Election Day)."). The current, nearly identical version of the Mailbox Deadlines was approved by the Governor on June 2, 2021, and has been effective since January 1, 2022. *See* AB 321 § 92(3). Now, nearly three years after the Mailbox Deadlines were approved, and over two years from their effective date, Plaintiffs bring this challenge. There can be no excuse for this delay. Given that the Organizational Plaintiffs already tried to challenge Nevada's laws on counting mail ballots received after an election in 2020, Plaintiffs unreasonably delayed in waiting to bring this lawsuit until the 2024 election cycle was already underway and only six months before the 2024 general election.

Nevada had a presidential preference primary election on February 6, 2024, *see* NRS 298.650(1), and will shortly have a primary election on June 11, 2024, NRS 293.175(1). The Mailbox Deadlines have already been in effect in 2024. Yet Plaintiffs ask that Defendants—the Secretary of State and Clark and Washoe County officials—change horses midstream and be enjoined from enforcing the Mailbox Deadlines for the November 5, 2024 general election. *See* Compl. at 16. The Secretary of State has expended significant resources to train election workers on voting laws and to provide voters with guidance and information on how to vote. If Plaintiffs' requested relief is granted for the 2024 general

election, the Secretary of State will be prejudiced by having to expend additional significant resources to educate voters and election workers, and there is still a substantial risk that some voters will not be apprised of the change to the Mailbox Deadlines and will cast ballots that will not be counted.

Additionally, voting by mail saves taxpayer funds; it allows counties to cut down on election day expenditures.  A change in laws governing mail ballots might cause voters to not vote by mail, which would result in an increase in taxpayer dollars needing to be spent for elections.

Furthermore, because county officials are tasked with the counting of mail ballots,[10] Plaintiffs' request that only two counties' officials—Washoe and Clark County—be enjoined from enforcing the Mailbox Deadlines would allow preferential treatment for voters in counties other than Washoe and Clark County, thereby imposing a burden on voters in Washoe and Clark County.  It would also place the 2024 general election ballot counting procedures at odds with the Nevada Constitution, which grants each voter the right "[t]o a uniform, statewide standard for counting and recounting all votes accurately as provided by law."  Nev. Const. art. 2 § 1A(10); *see also* NRS 293.2546(10).  The Secretary of State would be highly prejudiced in having to suffer the potential disenfranchisement of voters of the state for which he serves as Chief Officer of Elections, and also would be potentially subjected to lawsuits by voters who claim a violation of their rights under the Nevada Constitution.

Finally, in the context of elections, an unreasonable delay "can prejudice the administration of justice 'by compelling the court to steamroll through . . . delicate legal issues in order to meet' election deadlines."  *Ariz. Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 923 (D. Ariz. 2016).  The 2024 general election is just over five months away, which gives very little time for this Court and potentially appellate courts to determine whether to enjoin enforcement of the Mailbox Deadlines before the 2024 general election.

---

[10] *See, e.g.*, NRS 293.269929 (county clerk appoints mail ballot central counting board); NRS 293.269933 (mail ballot central counting boards process mail ballots); NRS 293.387 (boards of county commissions canvass returns); *see also* Compl. ¶¶ 21, 23.

An accelerated schedule for briefing delicate issues of election law would cause prejudice to the Secretary of State as well.

The Court should decline to grant Plaintiffs' requested relief prohibiting Defendants from enforcing the Mailbox Deadlines for the 2024 general election based on the doctrine of laches.

**III.    CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint.

DATED this 30th day of May 2024.

AARON D. FORD
Attorney General

By: */s/ Laena St-Jules*
LAENA ST-JULES (Bar No. 15156)
 Senior Deputy Attorney General
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
T: (775) 684-1100
E: lstjules@ag.nv.gov

*Attorneys for Secretary of State*