David R. Fox (NV Bar No. 16536)
Christopher D. Dodge (*pro hac vice*)
**Elias Law Group LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
(202) 968-4490
dfox@elias.law
cdodge@elias.law

Bradley S. Schrager (NV Bar No. 10217)
Daniel Bravo (NV Bar No. 13078)
**Bravo Schrager LLP**
6675 South Tenaya Way, Suite 200
Las Vegas, NV 89113
(702) 996-1724
bradley@bravoschrager.com
daniel@bravoschrager.com

*Attorneys for Intervenor-Defendants*
*Vet Voice Foundation and Nevada Alliance for Retired Americans*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; NEVADA REPUBLICAN PARTY; DONALD J. TRUMP FOR PRESIDENT 2024, INC.; and DONALD J. SZYMANSKI, | Case No. 3:24-cv-00198=MMD-CLB |
| Plaintiffs, | |
| v. | **INTERVENOR-DEFENDANTS' MOTION TO DISMISS**[1] |
| CARI-ANN BURGESS, *in her official capacity as the Washoe County Registrar of Voters*; JAN GALASSINI, *in her official capacity as the Washoe County Clerk;* LORENA PORTILLO, *in her official capacity as the Clark County Registrar of Voters;* LYNN MARIE GOYA, *in her official capacity as the Clark County Clerk;* FRANCISCO AGUILAR, *in his official capacity as Nevada Secretary of State,* | |
| Defendants. | |

---

[1] Intervenors filed this Motion to Dismiss as a Proposed Motion to Dismiss on June 5, 2024, ECF No. 69, pending adjudication of their Motion to Intervene. Intervention was granted on June 6, 2024. ECF No. 70.

1   Vet Voice Foundation ("Vet Voice") and the Nevada Alliance for Retired Americans

2   ("Alliance") (together, "Intervenors") move to dismiss the Complaint in this action under Federal

3   Rules of Civil Procedure 12(b)(1) and 12(b)(6).

4   **INTRODUCTION**

5   Nevada law includes a commonsense measure under which mail ballots are counted if they

6   are "[p]ostmarked on or before the day of the election;" and "[r]eceived by the clerk not later than

7   5 p.m. on the fourth day following the election." NRS 293.269921(1). This avoids disenfranchising

8   eligible and qualified voters who timely cast mail ballots on or before election day that are

9   delivered shortly after. More than twenty states and territories have similar laws.

10   Plaintiffs—the Republican National Committee, Nevada Republican Party, Donald J.

11   Trump for President 2024, Inc., and Donald J. Szymanski ("Plaintiffs")—seek to strike down this

12   sensible rule by arguing that it conflicts with the federal Election Day Statutes, 2 U.S.C. §§ 1, 7

13   and 3 U.S.C. § 1, and, as a result, violates Plaintiffs' constitutional rights to vote and stand for

14   office. *See* Compl. ¶¶ 62–82, ECF No. 1. They ask this Court to order that Nevada election officials

15   reject and refuse to count all mail ballots that arrive after election day, despite their being timely

16   cast by qualified Nevada voters. There is no legal basis for that demand.

17   Plaintiffs have tried this gambit before. Just months ago, they filed a nearly identical

18   complaint in Mississippi challenging that state's similar ballot receipt deadline. *See generally*

19   Compl., *Republican National Committee v. Wetzel*, Case No. 1:24-cv-25 (S.D. Miss. Jan. 6, 2024),

20   ECF No. 1 ("*Wetzel* Compl."). Prior to that suit, four different courts—including yet another case

21   where the RNC was plaintiff—rejected the precise claims the Plaintiffs raise here, either on

22   standing, the merits, or both.[2] Undeterred by this uniform record of failure, the Plaintiffs now ask

23   this Court to be the first in the nation to strike down such a ballot receipt law.

---

25   [2] *See, e.g.*, *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 348–49 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *Bost v. Ill.*

26   *State Bd. of Elections*, 684 F. Supp. 3d 720, 739 (N.D. Ill. July 26, 2023), *appeal pending* No. 23-2644 (7th Cir.); *Splonskowski v. White*, No. 1:23-CV-00123, 2024 WL 402629, at *4 (D.N.D. Feb.

27   2, 2024); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 366 (D.N.J. 2020) ("*Way I*"); *see also Donald J. Trump for President, Inc. v. Way*, No. 20-10753 (MAS) (ZNQ),

28   2020 WL 6204477, at *11 (D.N.J. Oct. 22, 2020) ("*Way II*").

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

The fifth or sixth time is not the charm. Plaintiffs lack standing to bring their claims. They fail to allege any organizational injury because they do not allege any concrete, non-speculative diversion of resources, or cognizable harm to their candidates' electoral prospects, as a result of a deadline that merely allows more ballots mailed by qualified and eligible voters on or before election day to be counted. Plaintiffs also fail to state a claim for which relief may be granted. Their statutory claim fails because Plaintiffs have no private right of action to enforce the Election Day Statutes, and because Nevada law does not conflict with those statutes in any event. And their constitutional claims fail because they show no constitutional violation under the governing *Anderson-Burdick* analysis. Nevada's ballot receipt deadline is fully compatible with federal law. The Court should dismiss Plaintiffs' claims in full.

## BACKGROUND

### I.   Nevada's mail ballot voting laws.

Voting by mail is extremely popular in Nevada.[3] For "every election," the county clerk sends a mail ballot to "each active registered voter in the county and each person who registers to vote or updates his or her voter registration information not later than the 14 days before the election," unless the voter chooses to opt out of receiving a mail ballot. NRS 293.269911. If the voter opts to return their ballot by mail, it must be "[m]ailed to the county clerk, and: (1) [p]ostmarked on or before the day of the election; and (2) [r]eceived by the clerk not later than 5 p.m. on the fourth day following the election." NRS 293.269921(1)(b). "If a mail ballot is received by mail not later than 5 p.m. on the third day following the election and the date of the postmark cannot be determined, the mail ballot shall be deemed to have been postmarked on or before the day of the election." NRS 293.269921(2).

NRS 293.269921's "Mail Ballot Receipt Deadline" was enacted in 2021. *See* Act of June 2, 2021, Ch. 248, 2021, 2021 Nev. Laws 1213, 1214. It shortened the pre-existing mail ballot receipt deadline by three days, from "5 p.m. on the seventh day following the election" to 5 p.m.

---

[3] *See* Nev. Sec'y of State, *Voter Turnout*, https://silverstateelection.nv.gov/vote-turnout/ (last accessed May 9, 2024) (showing 56.7% of primary voters and 51.21% of general election voters cast mail ballots in 2022).

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

on the *fourth* day following the election. *Id.* Over twenty states and territories have similar laws allowing mail ballots to be counted if they are received within a certain period after election day.[4] Among these states and territories, Nevada's Mail Ballot Receipt Deadline is relatively modest—most allow even *more* time for timely-cast ballots to arrive after election day.

Many other key acts of election administration in Nevada also happen after election day by both necessity and statutory design. *E.g.*, NRS 293.269927 (signature confirmation process, including curing, occurring up to six days after election day); NRS 293.413 (election contest must be filed no later than 14 days after election); NRS 293.403 (recount must be requested no later than three days after canvass); NRS 293.391 (requiring preservation of ballots for certain period of time and two week notice before their destruction). This includes the actual counting of mail ballots, NRS 293.269931 (count must be completed by seventh day following election, or three days after the Mail Ballot Receipt Deadline), as well as the canvass, NRS 293.387(1) (canvass must be completed by tenth day following election).

## II.    Plaintiffs' Complaint and Similar Lawsuits

Plaintiffs seek an injunction prohibiting Defendants from counting any absentee ballots received by mail after election day in all future congressional and presidential elections in Nevada, as well as a declaration that the Ballot Receipt Deadline deprives them of rights secured by the Constitution and Acts of Congress. *See* Compl. at 15–16 (Prayer for Relief). Since 2020, similarly-situated plaintiffs have made at least five prior attempts to challenge ballot receipt deadlines in federal court under similar theories—including two cases brought by the RNC (with others) and one brought by the Trump Campaign. All have failed.

In the first case, *Way I*, the RNC, the Trump campaign, and the New Jersey Republican Party alleged that a New Jersey law allowing officials to canvass ballots received within two days of election day was preempted by the Election Day Statutes. 492 F. Supp. 3d at 369. The district court rejected the plaintiffs' motion for a preliminary injunction, finding they were unlikely to

---

[4] *See Tbl. 11: Receipt & Postmark Deadlines for Absentee/Mail Ballots*, Nat'l Conf. of State Legs. (Mar. 18, 2024), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots.

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

1    succeed on the merits. *Id.* at 373. It later dismissed the action for lack of standing. *Way II*, 2020

2    WL 6204477, at *11 (finding alleged injury speculative and generalized grievance).

3           Next, a Pennsylvania Republican congressional candidate and voters brought a similarly-

4    reasoned suit challenging the Pennsylvania Supreme Court's decision that Pennsylvania's

5    constitution required a three-day post-election receipt deadline. *See Bognet*, 980 F.3d at 345–46.[5]

6    The district court declined to issue injunctive relief and the Third Circuit affirmed, finding the

7    plaintiffs lacked standing. *Id.* at 364–65.[6]

8           The third case, *Bost*, involved nearly identical challenges to Illinois' 14-day ballot-receipt

9    deadline as here, alleging a "Violation of the Right to Vote," "Violation of the Right to Stand for

10   Office," and "Violation of [the Election Day Statutes]." Compl. at 7–10, *Bost*, No. 22-cv-2754,

11   (N.D. Ill. May 25, 2022), ECF No. 1 ("*Bost* Compl."). Plaintiffs asserted standing as voters based

12   upon the "dilution" of their votes by "invalid" ballots counted after election day, and as a candidate

13   based on the possibility that "invalid" votes would be counted and because the law "forces [him]

14   to spend money and time campaigning after Election Day." 2023 WL 4817073, at *1, *7. The

15   district court dismissed, rejecting each asserted basis for standing and further holding that the

16   plaintiffs had not stated a claim upon which relief may be granted. *Id.* at *14.[7]

17          In July 2023, a county elections administrator brought a fourth case, this one challenging

18   a North Dakota statute that permits mail ballots to be counted if postmarked by the day before

19   election day and received within 13 days of the election. *See Splonskowski*, 2024 WL 402629, at

20   *1. The district court dismissed the case for lack of standing. *Id.* at *2.

21          Finally, the RNC, the Mississippi Republican Party, and others brought a suit nearly

---

[5] In the underlying state court action, the Pennsylvania Supreme Court noted that the Election Day Statutes were consistent with "federal and state law allowing for the tabulation of military and overseas ballots received after Election Day." *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 n.23 (Pa. 2020).

[6] The Supreme Court's vacatur of *Bognet* as moot was not based on the merits but rather in keeping its practice of vacating opinions that become moot on appeal. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950). The vacated decision remains persuasive. *See Melot v. Bergami*, 970 F.3d 596, 599 n.11 (5th Cir. 2020) (finding persuasive a "thoughtful opinion" that was "vacated as moot on rehearing").

[7] The plaintiffs' appeal of that ruling is currently pending, with argument scheduled to be heard by the Seventh Circuit on March 28, 2024. *See Bost*, No. 23-2644 (7th Cir. Aug. 21, 2023).

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

identical to this one in federal court in Mississippi. *See Wetzel* Compl. Cross motions for summary judgment are currently pending.

## STANDARD OF LAW

Rule 12(b)(1) requires dismissal when a plaintiff fails to show it has standing to adjudicate its claims in federal court. A plaintiff must show it has (1) "suffered an injury-in-fact," (2) that is "fairly traceable to the challenged action of the defendant," and (3) that is "likely" to be "redressed by a favorable [judicial] decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). An injury-in-fact requires: (1) the "invasion of a legally protected interest," (2) an injury that is both "concrete and particularized," and (3) an injury that is "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

Rule 12(b)(6) requires that a complaint "'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Dismissal is appropriate if plaintiffs "failed to plead more than conclusory allegations and [their] complaint lacked any cognizable legal theories[.]" *Sherstad v. Countrywide Home Loans, Inc.*, No. 2:10-CV-946 JCM (PAL), 2010 WL 3021614, at *1 (D. Nev. July 29, 2010).

## ARGUMENT

### I.    Plaintiffs lack standing.

Plaintiffs assert three theories of standing: organizational injury based on a diversion of resources, a competitive injury to their candidates' electoral prospects, and vote dilution. Plaintiffs do not adequately allege an injury in fact under any of these theories.

#### A.    Organizational Plaintiffs have not suffered a cognizable diversion of resources injury.

Organizations can show standing if a challenged law "frustrated their organizational missions and . . . they diverted resources" as a result. *Friends of the Earth v. Sanderson Farms,*

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

*Inc.*, 992 F.3d 939, 942 (9th Cir. 2021) (citing *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019)). Here, this requires facts showing that the Mail Ballot Receipt Deadline "perceptibly impaired [Plaintiffs'] ability to provide the services they were formed to provide." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 765 (9th Cir. 2018) (cleaned up). That means they "affirmative[ly]" "expended additional resources that they would not have otherwise expended" because of the challenged law, not that they merely conducted "business as usual" in continuing "existing advocacy." *Friends of the Earth*, 992 F.3d at 942–43 (internal quotations omitted). And the diversion must be in response to a concrete, imminent, actual harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).

Plaintiffs do not satisfy these requirements. They allege that the Mail Ballot Receipt Deadline forces them to "divert resources from in-person voting activities and election-integrity measures, and instead spend money on mail ballot chase programs and post-election activities." Compl. ¶¶ 14, 17–19. But they provide no specificity on those "programs" and "activities," and they do not explain why the need for them is attributable specifically to mail ballots received after election day, the sole subject of Plaintiffs' claims. Regardless of what happens in this case, mail ballots will be a central component of Nevada elections, and many of them will be counted after election day. Plaintiffs fail to allege any basis for concluding that their mail ballot chase programs and post-election activities are specifically attributable to ballots that arrive after election day, rather than "business as usual." *Friends of the Earth*, 992 F.3d at 942–43.

No surprise, then, that the *Bost* court rejected almost identical allegations as inadequate. *See* 684 F. Supp. 3d at 726, 728–34. As that court explained, "Spending time and money on campaigning is an inevitable feature of running for office . . . ." *Id.* at 739. And the idea that Plaintiffs would need to expend more resources specifically due to ballots received after election day "is not certainly impending" and is "mere conjecture[.]" *Id.* at 733. Even under Nevada law, all mail ballots must be in the mail by Election Day, NRS 293.269921(1)(b), so Organizational Plaintiffs' "electoral fate is sealed at midnight on Election Day, regardless of the resources [they] expend[] after the fact." *Bost*, 684 F. Supp. 3d at 733–34; *see also Way II*, 2020 WL 6204477, at

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

*7 (finding the "unlikely chain of events where a ballot would be 1) cast after Election Day; 2) happen to lack a postmark against Postal Service policy, which is both rare and not correlated to the date the ballot is mailed; and 3) arrive faster than the Postal Service's most optimistic expectations" to be "too speculative and remote to satisfy Article III's actual or imminent injury requirement"); *Bognet*, 980 F.3d at 351–52 ("[F]or Bognet to have standing to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to Bognet's detriment. . . . Bognet does not allege as much, and such a prediction was inherently speculative when the complaint was filed. The same can be said for Bognet's alleged wrongfully incurred expenditures and future expenditures."). Thus, Plaintiffs do not allege any "concrete, non-speculative injuries." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021).

At bottom, Plaintiffs allege that the Mail Ballot Receipt Deadline "harms" them because it allows more ballots cast by qualified voters to be counted. Compl. ¶¶ 14, 46, 56, 60. It is unclear that enfranchising more voters *could* cause anyone to be harmed in a legally cognizable way. *Cf. Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018) (explaining that a law that "makes it easier for some voters to cast their ballots by mail" "does not burden anyone's right to vote"). But even if it could, that alleged "harm"—that too many qualified voters will have their timely cast ballots counted—has nothing to do with any purported diversion of resources. Regardless of what deadline is enforced, every Nevada voter will be entitled to vote by mail, and Plaintiffs will have every incentive to expend all available resources campaigning for their votes.[8]

A contrary ruling would mean that a plaintiff could invoke federal jurisdiction whenever a law facilitated voter turnout and broadened the voting pool. That contravenes basic democratic

---

[8] The same is true of Plaintiffs' asserted rights to "be represented on county mail ballot central counting boards" and "to observe the handling and counting of mail ballots." Compl. ¶ 48 (first citing NRS 293.269929(2) then citing NRS 293.269931(1); and then citing Nev. Admin. Code 293.322(3), (4), 356(1)). Regardless of what happens in this case, many Nevada ballots will be counted after election day and Plaintiffs' alleged desire to observe that counting will be the same. And Plaintiffs have no non-generalized right with respect to these issues in any event. *See* NRS 293.269929(2) (providing only that election board officers "must not all be of the same political party"); Nev. Admin. Code 293.356 (conditional right, subject to county clerk's discretion, for "any person" to observe processing and counting of ballots at central counting place). Nev. Admin. Code 293.322(4) (allowing for observation by "members of the general public").

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

principles and raises Article III traceability concerns. *See Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1002 (D. Nev. 2020) (observing that in cases where courts have recognized organizational standing to challenge an election rule, "the challenged law has a direct and specific impact on a voter's ability to vote"); *cf. Short*, 893 F.3d at 677, 679 (rejecting *Anderson-Burdick* claim challenging law that "ma[de] it easier for some voters to cast their ballots" and kept "access to the ballot [] exactly the same" for other voters, and explaining plaintiffs' theory would "essentially bar a state from implementing any pilot program to increase voter turnout"). Rather, where a "challenged law expands access to voting through mail without restricting prior access to in-person voting . . . plaintiffs need not divert resources to enable or encourage their voters to vote." *Cegavske*, 488 F. Supp. 3d at 1002 (emphasis omitted). Their alleged choice to divert any resources is purely their own, and not traceable to Defendants' enforcement of the Mail Ballot Receipt Deadline.

**B.    Plaintiffs have not demonstrated any injury to their candidates.**

Plaintiffs also fail to adequately allege standing based on threatened harm to their electoral prospects. To invoke "competitive standing," a candidate must "make [a] showing of 'an unfair advantage in the election process.'" *Cegavske*, 488 F. Supp. 3d at 1003 (quoting *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011)). But the Mail Ballot Receipt Deadline applies equally to *all* candidates and to *all* voters, so no one "is specifically disadvantaged" by it. *Bost*, 684 F. Supp. 3d at 737–38 (quoting *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020)); *see also Bognet*, 980 F.3d at 351 (noting "all candidates in Pennsylvania, including Bognet's opponent, are subject to the same rules"). The Mail Ballot Receipt Deadline therefore does not threaten Plaintiffs with any "harms that are unique from their electoral opponents." *Cegavske*, 488 F. Supp. 3d at 1003. The voters that support them stand to be benefitted as much by the deadline as those who support their opponents.

Intervenors are unaware of any case in which a court found that it had jurisdiction because a plaintiff thought that *throwing out ballots cast by qualified voters* would likely hurt their opponent more than them. As the Third Circuit observed in *Bognet*, is it not clear "how counting

- 9 -
INTERVENOR-DEFENDANTS' MOTION TO DISMISS

*more* timely cast votes would lead to a *less* competitive race." 980 F.3d at 351. And Plaintiffs'
claim that many Democratic voters across the country vote by mail and may do so closer to election
day, Compl. ¶¶ 56–59, does not demonstrate that the deadline threatens Plaintiffs' electoral
prospects through any "unfair advantage" or "harms that are unique from their electoral
opponents." *Cegavske*, 488 F. Supp. 3d at 1003.

Plaintiffs' concern that ballots voted before, but received after, election day will
"disproportionately break for Democrats," cutting into "fragile" "early Republican leads in close
races," Compl. ¶¶ 56, 58, also does not state a cognizable injury for standing purposes—
competitive or otherwise. Any "lead" before all ballots are counted is an arbitrary consequence of
the order in which ballots are counted. Unlike a game of musical chairs, where the winner is
whoever happens to be sitting when the music stops, American elections end when all the ballots
are counted. Nevada law confirms: the certificate of election is ultimately delivered to the
"person[] having the highest number of votes," NRS 293.393, 293.034—not whoever happens to
be leading at some point on election night. Plaintiffs have no legal entitlement to any "early lead"
in an election; this basis for standing must be rejected as well.

**C.   Plaintiffs' alleged vote dilution injuries are insufficient to confer standing.**

The Court should also reject Plaintiffs' claim that "timely, valid ballots are *diluted* by
untimely, invalid ballots" due to the Mail Ballot Receipt Deadline. Compl. ¶ 4 (emphasis added);
*see also id.* ¶¶ 50–55, 79–80 (Count III). This exact theory was rejected in *Bost*, 684 F. Supp. 3d
at 731–33, and in *Bognet*, 980 F.3d at 356–60, as well as by a "veritable tsunami" of decisions that
have considered it, *O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL
1662742, at *9 (D. Colo. Apr. 28, 2021) (collecting cases), *aff'd,* No. 21-1161, 2022 WL 1699425
(10th Cir. May 27, 2022), including from this same Court, *see Paher v. Cegavske*, 457 F. Supp. 3d
919, 926 (D. Nev. 2020) (Du, J.).

Plaintiffs contend that "honest votes" carry less overall weight because the Mail Ballot
Receipt Deadline allows "illegitimate" ballots to be counted in violation of federal law. Compl. ¶¶
51, 79–80. This allegedly injures them because more Democrats voted by mail than Republicans

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

in recent elections. *Id.* ¶¶ 55–60. But if Plaintiffs were correct that their votes have been "diluted" by "illegitimate" votes, then so, too, were the votes of every other "honest" Nevada voter. This is a "paradigmatic generalized grievance that cannot support standing." *Bognet*, 980 F.3d at 356 (internal quotation omitted); *see also Bost*, 684 F. Supp. 3d at 730, 733 (finding plaintiffs alleging same injuries lacked standing and noting that "[c]ourts faced with similar allegations have rejected plaintiffs' claims that they possessed standing").

Numerous plaintiffs attempted to secure federal jurisdiction under this very theory in litigation during and after the 2020 elections, without success, with courts uniformly finding that this type of "vote dilution argument fell into the 'generalized grievance' category." *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 608 (E.D. Wis. 2020); *see also Wood*, 981 F.3d at 1314–15 ("'[N]o single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'" (quoting *Bognet*, 980 F.3d at 356)); *O'Rourke*, 2021 WL 1662742, at *6–9 (collecting over a dozen decisions from 2020 election cycle rejecting voter dilution theory); *Page v. Tri-City Healthcare Dist.*, 860 F. Supp. 2d 1154, 1162–63 (S.D. Cal. 2012) ("Plaintiff must show how his averred injury is peculiar to himself, distinguished from an injury shared equally with his fellow citizens."). As this Court correctly put in *Paher*: "Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter. Such claimed injury therefore does not satisfy the requirement that Plaintiffs must state a concrete and particularized injury." 457 F. Supp. 3d at 926. That holding is no less true now than when the Court first reached it four years ago.

The "vote dilution" cases cited in the Complaint which concern apportionment or redistricting illustrate the point. Compl. ¶ 79. Those cases recognize an injury when a law *minimizes* a voter's or a group of voters' voting strength or ability to access the political process *as compared to other voters*. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 207–08 (1962) ("The injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-a -vis voters in

1    irrationally favored counties."); *Reynolds v. Sims*, 377 U.S. 533, 568 (1964) ("[A]n individual's

2    right to vote . . . is unconstitutionally impaired when its weight is in a substantial fashion diluted

3    when compared with votes of citizens living on other parts of the State.").[9] As the Third Circuit

4    put it in *Bognet*, these cases were "concerned with votes being weighed *differently*." 980 F.3d at

5    355 (emphasis added). "Vote dilution can be the basis for standing when voters are harmed

6    compared to 'irrationally favored' voters from other districts." *Clark v. Weber*, No. 2:23-CV-

7    07489-DOC-DFMx, 2023 WL 6964727, at *3 (C.D. Cal. Oct. 20, 2023) (quoting *Wood*, 981 F.3d

8    at 1314). "Here, by contrast, no single voter is disadvantaged relative to another voter[.]" *Id.*

9    Indeed, no single Nevada voter's ballot is alleged to be diluted more than any other, unlike in the

10   redistricting context. Plaintiffs' alleged "vote dilution" harm is thus insufficiently particularized

11   to satisfy Article III's injury-in-fact requirement.

12        **D.    The bare allegation of illegality does not confer standing.**

13        With Plaintiffs' organizational, associational, and vote dilution injuries inadequate, what

14   is left is Plaintiffs' bare assertion that the Mail Ballot Receipt Deadline violates federal law. *See,*

15   *e.g.*, Compl. ¶¶ 67–69, 73, 78, 80. Plaintiffs claim that they should not have to conform their

16   behavior to an allegedly invalid law, *id.* ¶¶ 14, 46, 74, or that their candidates' electoral prospects

17   are harmed and their votes are diluted by the counting of allegedly invalid ballots because of the

18   challenged law, *id.* ¶¶ 4, 50–55, 60, 73, 79. But a claim that "the law . . . has not been followed"

19   is a "generalized grievance about the conduct of government" that is insufficient to show standing.

20   *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam); *see also Allen v. Wright*, 468 U.S. 737,

21   754 (1984) ("This Court has repeatedly held that an asserted right to have the Government act in

22   accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court.");

23   *Clark v. Metro. Life Ins. Co.*, No. ED CV 17-385-JGB (SPx), 2017 WL 10589997, at *4 (C.D.

24   Cal. Dec. 22, 2017) ("[I]f making sure the law is followed as a general matter were sufficient to

25   give a party standing to bring a motion, the standing requirement would be illusory; anyone at any

26

27   ───────────────

[9] Plaintiffs also cite *Anderson v. United States*, 417 U.S. 211 (1974), which was a criminal case
involving a conspiracy to cast fraudulent votes in violation of federal law. That case did not have
anything to do with standing.

28

time would have standing to bring a motion where they believe the law is not being followed, even where the failure in no way affected them."). For this reason, courts have repeatedly found similar plaintiffs lacked standing to pursue similar challenges based on similar theories of injury. *See Bognet*, 980 F.3d at 349; *Bost*, 684 F. Supp. 3d at 731–34. Plaintiffs provide no reason for this Court to find otherwise here.

## II.   Plaintiffs fail to state a claim.

### A.   Plaintiffs have no private right of action for their statutory claim in Count I.

In Count I, Plaintiffs allege that the Mail Ballot Receipt Deadline violates three federal statutes, two which set out the "day for the election" of members of Congress, and the third which sets the day on which "[t]he electors of President and Vice President shall be appointed." 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1. This statutory claim fails at the threshold because Plaintiff has no private right of action to enforce these statutes. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "If the statute itself does not display an intent to create a private remedy, then a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017) (cleaned up). That is true even where a state statute is alleged to conflict with federal law, because "the Supremacy Clause is not the source of any federal rights, and it certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (cleaned up); *see also Tex. Voters All. v. Dallas Cnty.*, 495 F. Supp. 3d 441, 461 (E.D. Tex. 2020) (same as to Election Clause). Suits for declaratory and injunctive relief rather than damages are no exception: *Alexander* itself was such a case. *See Sandoval v. Hagan*, 7 F. Supp. 2d 1234, 1244 (M.D. Ala. 1998), *rev'd*, *Alexander*, 532 U.S. 275.

Plaintiffs' reliance on *Ex parte Young* does not change this. *Ex parte Young* provides a cause of action in one, specific circumstance: where an "individual claims federal law immunizes him from state regulation" and sues for "an injunction upon finding the state regulatory actions preempted." *Armstrong*, 575 U.S. at 326. Thus, the Ninth Circuit allowed an action under *Ex parte*

*Young* where tenants challenged as a violation of the Due Process Clause an eviction procedure under which state courts issued eviction orders without a hearing. *Moore v. Urquhart*, 899 F.3d 1094, 1098, 1103 (9th Cir. 2018). But as the Sixth Circuit has explained, "matters differ when litigants wield *Ex parte Young* as a cause-of-action creating *sword*. In that setting—today's setting—the State is not threatening to sue anyone," and the plaintiff seeks an affirmative change to state conduct, not just immunity from unlawful regulation. *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014). That is the situation *Armstrong* addresses, and it requires a statutory cause of action—*Ex parte Young* does not suffice. *Armstrong*, 575 U.S. at 324–25.

Plaintiffs do not cite any statutory cause of action in support of their statutory claims, and no such cause of action exists. In particular, 42 U.S.C. § 1983 does not authorize Plaintiffs' statutory claims. For a plaintiff to sue under § 1983 based on a violation of a federal statute: (1) "Congress must have intended that the provision in question benefit the plaintiff"; (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence"; and (3) "the statute must unambiguously impose a binding obligation on the States." *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997) (cleaned up). Section 1983 therefore allows suit only for deprivations of "rights, privileges, or immunities secured by the Constitution and laws of the United States . . . not the broader or vaguer 'benefits' or 'interests.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). And on determining "whether Congress intended to create a federal right . . . the question . . . is definitively answered in the negative whe[n] a statute by its terms grants no private rights to any identifiable class." *Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 358–59 (5th Cir. 2020) (quoting *Gonzaga*, 536 U.S. at 283–84). "Accordingly, whe[n] the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* (quoting *Gonzaga*, 536 U.S. at 286).[10]

---

[10] While the Supreme Court addressed a statutory claim under 42 U.S.C. § 1983 based on a violation of the Election Day Statutes in *Foster v. Love*, 522 U.S. 67 (1997), the Court addressed only the meaning of the Election Day Statutes and not the existence of a cause of action. The Fifth

Plaintiffs' statutory claims clearly fail the first element of the *Blessing* test, as clarified in *Gonzaga*. The Election Day Statutes do not contain "rights-creating language" that unambiguously creates an "*individual* entitlement." 536 U.S. at 287 (cleaned up). The Election Day Statutes speak only to the time for holding an election. They make no reference to individual rights, nor do they create any entitlements for any individual. Because no federal statute confers an individual right on Plaintiffs, the Court "need not proceed further than this first step of the *Blessing* test" to conclude that Plaintiffs' statutory claim for a violation of the Election Day Statutes may not be brought under § 1983. *Guzman v. Shewry*, 552 F.3d 941, 953 (9th Cir. 2009). Only Plaintiffs' constitutional claims are the proper subject of a § 1983 lawsuit, and those claims fail for other reasons. *See infra* Part II.C.

### B.     The Mail Ballot Receipt Deadline does not conflict with the Election Day Statutes.

Regardless, the Mail Ballot Receipt Deadline does not conflict with the Election Day Statutes, so it is not preempted by them. The governing preemption analysis differs in this area, because the Elections Clause of the U.S. Constitution expressly grants states the power to set the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congress's power to "by Law make or alter such Regulations." U.S. Const., art. I, § 4, cl.1. Similarly, the Constitution vests Congress with the power to determine when electors for the office of the President and Vice President are chosen, *id.*, art II, § 1, cl. 4, but otherwise reserves the manner of such selection to the states, *id.* art. II, § 1, cl. 2. The Supreme Court has held that as a result of these provisions, federal law "alter[s]" state election laws only when the state law cannot possibly "operate harmoniously" with the federal law "in a single procedural scheme." *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013); *see also Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775

---

Circuit had expressly declined to address that issue below, emphasizing that among the "issues not considered in this opinion" was "whether plaintiffs have stated a claim enforceable under 42 U.S.C. § 1983." *Love v. Foster*, 90 F.3d 1026, 1032 n.8 (5th Cir. 1996). And that decision predated by several years the Supreme Court's narrowing of the scope of permissible § 1983 claims in *Gonzaga*, 536 U.S. at 283 ("We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983.").

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

(5th Cir. 2000) ("[A] state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject."). Congress's power to regulate the "Times, Places, and Manner" of congressional elections supersedes "inconsistent" State laws "so far as it is exercised, *and no farther*." *Arizona*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)) (emphasis added).

There is no conflict here. Plaintiffs argue otherwise only by putting forward an impossibly broad interpretation of the statutory term "day for the election" in the Election Day Statutes. But the plain meaning of that term requires only that voters *cast* their ballots by election day. Plaintiffs' argument that the Election Day Statutes require "receipt" contradicts the statutes' plain text, purpose, structure, and history—not to mention ample federal case law.

### 1.    Plaintiffs' interpretation is inconsistent with the statutory text.

Statutory interpretation begins with the text. *Ross v. Blake*, 578 U.S. 632, 638 (2016). When Congress exercises its power under the Elections Clause, "the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Arizona*, 570 U.S. at 14. Thus, Courts should "read Elections Clause legislation simply to mean what it says." *Id.* at 15. The text of the Election Day Statutes simply designates when the "election" must occur. 2 U.S.C. §§ 1, 7; 3 U.S.C. §§ 1, 21(1). There is no mention of procedures for the transmission, receipt, processing, or counting of ballots. Those decisions are thus left to the states.

As multiple federal courts have explained: "[f]ederal law does not provide for *when* or *how* ballot counting occurs," *Bognet*, 980 F.3d at 353, and the Election Day Statutes "are silent on methods of determining the timeliness of ballots," *Way I*, 492 F. Supp. 3d at 372. Because Congress has not codified a competing receipt deadline, "compliance with both [the Receipt Deadline] and the federal election day statutes does not present 'a physical impossibility,'" and no preemption has occurred. *Millsaps v. Thompson*, 259 F.3d 535, 549 (6th Cir. 2001) (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)). "Put another way, there is no reason to think that simply because Congress established a federal election day it displaced all

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

State regulation of the times for holding federal elections." *Id.*; *see also Bost*, 684 F. Supp. 3d at 736 (holding Illinois' post-election-day receipt deadline "operates harmoniously with the federal statutes that set the timing for federal elections").

Contemporaneous dictionary definitions confirm this. Congress first enacted the Election Day Statutes in the mid-nineteenth century. *See* Act of Jan. 23, 1854, 5 Stat. 721 (1845) (predecessor to 3 U.S.C. § 1); Act of Feb. 2, 1872, 17 Stat. 28 (1872) (predecessor to 2 U.S.C. § 7). As the Supreme Court has observed, nineteenth century dictionaries define "election" as "[t]he day of a public choice of officers." *Foster*, 522 U.S. at 71 (defining an "election" as the voters "act of choosing a person to fill an office" (quoting N. Webster, *An American Dictionary of the English Language* 433 (Charles Goodrich & N. Porter eds. 1869))). That is, "election" day is the day on which the "public" make their "choice."

Applying that definition, there is no conflict. Nevada's Ballot Receipt Deadline ensures that voters make their "choice" by no later than election day. Once the voter mails the ballot—on or before that day—the voter has made their choice. The RNC's assertion that the Mail Ballot Receipt Deadline "holds voting open" after election day, Compl. ¶ 69, is therefore simply wrong. *See Bost*, 684 F. Supp. 3d at 736–37 ("By counting only th[o]se ballots that are postmarked no later than Election Day, the Statute complies with federal law that set[s] the date for Election Day."); *Way I*, 492 F. Supp. 3d at 372 ("New Jersey law prohibits canvassing ballots *cast* after Election Day, *in accordance with the Federal Election Day Statutes*." (emphasis added)).

### 2. *Foster v. Love* does not support Plaintiffs' position.

*Foster v. Love*, 522 U.S. 67 (1997), does not support Plaintiffs' position. In *Foster*, the Supreme Court addressed a Louisiana "open primary" system under which the election of candidates for Congress could be *concluded* as a matter of law *before* the federally-mandated "election day." 522 U.S. at 70. Under that system, if any candidate received a majority of the votes cast in the open primary, they would be "elected," and *no* general election would be held on the federal election day. *Id.* The Court concluded this system was inconsistent with the Election Day Statutes, but it emphasized that its ruling was narrow, holding "only that if an election does

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

take place, it *may not be consummated prior to* federal election day." *Id.* at 72 n.4 (emphasis added). It did not purport to "isolat[e] precisely what acts a State must cause to be done on federal election day . . . in order to satisfy the [Election Day Statutes]." *Id.* at 72.

Nevada's Ballot Receipt Deadline does not "consummate[]" an election "prior to federal election day," or set a competing date on which the voters' selection "is concluded as a matter of law." *Id.* at 72 & n.4. It ensures that the voters' selection is made on or before election day. *Foster*'s holding therefore simply does not apply here.

The RNC seizes on *Foster*'s statement that the term "election" refers to "combined actions of voters and officials meant to make a final selection of an officeholder," *Id.* at 71, to suggest that *all* such actions—including ballot receipt—must occur *on* election day. Compl. ¶ 45. That cannot be right. It cannot be reconciled with the *Foster* Court's "express disavowal . . . that it was establishing any particular actions a State must perform on election day to comply with the federal statutes." *Millsaps*, 259 F.3d at 546 (citing *Foster*, 522 U.S. at 72 & n.4). And the RNC's interpretation would lead to absurd and catastrophic results. Ballot receipt is no different from the counting, canvassing, and any number of other ministerial actions that election officials routinely take after election day. *See id.* at 546 n.5 (recognizing that "official action to confirm or verify the results of the election extends well beyond federal election day"); *see also Bush v. Gore*, 531 U.S. 98, 116 (2000) (Rehnquist, C.J., Scalia & Thomas, JJ., concurring) (cataloguing administrative actions occurring in Florida after election day to conclude the election process). There is no principled reason to distinguish "receipt" from these other administrative actions. *See Millsaps*, 259 F.3d at 545–46 (the "'final selection' of an officeholder requires more than mere receipt of ballots cast by voters.").

There is a far simpler, and less disruptive, answer to what the "the combined actions of voters and officials" refers to. The Court itself supplied the answer in *Foster*: the "combined actions of voters and officials" "may not be *consummated prior* to federal election day." 522 U.S. at 71, 72 n.4. *Foster* pointedly says nothing more.

### 3. The Mail Ballot Receipt Deadline is consistent with the purpose and legislative history of the Election Day Statutes.

The Mail Ballot Receipt Deadline is also consistent with the purpose and legislative history of the Election Day Statutes. The legislative history shows that the Election Day Statutes were enacted to prevent (1) "distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States" and (2) the "burden on citizens forced to turn out on two different election days to make final selections of federal officers in presidential election years." *Bomer*, 199 F.3d at 777; *see also Foster*, 522 U.S. at 73–74; Cong. Globe, 42d Cong., 2d Sess. 141 (1871). Congress also wished to prevent a situation where voters could travel "from one part of the Union to another[] in order to vote" in multiple States. Cong. Globe, 28th Cong., 1st Sess. 679 (1844). Nevada's Ballot Receipt Deadline thus does not implicate any of the evils targeted by the Election Day Statutes because it requires voters to make their final decision on or before election day.

In contrast, declining to count ballots cast on or before election day, but received after election day, would disenfranchise large numbers of Nevadans. In fact, Plaintiffs *admit* that is why they brought this suit. They believe that mail ballots "disproportionately break for Democrats," cutting into "fragile" "early Republican leads in close races," Compl. ¶¶ 56–60. Based on these concerns, they ask the Court to issue an order that would require Nevada to *reject* mail ballots cast by lawful, qualified voters, simply because they arrive after election day—even when the postmark proves they were timely cast. As the Fifth Circuit explained, "we cannot conceive that Congress intended the federal Election Day Statutes to have the effect of impeding citizens in exercising their right to vote. The legislative history of the statutes reflects Congress's concern that citizens be able to exercise their right to vote." *Bomer*, 199 F.3d at 777 (citing Cong. Globe, 42d Cong., 2d Sess. 3407–08 (1872)). Plaintiffs' argument runs directly contrary to this purpose and denigrates the very constitutional rights that Plaintiffs claim they seek to safeguard.

#### 4.   Related statutory provisions confirm the plain text meaning of the Election Day Statutes.

The Election Day Statutes are not Congress's sole enactment governing congressional or presidential elections. And elsewhere in the U.S. Code, federal law acknowledges and respects that many states have post-election ballot receipt deadlines. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005) ("[W]e must examine the statute's text in light of context, structure, and related statutory provisions.").

The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) expressly acknowledges and incorporates state ballot receipt deadlines. UOCAVA generally requires states to permit military and overseas voters to vote absentee in federal elections. 52 U.S.C. § 20302(a)(1). If a UOCAVA voter does not receive a write-in ballot from state authorities by the required deadline, then that voter may instead utilize an alternative "federal write-in absentee ballot." *Id.* § 20303(a)(1). Such federal write-in ballots shall not be counted, however, if the voter also votes a state absentee ballot and that ballot "is received by the appropriate State election official not later than *the deadline for receipt of the State absentee ballot under State law*." *Id.* § 20303(b)(3) (emphasis added). When this provision was first enacted in 1986, *see* UOCAVA, Pub. L. No. 99-410, § 103(b)(3), 100 Stat. 924 (1986), many states had post-election-day receipt deadlines. Rather than choose to displace such laws, Congress expressly recognized them in a federal statute.

The MOVE Act, passed in 2009, also defers to state-law ballot receipt deadlines. It requires officials to ensure that overseas servicemembers' ballots "for regularly scheduled general elections for Federal office" are delivered "to the appropriate election officials" "not later than *the date by which an absentee ballot must be received in order to be counted in the election*." 52 U.S.C. § 20304(b)(1); National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, div. A, tit. V., subtit. H, § 580(a), 123 Stat. 2190 (2009). This language makes no sense if the Election Day Statutes categorically preempted longstanding post-election-day receipt deadlines. And Congress could have just as easily required that such ballots be delivered to election officials "by Election Day." Instead, it again deferred to the states' constitutional prerogative to set this

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

deadline. Thus, "even federal laws governing elections allow ballots received after Election Day to be counted." *Bost*, 684 F. Supp. 3d at 737. "These longstanding efforts by Congress and the Executive Branch to ensure that ballots cast by Americans living overseas are counted, so long as they are cast by Election Day, strongly suggest that statutes like the one at issue here are compatible with the Elections Clause." *Id*.[11]

In contrast, in 1942, Congress required states to permit members of the armed services to vote absentee in federal elections in times of war, providing that "no official war ballot shall be valid . . . if it is received by the appropriate election officials . . . after the hour of closing the polls on the date of the holding of the election." Act of Sept. 16, 1942, ch. 561, 56 Stat. 753, § 9. This shows that, when Congress wishes to set Election Day as a categorical deadline for receipt of ballots, it knows how to clearly do so. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005). And if the Election Day Statutes already required an election day receipt deadline, then there would have been no need for Congress to specify election day as the receipt deadline for military absentee ballots.

**5.    The Mail Ballot Receipt Deadline is consistent with historical practice.**

As described above, post-election absentee ballot receipt deadlines are commonplace in modern elections. But they also have a long pedigree in the United States. In the State of Washington, as early as 1918, voters who were unable to vote in their home counties could cast a ballot in another county which would then be "sealed and returned to the voter's home county." P. Orman Ray, *Absent-Voting Laws, 1917*, 12 Am. Pol. Sci. Rev. 251, 253 (May 1918). To be counted the ballot must have been received by the home county auditor within six days from the date of

---

[11] Plaintiffs' position is also inconsistent with the longstanding practice of federal courts remedying UOCAVA violations. Courts frequently extend ballot receipt deadlines to remedy such violations—even though UOCAVA itself only requires post-election receipt deadlines in limited circumstances. *See Cases Raising Claims Under the Uniformed and Overseas Citizen Absentee Voting Act*, Dep't of Just. (Mar. 24, 2022), https://www.justice.gov/crt/cases-raising-claims-under-uniformed-and-overseas-citizen-absentee-voting-act. Plaintiffs' reading of the Election Day Statutes, if correct, would preclude that remedy. *See INS v. Pangilinan*, 486 U.S. 875, 883 (1988) (explaining that even courts of equity cannot "disregard statutory [] requirements" or "create a remedy in violation of law"); *Perkins v. City of Chi. Heights*, 47 F.3d 212, 217–18 & n.4 (7th Cir. 1995) (recognizing that judicially-imposed consent decree must both remedy a violation of *and comply with federal law*) (emphasis added).

1  the election or primary. *Id.* The Mail Ballot Receipt Deadline likewise requires voters to transmit

2  their ballots by election day, but allows for those ballots to be counted as long as they are received

3  by the relevant election official within five days thereafter. Handing a ballot to a county election

4  official who is not empowered to count or process it, for delivery to the correct county election

5  official, is no different from handing the ballot to a postal worker.

6  "[Y]et Congress has taken no action to curb this established practice." *Bomer*, 199 F.3d at

7  776. As the Ninth Circuit explained in the related context of absentee voting: "What persuades us

8  of the proper outcome in this difficult case is the long history of congressional tolerance, despite

9  the federal election day statute, of absentee balloting and express congressional approval of

10  absentee balloting when it has spoken on the issue." *Voting Integrity Proj., Inc. v. Keisling*, 259

11  F.3d 1169, 1175 (9th Cir. 2001). "Despite these ballot receipt deadline statutes being in place for

12  many years in many states, Congress has never stepped in and altered the rules." *Bost*, 684 F. Supp.

13  3d at 736. That acquiescence is not a product of mere Congressional inattention. Against the

14  backdrop of these longstanding state election laws, Congress has amended the Election Day

15  Statutes several times without addressing ballot receipt deadlines—including most recently in

16  December 2022. *See* Electoral Count Reform and Presidential Transition Improvement Act of

17  2022, Pub. L. No. 117-328, div. P, tit. I, 136 Stat. 4459, 5233 (2022) ("ECRA"). *Cf. Bob Jones

18  Univ. v. United States*, 461 U.S. 574, 599 (1983) (finding "unusually strong case of legislative

19  acquiescence" where Congress was "constantly reminded" and "aware[]" of the issue "when

20  enacting other and related legislation").

21  **C. The Mail Ballot Receipt Deadline does not violate the right to vote or the right to stand for office.**

22  Counts II and III of the Complaint assert violations of Plaintiffs' rights to vote and stand

23  for office. As to these constitutional claims, Plaintiffs do have a private cause of action under 42

24  U.S.C. § 1983: if indeed Plaintiffs' rights to vote and stand for office were threatened, § 1983

25  would allow them to sue. But Plaintiffs fail to allege facts showing a violation of either of those

26  rights, so these counts fail to state a claim for which relief can be granted, for two independent

27  reasons.

28

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

First, each of Plaintiffs' constitutional counts expressly and entirely depends on Plaintiffs' misreading of the Election Day Statutes. Plaintiffs' only basis for alleging that their rights to vote and stand for office are violated is their assertion that the Mail Ballot Receipt Deadline violates federal law. *See* Compl. ¶¶ 73–74, 78–80. Because the Mail Ballot Receipt Deadline is valid, these allegations fail on their own terms. *See supra* Part II.B.

Second, if Plaintiffs were right that the Mail Ballot Receipt Deadline conflicts with the Election Day Statutes, they still do not allege facts showing that the resulting conflict violates their constitutional rights. Not every statutory violation abridges a constitutional right. And Plaintiffs make no effort to show that these alleged statutory violations do so. Alleged burdens on the right to vote and to stand for office under the First and Fourteenth Amendments are reviewed under the *Anderson-Burdick* standard. *See Short*, 893 F.3d at 676; *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) (en banc); *Mecinas v. Hobbs*, 30 F.4th 890, 904 (9th Cir. 2022). "This is a sliding scale test, where the more severe the burden, the more compelling the state's interest must be, such that a state may justify election regulations imposing a lesser burden by demonstrating the state has important regulatory interests." *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018) (quotation marks omitted).

The first step in the constitutional analysis is thus to determine the extent of the burden on Plaintiffs' rights. There is none. The Mail Ballot Receipt Deadline law does not make it harder for anyone to exercise the right to vote. And laws that "make[] it easier for some voters to cast their ballots by mail" "do[] not burden anyone's right to vote." *Short*, 893 F.3d at 677. On its face, the Mail Ballot Receipt Deadline *protects* the right to vote by ensuring that qualified voters do not have their timely-cast ballots rejected. Indeed, the *stated purpose* of this lawsuit is to prevent the counting of lawfully cast votes because Plaintiffs believe those voters—though undisputedly qualified—are more likely to vote for their opponents. Compl. ¶¶ 56–60. Plaintiffs cannot state a constitutional claim by couching their attack on the voting rights of certain voters as an attempt to vindicate their own voting rights. Thus, even if Plaintiffs were right about the Election Day Statutes, they do not allege a resulting violation of their constitutional right to vote.

1    Nor can Plaintiffs plausibly identify any burden on their "right to stand for office." Compl.

2    at 14. "[T]he right to stand for office is to some extent derivative from the right of the people to

3    express their opinions by voting," and refers to the right to have one's name placed on the ballot.

4    *Nader v. Keith*, 385 F.3d 729, 737 (7th Cir. 2004); *see also Ariz. Green Party v. Reagan*, 838 F.3d

5    983, 988 (9th Cir. 2016). That right is not implicated here at all: Donald Trump is on the ballot.

6    He will stand for office.

7    Moreover, the Mail Ballot Receipt Deadline is supported by strong state interests that fully

8    justify any conceivable burden it imposes. Nevada has a strong interest in ensuring that qualified

9    voters who cast timely votes do not have those ballots arbitrarily rejected, and in avoiding the

10   confusion that would follow if the law was suddenly changed as Plaintiffs demand. The Mail Ballot

11   Receipt Deadline and the Election Day Statutes share common purposes in expanding the franchise

12   and protecting the right to vote. "These state interests constitute the very backbone of our

13   constitutional scheme—the right of the people to cast a meaningful ballot." *Utah Republican Party

14   v. Cox*, 892 F.3d 1066, 1084 (10th Cir. 2018); *Soltysik*, 910 F.3d at 447 ("[A]voiding voter

15   confusion . . . is an important government interest.").

16   The Mail Ballot Receipt Deadline sets a clear, predictable rule for voters to know when

17   they must mail their ballot to ensure that it is counted, enabling eligible voters to consume more

18   information about candidates as it becomes available closer to election day, which benefits both

19   candidates and voters. It also accounts for significant mail delays that have plagued previous

20   elections. Because Plaintiffs lack standing to bring this case, they complain of an illusory conflict

21   between rights reserved to Nevada and federal law, and they fail to state a cognizable constitutional

22   claim, Intervenor-Defendants are entitled to judgment as a matter of law.

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, Intervenor-Defendants respectfully request that the Court dismiss Plaintiffs' claims as a matter of law.

Dated: June 7, 2024

Respectfully submitted,

**ELIAS LAW GROUP LLP**


By: */s/ Daniel Bravo*
_____

David R. Fox (NV Bar No. 16536)
Christopher D. Dodge (*pro hac vice*)
**Elias Law Group LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
(202) 968-4490
dfox@elias.law
cdodge@elias.law

Bradley S. Schrager (NV Bar No. 10217)
Daniel Bravo (NV Bar No. 13078)
**Bravo Schrager LLP**
6675 South Tenaya Way, Suite 200
Las Vegas, NV 89113
(702) 996-1724
bradley@bravoschrager.com
daniel@bravoschrager.com

*Attorneys for Intervenor-Defendants*

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

- 25 -

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 7th day of June, 2024, a true and correct copy of Intervenors'
Motion to Dismiss was served via the United States District Court's CM/ECF system on all parties
or persons requiring notice.


By:   */s/ Dannielle Fresquez*
Dannielle Fresquez, an employee of
Bravo Schrager LLP

INTERVENOR-DEFENDANTS' MOTION TO DISMISS

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC