Jeffrey F. Barr (NV Bar No. 7269)
8275 South Eastern Avenue, Suite 200
Las Vegas, NV 89123
(702) 631-4755
barrj@ashcraftbarr.com

Thomas R. McCarthy* (VA Bar No. 47145)
Conor D. Woodfin* (VA Bar No. 98937)
Thomas S. Vaseliou* (TX Bar No. 24115891)
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
conor@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

Sigal Chattah (NV Bar No. 8264)
5875 S. Rainbow Blvd #204
Las Vegas, NV 89118
(702) 360-6200
sigal@thegoodlawyerlv.com

David A. Warrington* (VA Bar No. 72293)
Gary M. Lawkowski* (VA Bar No. 82329)
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
703-574-1206
DWarrington@dhillonlaw.com
GLawkowski@dhillonlaw.com

Michael A. Columbo* (CA Bar No. 271283)
177 Post Street, Suite 700
San Francisco, California 94108
MColumbo@dhillonlaw.com
**admitted pro hac vice*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CARI-ANN BURGESS, et al., <br><br> Defendants. | No. 3:24-cv-198-MMD-CLB <br><br> **RESPONSE IN OPPOSITION TO DNC's MOTION TO DISMISS** |

Plaintiffs—the Republican National Committee, the Nevada Republican Party, Donald J. Trump for President 2024, Inc., and Donald J. Szymanski—file this response in opposition to the Democratic National Committee's motion to dismiss. *See* DNC Mot. (Doc. 59). The DNC's motion raises most of the same arguments as the Secretary of State's motion to dismiss (Doc. 60). To aid the Court's review, Plaintiffs incorporate their arguments made in response to the Secretary to the extent those same arguments are made by the DNC. Plaintiffs expand in this response on the unique arguments made by the DNC. For the reasons discussed in this response, the Court should deny the motion.

## **ARGUMENT**

In 1845, Congress established federal election day as "the Tuesday next after the first Monday in November" for presidential elections. Act of Jan. 23, 1845, ch. 1, 5 Stat. 721 (now codified at 3 U.S.C. §1). Over the years, Congress extended the rule to congressional elections. *See* 2 U.S.C. §§1, 7. This trio of statutes "mandates holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster v. Love*, 522 U.S. 67, 70 (1997). And "[w]hen the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder." *Id.* at 71. That is, the "election" means the "final choice" of a federal officer "by the duly qualified electors." *Newberry v. United States*, 256 U.S. 232, 250 (1921). And when the "combined actions" of an election—casting and receiving ballots—are "concluded as a matter of law before the federal election day," the system violates the federal election-day statutes. *Foster*, 522 U.S. at 72.

**I.     History shows that ballots must be received by election officials no later than election day.**

Were there any doubt over the meaning of the election-day statutes, historical practice resolves it. The Supreme Court has found "historical practice particularly pertinent when it comes to the Elections and Electors Clauses." *Moore v. Harper*, 600

1

1  U.S. 1, 32 (2023). And historical practice "[a]t the time of the Act's adoption" is a good
2  indicator of the original public meaning of a statute. *Wis. Cent. Ltd. v. United States*,
3  585 U.S. 274, 276-77 (2018) (consulting historical practice to interpret the Railroad
4  Retirement Tax Act). The Ninth Circuit thus extensively analyzed the historical
5  absentee voting practice of States and applied it to interpret the election-day statutes.
6  *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1172 (9th Cir. 2001). This
7  history demonstrates that States did not count mail-in ballots received after election
8  day. It was not a practice at the time Congress enacted the election-day statutes, and
9  it remained unheard of for many decades after.

10  During the American Colonial period, most elections were conducted by a show
11  of hands or by a voice vote. *Burson v. Freeman*, 504 U.S. 191, 200 (1992). The Founding
12  saw a gradual transition to the use of paper ballots. "Individual voters made their own
13  handwritten ballots, marked them in the privacy of their homes, and then brought
14  them to the polls for counting." *Id.* Election day during this time was chaotic, "akin to
15  entering an open auction place" marked by bribery and intimidation. *Id.* at 201-02.

16  The scheduling of elections was similarly disorganized. In 1792, Congress
17  established a month-long window for States to appoint presidential electors. The
18  statute required States to appoint presidential electors "within thirty-four days
19  preceding the first Wednesday in December in every fourth year succeeding the last
20  election." Act of March 1, 1792, ch. 8, §1, 1 Stat. 239. The result was that States held
21  their elections on different days over the month of November. For the better part of a
22  century, "Congress left the actual conduct of federal elections to the diversity of state
23  arrangements." *Keisling*, 259 F.3d at 1171.

24  As the telegraph ushered in an era of instant communication, Congress saw the
25  need for a uniform election day. In 1845, Congress mandated that in presidential
26  election years "[t]he electors of President and Vice President shall be appointed, in
27  each State, on the Tuesday next after the first Monday in November." Act of Jan. 23,
28  1845, ch. 1, 5 Stat. 721. Even then, Congress recognized the sweep of its

Opposition to DNC's Motion to Dismiss

1  pronouncement by providing exceptions "for the filling of any vacancy" of electors and
2  for runoff elections if the voters "fail to make a choice on the [election] day." *Id*. After
3  the Civil War, Congress extended the rule to the House of Representatives by
4  providing that "the Tuesday next after the first Monday in November, in every second
5  year … is established as the day for the election." Act of Feb. 2, 1872, ch. 2, §25, 18
6  Stat. 5. Again, Congress carved out exceptions for vacancies and runoff elections. *See*
7  *id.*, §26. It also considered and rejected provisions to allow multi-day voting. *Keisling*,
8  259 F.3d at 1171-74 (detailing the legislative history of the election-day statute).
9  Finally, soon after the Seventeenth Amendment was ratified, Congress included
10 Senators in the uniform election day. *See* Act of June 4, 1914, ch. 103, §1, 38 Stat. 384.
11 By necessity, elections throughout this period were conducted on a single day, and
12 votes were cast and received in person.

13       The DNC points to the advent of absentee balloting during the Civil War, but
14 that only proves the historical practice of election officials receiving ballots by election
15 day. See DNC Mot. 13-14. At the beginning of the war, "there was no legislation under
16 which a soldier or sailor, having the right to vote in an election district of any State
17 could vote anywhere outside of his district." Josiah Henry Benton, *Voting in the Field*
18 5 (1915), available at bit.ly/3TOWdYl. States sought to ensure that soldiers deployed
19 across the nation could still exercise their right to vote. They employed two methods.
20 The first method was "voting in the field," where an election official took the ballot box
21 to the soldiers to enable them to cast their ballots. *Id.* at 15. Through this method, the
22 soldier's "connection with his vote ended when he put it in the box, precisely as it
23 would have ended if he had put it into the box in his voting precinct, at home." *Id.* The
24 other method, "proxy voting," enabled an authorized agent to take the soldier's ballot
25 and cast it directly into the ballot box back home. *Id.* "Under this method it was
26 claimed that the voter's connection with his ballot did not end until it was cast into
27 the box at the home precinct, and therefore that the soldier really did vote, not in the
28 field, but in his precinct." *Id.* Or, in the language of *Foster*, the election was not

3

Opposition to DNC's Motion to Dismiss

1  "consummated" until the soldier's ballot was placed in the ballot box on election day.
2  *Foster*, 522 U.S. at 72 n.4.

3  The idea that soldiers who were not election officials would receive ballots was a frequent source of objection to field-voting. The problem "was avoided by the appointment in the soldiers' voting acts, of officers or soldiers to act in an election as constables, supervisors, etc., as the laws of the State might designate, would act in elections at home." Benton, *supra*, at 17. That is, States designated the soldiers *as election officials* so that they could receive ballots *on election day*. In the absence of that designation, receiving ballots "could not be done by military officers, even if they were authorized to do it by the State," because "voting was a civil matter, which was under the control of civil officers, answerable for the performance of their duties to the civil and not the military power." *Id.* Again, history demonstrates that receipt by election officials on election day was the necessary criteria for a timely ballot.

Absentee voting largely ended with the war. But when war returned, so did absentee voting. By 1918, many States had adopted a variety of absentee voting laws. Washington, for example, permitted absent voters to vote anywhere within the State on election day. P. Orman Ray, *Absent-Voting Laws, 1917*, 12 Am. Pol. Sci. Rev. 251, 253 (May 1918), available at bit.ly/3PAlbsi. If a voter was unable to return to his home county in time to vote, he could cast a ballot in another county by writing in the names of officers in his home precinct. The ballot was then "sealed and returned to the voter's home county." *Id.* at 253. "In order to be counted the ballot must have been received by the [home] county auditor within six days from the date of the election or primary." *Id.* at 253-54. Even though the ballot was transmitted between election officials after election day, the final act of election—transferring the ballot from the voter to an election official—occurred on election day. Hence, even under Washington's system, the election was consummated on election day.

Many States did not specify a receipt date—it was simply understood that absentee ballots were to be received by election day. For example, Minnesota's law

4

1  indicated that "when received at the voter's home post office before the day of election
2  … ballots are to be retained there in the custody of the postal officials until their
3  delivery to the precinct officials on the day of election." *Id.* at 258. In Texas, the "county
4  clerk [was] required to forward the absent voter's ballots to the precincts on the second
5  day prior to election," likewise implying that the ballots must be received before then.
6  *Id.* at 259. "In Indiana, Montana and Wisconsin, the ballot envelopes may be opened
7  at any time between the opening and the closing of the polls, and this [was] the
8  provision most commonly found in such laws." *Id.* In fact, Illinois was the only State
9  during this time "to make any provision for ballots received too late to be counted." *Id.*
10 Those ballots were to be marked as late, maintained for a time, and destroyed. *Id.*
11 Universally, ballots received after election day were not counted.

12  Federal law also mandated receipt by election day. In 1942, Congress passed a
13 law to provide for absentee voting for members of the Armed Forces. *See* Act of Sept.
14 16, 1942, ch. 561, 56 Stat. 753. The law mandated that States permit members of the
15 Armed Forces to vote absentee in federal elections in times of war, and it established
16 certain required balloting procedures. Among other things, the voter was required to
17 "subscribe the oath printed upon the official envelope" and mail the "war ballot" "to
18 the secretary of state of the State of his residence." *Id.*, §8. Although the law deferred
19 to States on canvassing procedures, "no official war ballot shall be valid … if it is
20 received by the appropriate election officials … after the hour of the closing of the polls
21 on the date of the holding of the election." *Id.*, §9.

22  Post-election-day receipt is a relatively new phenomenon. In 1971, the
23 Department of Defense issued a directive that contained a survey of state absentee-
24 ballot deadlines. *Overseas Absentee Voting: Hearing on S. 703 Before the S. Comm. on*
25 *Rules and Admin.*, 95th Cong. 33-34 (1977) (Statement of John C. Broger, Deputy
26 Coordinator of the Federal Voting Assistance Program, Department of Defense),
27 perma.cc/P4PK-LTL2. At that time, 48 States plus Guam, Puerto Rico, the Virgin
28

5

Opposition to DNC's Motion to Dismiss

1  Islands, and Washington, D.C., counted ballots only if received by election day at the
2  latest.

3  Only two States counted ballots received after election day. Nebraska accepted
4  ballots one day after the election. It has since repealed that law and now requires
5  absentee ballots to be "returned not later than the hour established for the closing of
6  the polls." Neb. Rev. Stat. §32-950. The other State, Washington, has been discussed
7  above: for quite some time, Washington still required absentee voters to deliver their
8  ballot to an *election official* by election day, who would then mail the ballot to the
9  proper county. *See* Ray, *supra*, at 253-54. Later, Washington allowed voters to mail
10 ballots directly, and would count ballots "postmarked or received (if not delivered by
11 mail) not later than the primary or election day." Act of Apr. 17, 1963, ch. 23, §5, 1963
12 Wash. Laws 1454, 1458. But these two "late-in-time outliers" are far removed from
13 the enactment of the election-day statutes, and thus have little bearing on the
14 ordinary public meaning. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70
15 (2022). Nebraska and Washington prove the rule: the overwhelming consensus was
16 that mail-in ballots must be received by election day.

17 "The law remains the same today." *Keisling*, 259 F.3d at 1171. In recent years,
18 States have begun counting mail-in ballots received after election day. *See* Nat'l Conf.
19 of State Legislatures, *Table 11: Receipt and Postmark Deadlines for Absentee/Mail*
20 *Ballots* (Mar. 18, 2024), perma.cc/B3HF-8MBD. Some States, including Nevada,
21 adopted post-election deadlines in response to the COVID-19 pandemic. These recent
22 changes do not have the pedigree to overcome the original meaning of the election day
23 statutes. In considering whether absentee balloting as a whole violates the election
24 day statutes, the Fifth Circuit declined "to read the federal election day statutes in a
25 manner that would prohibit such a universal, longstanding practice of which Congress
26 was obviously well aware." *Bomer*, 199 F.3d at 776.; *see also Keisling*, 259 F.3d at 1175
27 (noting the "long history of congressional tolerance, despite the federal election day
28 statute, of absentee balloting and express congressional approval of absentee balloting

6

Opposition to DNC's Motion to Dismiss

1  when it has spoken on the issue"). But post-election deadlines are neither universal
2  nor longstanding. There is no "long history" of receiving ballots after election day in
3  Nevada or any other State. *Keisling*, 259 F.3d at 1175. And when Congress has
4  "spoken on the issue," it has set election-day deadlines for absentee ballots. *Id.*

5  The two district courts that have addressed the merits of this issue have either
6  overlooked or ignored the history of mail-in voting. *See Way*, 492 F. Supp. 3d at 369-
7  73; *Bost v. Ill. State Bd. of Elections*, No. 22-cv-2754, 2023 WL 4817073, at *10-11
8  (N.D. Ill. July 26, 2023), *on appeal* No. 23-2644 (7th Cir.). But this historical practice
9  compels the conclusion that original understanding of the election-day statutes
10 required receipt of ballots by election day.

11 **II.     The DNC's theory of "final selection" leads to absurd results.**

12 The history of election-day receipt also proves that a ruling in Plaintiffs' favor
13 would not "lead to absurd results." DNC Mot. 17. For most of this country's history,
14 ballots had to be received by election officials by election day. That remained the
15 established practice for well over a century after Congress enacted the election-day
16 statutes. And universal post-election deadlines such as Nevada's still remained
17 outliers until the COVID pandemic.

18 The DNC argues that Plaintiffs' rule would also prohibit early voting,
19 canvassing ballots after election day, or other postelection administrative activities.
20 That misapplies logic and misunderstands history. First, the "final selection" between
21 "voters and officials" must not be "*consummated* prior to federal election day." *Foster*,
22 522 U.S. at 71-72 & n.4 (emphasis added). Early voting does not "consummate[]" those
23 "combined actions." But holding open voting *after* election day does. Likewise, officials
24 can continue counting ballots, tallying votes, challenging voter qualifications, and
25 conducting the assortment of administrative tasks well after election day. Those
26 administrative tasks are solely the actions of election officials, not the "combined
27 actions of voters and officials." *Id.* at 71.

28

7

Opposition to DNC's Motion to Dismiss

In any event, early voting, canvassing ballots, and other administrative acts are longstanding practices, indicating that they comply with the election-day statutes. Even under the most generous reading of the history in Defendants' favor, post-election receipt of ballots doesn't come close to the "longstanding practice" of absentee voting. *Bomer*, 199 F.3d at 776. And the DNC admits that even today post-election receipt of ballots is not "universal." *Id.* Every court to address the post-election receipt of mail-in ballots has overlooked this history. But the history resolves the original meaning of the election-day statutes, and it supports Plaintiffs' claims.

In contrast, the DNC's theory of "final selection" is incoherent. It claims that "[t]he relevant *choice* must conclude by election day." DNC Mot. 19. That statement is unhelpful. Presumably, the DNC means that the *voter* must choose "by election day." But that would be clearly wrong. A voter has not successfully voted until her ballot is received by election officials. If voting were simply about the "choice," *id.*, a voter who mailed her ballot to the Department of Public Safety would be entitled to have her ballot counted. And a voter who deposits her ballot in the trashcan at the polling place would have made her "final selection." Neither ballot is valid because, "[o]bviously, unless it reaches the officials it is never cast at all, whether or not it is marked for any candidate, or forwarded by mail or otherwise." *Maddox v. Bd. of State Canvassers*, 116 Mont. 217, 149 P.2d 112, 115 (1944). For the same reason, a voter is not disenfranchised when she gives her mail-in ballot to a family member to take the post office, and the family member forgets to deliver the mail. The DNC's theory cannot explain why those ballots are properly rejected, or why allowing a voter to vote *after* election day would violate the election-day statutes.

In contrast, the holding Plaintiffs request is simple, and upsets no other election processes: ballots are valid only if received on or before election day. That rule is not "absurd." It makes good sense. "To state the obvious, a State cannot conduct an election without deadlines." *DNC v. Wis. State Legislature,* 141 S. Ct. 28, 33 (2020) (Kavanaugh, J., concurral). A uniform, national election day prevents "the distortion

8

of the voting process threatened when the results of an early federal election in one State can influence later voting in other States." *Foster*, 522 U.S. at 73. The federal election day is a "check to frauds in elections, to double voting, to the transmission of voters from one State to another, and [it] allow[s] the people to vote for their Representatives undisturbed by considerations which they ought not to take at all into account." *Keisling*, 259 F.3d at 1174 (quoting Cong. Globe, 42 Cong., 2d Sess. 618 (1872)). And "a single deadline" for the receipt of ballots "supplies clear notice, and requiring ballots be in by election day puts all voters on the same footing." *DNC*, 141 S. Ct. at 28 (Gorsuch, J., concurral). There are "important reasons" to "require absentee ballots to be received by election day, not just mailed by election day." *Id.* at 33 (Kavanaugh, J., concurral). Among them, election-day receipt helps "avoid the chaos and suspicions of impropriety that can ensue if thousands of absentee ballots flow in after election day and potentially flip the results of an election." *Id.* And "[w]ithout question, Congress has the authority to compel states to hold these elections on the dates it specifies." *Keisling*, 259 F.3d at 1170.

## **CONCLUSION**

The DNC's remaining arguments are addressed in Plaintiffs' response to the Secretary's motion. The Court should deny the motion to dismiss.

9

Opposition to DNC's Motion to Dismiss

| | | |
|---|---|---|
| 1 | Dated: June 14, 2024 | Respectfully submitted, |
| 2 | Thomas R. McCarthy*<br>  VA Bar No. 47145 | /s/ Jeffrey F. Barr |
| 3 | Conor D. Woodfin*<br>  VA Bar No. 98937 | Jeffrey F. Barr (NV Bar No. 7269)<br>ASHCRAFT & BARR LLP |
| 4 | Thomas S. Vaseliou*<br>  TX Bar No. 24115891 | 8275 South Eastern Ave., Suite 200<br>Las Vegas, NV 89123 |
| 5 | CONSOVOY MCCARTHY PLLC<br>1600 Wilson Boulevard, Suite 700 | (702) 631-4755<br>barrj@ashcraftbarr.com |
| 6 | Arlington, VA 22209<br>(703) 243-9423 | *Counsel for the RNC, Donald J.* |
| 7 | tom@consovoymccarthy.com<br>conor@consovoymccarthy.com | *Trump for President 2024, Inc., and Donald J. Szymanski* |
| 8 | tvaseliou@consovoymccarthy.com | |
| 9 | *Counsel for Plaintiffs* | /s/ Sigal Chattah |
| 10 | | Sigal Chattah (NV Bar No. 8264) |
| 11 | David A. Warrington*<br>  VA Bar No. 72293 | CHATTAH LAW GROUP<br>5875 S. Rainbow Blvd #204 |
| 12 | Gary M. Lawkowski*<br>  VA Bar No. 82329 | Las Vegas, NV 89118<br>(702) 360-6200 |
| 13 | DHILLON LAW GROUP, INC.<br>2121 Eisenhower Avenue, Suite 608 | sigal@thegoodlawyerlv.com |
| 14 | Alexandria, VA 22314<br>703-574-1206 | *Counsel for the Nevada Republican Party* |
| 15 | DWarrington@dhillonlaw.com<br>GLawkowski@dhillonlaw.com | |
| 16 | Michael A. Columbo*<br>  CA Bar No. 271283 | |
| 17 | DHILLON LAW GROUP, INC.<br>177 Post Street, Suite 700 | |
| 18 | San Francisco, California 94108<br>MColumbo@dhillonlaw.com | |
| 19 | | |
| 20 | *Counsel for Donald J. Trump for President 2024, Inc.* | |
| 21 | *admitted pro hac vice | |
| 22 | | |
| 23 | **CERTIFICATE OF SERVICE** | |
| 24 | This filing was served on all appearing parties on the 13th day of June 2024 by | |
| 25 | electronic service by way of the Court's ECF System. | |
| 26 | | |
| 27 | | /s/ Jeffrey F. Barr<br>An employee of Ashcraft & Barr LLP |
| 28 | | |

10

Opposition to DNC's Motion to Dismiss