Jeffrey F. Barr (NV Bar No. 7269)
8275 South Eastern Avenue, Suite 200
Las Vegas, NV 89123
(702) 631-4755
barrj@ashcraftbarr.com

Thomas R. McCarthy* (VA Bar No. 47145)
Conor D. Woodfin* (VA Bar No. 98937)
Thomas S. Vaseliou* (TX Bar No. 24115891)
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
conor@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

Sigal Chattah (NV Bar No. 8264)
5875 S. Rainbow Blvd #204
Las Vegas, NV 89118
(702) 360-6200
sigal@thegoodlawyerlv.com

David A. Warrington* (VA Bar No. 72293)
Gary M. Lawkowski* (VA Bar No. 82329)
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
703-574-1206
DWarrington@dhillonlaw.com
GLawkowski@dhillonlaw.com

Michael A. Columbo* (CA Bar No. 271283)
177 Post Street, Suite 700
San Francisco, California 94108
MColumbo@dhillonlaw.com
*admitted pro hac vice

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CARI-ANN BURGESS, et al., <br><br> Defendants. | No. 3:24-cv-198-MMD-CLB <br><br> **RESPONSE IN OPPOSITION TO SECRETARY'S MOTION TO DISMISS** |

Plaintiffs—the Republican National Committee, the Nevada Republican Party, Donald J. Trump for President 2024, Inc., and Donald J. Szymanski—file this response in opposition to the Secretary of State's motion to dismiss. *See* Sec'y Mot. (Doc. 60) (joined by county defendants, Docs. 61, 63). For the reasons discussed in this response, the Court should deny the motion.

## INTRODUCTION

When it comes to elections, timing is everything. Deadlines govern when politicians announce their candidacy, when campaigns contact voters, and when states print ballots—just to name a few. Deadlines dictate the actions of parties, candidates, voters, and the government. And the day of the election looms over all other deadlines. Parties and candidates organize their electoral efforts around that day, devoting their time and resources around "election day."

Nearly two centuries ago, Congress determined that federal elections would take place on "the Tuesday next after the first Monday in November" of every even-numbered year. *See* Act of Jan. 23, 1845, ch. 1, 5 Stat. 721. States must abide by that decree, which prohibits States from consummating an election prior to election day. *Foster v. Love*, 522 U.S. 67, 70 (1997). This deadline provides clear notice, helps prevent fraud, and quells the suspicions of impropriety that can ensue when ballots flow in after election day and potentially flip the results. Nevertheless, Nevada permits ballots that come in after election day to be counted. So long as a mail-in ballot is postmarked by election day and received within four business days after election day, Nevada law requires county election officials to count it. Nev. Rev. Stat. §293.269921(1)(b). And it goes a step further: election officials must *presume* that ballots received up to three days after Election Day "have been postmarked on or before the day of the election" if the date of the postmark is indeterminate. *Id.* §293.269921(2). By effectively extending Nevada's federal election past election day, Nevada violates federal law mandating that elections take place on the uniform, national "day for the election."

**BACKGROUND**

For nearly all of its history, Nevada required mail-in ballots to be returned before election day. That changed in 2019. The Nevada Legislature passed a law requiring absentee ballots to be counted if they are postmarked on or before election day and received up to seven days after election day. *See* A.B. 345, §§45, 48, 80th Sess. Nev. Legis. (2019), perma.cc/WN2J-25YL. The law also provided that absentee ballots received up to three days after the day of the election "shall be deemed to have been postmarked on or before the day of the election" if "the date of the postmark cannot be determined." *Id.* §45(2). In 2020, the Legislature amended the law to apply to all "mail ballot[s]" during an "emergency or disaster" declared by the Legislature. A.B. 4, §§2, 20, 37, 32d Spec. Sess. Nev. Legis. (2020), perma.cc/5SGV-KJPC. In 2021, the Legislature amended the law again. The law now requires election officials to count mail ballots if they are postmarked by election day and received up to four days after Election Day. Nev. Rev. Stat. §293.269921(1)(b). Ballots for which "the date of the postmark cannot be determined" are "deemed" timely if received within three days after election day. *Id.* §293.269921(2). And these rules apply to all mail ballots regardless of whether there is an emergency.

The Republican National Committee (RNC), Nevada Republican Party (NVGOP), Donald J. Trump for President 2024, Inc., and Donald J. Szymanski filed this lawsuit to enjoin Nevada's violation of federal law. *See* Compl. (Doc. 1) at 9-20. They represent their own interests in participating in fair elections, running effective campaigns, and preserving their resources. And they represent the interests of voters and candidates in lawful elections that protect the right to vote and run for office. They filed this suit against Defendants, all of whom bear some level of responsibility in enforcing Nevada's mail-ballot deadline at the state and county levels.

**LEGAL STANDARDS**

A motion to dismiss under Rule 12(b)(6) "tests" whether the complaint satisfies Rule 8. *Thomson v. Caesars Holdings Inc.*, 661 F. Supp. 3d 1043, 1052 (D. Nev. 2023).

2

Rule 8 in turn requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Courts must accept the factual allegations as true, allow all reasonable inferences from those allegations, and construe the complaint in the light most favorable to the plaintiff. *Edwards v. Signify Health, Inc.*, 2023 WL 3467558, at *2 (D. Nev. May 12, 2023). After drawing all those inferences in Plaintiffs' favor, the question is whether the complaint states a claim that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausible means a "reasonable inference that the defendant is liable." *Id.* It does not mean that liability is "probable," *id.*, or even that Plaintiffs are "likely to succeed," *Produce Pay, Inc. v. Izguerra Produce, Inc.*, 39 F.4th 1158, 1166 (9th Cir. 2022).

The same rules apply to the Rule 12(b)(1) motion. "When 'standing is challenged on the basis of the pleadings,'" the Court "must 'accept as true all material allegations of the complaint' and 'construe the complaint in favor of the complaining party.'" *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1100 (9th Cir. 2024) (quoting *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988)). At this stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," because courts must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).

## ARGUMENT

### I. Plaintiffs are not precluded by a different lawsuit over a different law that involved different parties with different bases for standing.

Issue preclusion applies only when "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Love v. Villacana*, 73 F.4th 751, 754 (9th Cir. 2023) (citation omitted). Issue preclusion "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain

Opposition to Secretary's Motion to Dismiss

unchanged." *Comm'r v. Sunnen*, 333 U.S. 591, 599-600 (1948). And the party asserting issue preclusion bears the burden to show that the precluded issue "is identical to an issue litigated in a previous action." *Steen v. John Hancock Mut. Life Ins.*, 106 F.3d 904, 912 (9th Cir. 1997) (citation omitted). "[I]f there is any doubt as to whether an issue was actually litigated in a prior proceeding," issue preclusion "is inappropriate." *Eureka Fed. Sav. & Loan Ass'n v. Am. Casualty Co. of Reading*, 873 F.2d 229, 233 (9th Cir.1989). The Secretary argues that this Court's decision on standing in *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020), precludes Plaintiffs from bringing this case. *See* Sec'y Mot. 7-8. But issue preclusion doesn't apply for at least two reasons.

**First,** the "issue" of whether Plaintiffs have standing to challenge a new law is not "identical" between this case and *Cegavske*. *Love*, 73 F.4th at 754. The judgment in *Cegavske* was that the RNC, NVGOP, and 2020 Trump Campaign lacked standing to "challenge several key provisions of AB 4," including the emergency seven-day mail-ballot deadline. 488 F. Supp. 3d at 996. The law has since changed. The legislature amended the deadline from seven days to four days. Nev. Rev. Stat. §293.269921(1)(b). And it changed the conditions under which the deadline applies—now, the law is a permanent fixture of Nevada elections, regardless of whether the legislature declares an emergency. A.B. 4, §§2, 20, 37. "When a different rule of law applies, the issue is not 'identical' and [issue preclusion] is not available." *Sw. Pet Prod., Inc. v. Koch Indus., Inc.*, 32 F. App'x 213, 215 (9th Cir. 2002) (citing *Peterson v. Clark Leasing Corp.*, 451 F.2d 1291, 1292 (9th Cir. 1971)). The Secretary thus has not carried his burden to show that the issues are "identical." *Steen*, 106 F.3d at 912. Indeed, the Secretary admits that the two statutes are "nearly identical," Sec'y Mot. 22, not "identical."

Concerns about a second bite at the apple do not apply when there's a second apple. The Secretary argues that the issue of "standing" is the same between the two cases. Secy' Mot. 8. But if courts framed the issue that broadly, a plaintiff who lost a

4

suit against a state official based on standing would be permanently barred from ever suing a government official again, for any legal violation. The court in *Cegavske* did not hold that the plaintiffs lacked standing to sue the Secretary, or that they don't suffer harm from any election law, or that they aren't injured by any election-day deadline. It held only that the plaintiffs were not injured by the "provisions of AB 4" that they challenged. *Cegavske*, 488 F. Supp. 3d at 996. Anything broader would have been an unconstitutional advisory opinion and thus not "necessary to decide the merits." *Love*, 73 F.4th at 754. Said differently, "issue preclusion does not apply" even to issues that "could have been raised, but were not." *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019). And the standing of Plaintiffs to challenge *this law*— enacted in 2021—could not have been raised in a case decided in 2020.

Courts even decline to apply issue preclusion when there is "an intervening change in the governing law." *Artukovic v. INS*, 693 F.2d 894, 898 (9th Cir. 1982). That doctrine usually appears when a judicial decision changes the "legal climate," which can be a difficult line to draw. *Sunnen*, 333 U.S. at 606. Here, the line is clear: the legislature changed the very law that Plaintiffs challenge. The Secretary cites no case in which a party was precluded from challenging a law that has been changed since the prior lawsuit. The standing issues are thus not "identical in all respects," so preclusion doesn't apply. *Id.* at 599. Plaintiffs are no more bound by the *Cegavske* judgment than Defendants are bound to enforce the now-repealed version of the law.

***Second***, even if issue preclusion applied to the RNC and NVGOP, it wouldn't apply to the other two plaintiffs in this case who were not parties to *Cegavske*. The Secretary all but admits that preclusion doesn't apply to Mr. Szymanski, which is reason enough to proceed to the merits. And the 2024 Trump Campaign didn't even exist when *Cegavske* was litigated. The 2024 campaign and the 2020 campaign are two different entities with separate FEC filings running different campaigns in different election cycles. *See Donald J. Trump For President 2024 Statement of Organization*, Fed. Election Comm. (Nov. 2022), perma.cc/NLE3-LKF5. And none of

5

1    the traditional privity rules apply. *See In re Schimmels*, 127 F.3d 875, 881 (9th Cir.

2    1997) ("First, a non-party who has succeeded to a party's interest in property is bound

3    by any prior judgment against the party. Second, a non-party who controlled the

4    original suit will be bound by the resulting judgment. Third, federal courts will bind

5    a non-party whose interests were represented adequately by a party in the original

6    suit."). Issue preclusion does not apply.

7    **II.  Plaintiffs have plausibly alleged several bases for standing.**

8    Standing requires injury, causation, and redressability. Because all Plaintiffs

9    here seek the same relief under the same claim, "the Article III injury requirement is

10   met if only one plaintiff has suffered concrete harm." *Juliana v. United States*, 947

11   F.3d 1159, 1168 (9th Cir. 2020). Plaintiffs have standing under a variety of theories,

12   any one of which is sufficient to deny Defendants' motions.

13

14   **A.  Political parties are injured by laws that force them to divert money from other activities critical to their mission.**

15   The simplest case for standing is Plaintiffs' monetary expenditures caused by

16   the law they challenge. Resource diversion is frequently the basis for standing in

17   election-law cases. *E.g.*, *Brnovich v. DNC*, 141 S. Ct. 2321 (2021) (Democratic Party

18   had standing to challenge ballot-counting and ballot-collection laws); *Fair Fight*

19   *Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019) (the "need to

20   divert resources from general voting initiatives or other missions of the organization"

21   establishes standing "[i]n election law cases"); *Nat'l Council of La Raza v. Cegavske*,

22   800 F.3d 1032, 1040 (9th Cir. 2015) (collecting cases). The complaint alleges that

23   counting ballots received days after the election forces the organizational plaintiffs to

24   spend money on a variety of election activities that they would otherwise spend on

25   other mission-critical activities. Compl. ¶¶14-19, 48-49, 74. "[T]here can be no

26   question" that diversions of resources are an "injury in fact." *Havens Realty Corp. v.*

27   *Coleman*, 455 U.S. 363, 379 (1982).

28   Even a "'broadly alleged'" diversion-of-resources injury is sufficient "at the

6

pleading stage." *La Raza*, 800 F.3d at 1041 (quoting *Havens*, 455 U.S. at 379). But the complaint includes specifics. By accepting ballots after election day, Nevada prolongs the feasible time for voters to return their ballots via mail, which forces political parties to divert money to absentee ballot-chase programs through election day. Compl. ¶14. Failing to spend that money harms the RNC and NVGOP's mission to "elect Republican candidates to state and federal office" and harms the Trump Campaign's mission to reelect President Trump. ¶¶12, 15, 19. And the organizational Plaintiffs are able to "maintain mail-ballot-specific get-out-the-vote operations" through Election Day only by "divert[ing] resources from in-person Election Day get-out-the-vote activities." ¶49. Because these "are resources they would have spent on some other aspect of their organizational purpose" that "advances their goals," the organizational Plaintiffs have plausibly alleged an injury in fact. *La Raza*, 800 F.3d at 1040.

The post-election deadline also forces the organizational Plaintiffs to spend time and money observing additional post-election-day ballot processing and counting. Nevada law guarantees Plaintiffs the right to be represented on county mail ballot central counting boards. Nev. Rev. Stat. §293.269929(2). It also guarantees the right to observe the handling and counting of mail ballots. *Id.* §293.269931(1); Nev. Admin. Code §§293.322(3)-(4), .356(1). Extending the days for which mail ballots will be received and counted "requires Plaintiffs and their members to divert more time and money to post-election mail ballot activities." Compl. ¶48.

The Secretary points out that Nevada allows seven days for counting ballots, regardless of when ballots are received. Sec'y Mot. 9-10. But that misunderstands the injury. The post-election deadline requires election officials to determine the time of receipt and the date of the postmark, and to make judgment calls if "the date of the postmark cannot be determined." Nev. Rev. Stat. §293.269921. It is *that fact* that requires additional training, preparation, and volunteer time, all of which "divert[] resources from in-person Election Day get-out-the-vote activities." Compl. ¶49. In

7

other words, the *rules* for ballot-counting matter just as much as the *time* for ballot counting when it comes to political parties allocating resources for poll-watching. And the resource-diversion doctrine does not permit the Court "to second-guess a candidate's reasonable assessment of his own campaign." *Becker v. FEC*, 230 F.3d 381, 387 (1st Cir. 2000) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)). The seven-day ballot-counting deadline is irrelevant to Plaintiffs' standing.

The Secretary's inapplicable cases don't rebut these principles. First, the Secretary tried to dismiss these injuries as mere "'budgetary choices.'" Sec'y Mot. 9 (quoting *United Poultry Concerns v. Chabad of Irvine*, 743 F. App'x 130, 131 (9th Cir. 2018)). But the quoted case held that a nonprofit did not have standing based on resources devoted to investigating *someone else's* potential legal violations. *United Poultry Concerns*, 743 F. App'x at 131. Whether investigated or not, the violations themselves did not injure the plaintiffs. *Id.* That's not the case here—the Plaintiffs allege that the post-election deadline forces them to spend money on "mail-ballot-specific get-out-the-vote operations" instead of "in-person Election Day get-out-the-vote activities." Compl. ¶49. And if Plaintiffs "had not diverted resources to counteracting the problem" of late-arriving ballots, they "would have suffered some other injury" to their electoral interests by neglecting mail-in voter turnout. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). In other words, the Plaintiffs must choose between prioritizing in-person turnout or mail-in turnout on election day. They cannot "avoid suffering one injury or the other, and therefore [have] standing to sue." *Id*

The Secretary cites two election cases that addressed different standing theories than those presented here. Both cases dismissed allegations that diversion of resources was necessary to educate voters to combat confusion and discouragement from a change in the law. *See Donald J. Trump for President, Inc. v. Way*, 2020 WL 6204477, at *8 (D.N.J. Oct. 22, 2020); *Donald J. Trump for President, Inc. v. Boockvar*,

Opposition to Secretary's Motion to Dismiss

493 F. Supp. 3d 331, 380 (W.D. Pa. 2020). And the New Jersey case ruled that diverting resources for canvassing to address COVID-era problems did not support standing because they were "not geared toward identifying or counteracting injuries arising from the challenged conduct." *Id.* at *10. Neither case is relevant to the conduct here. The Plaintiffs are not diverting their resources based on a law's hypothetical effects on voter confusion and turnout. They are diverting resources to combat the law's *actual effect* of extending the time for voters to return ballots. That effect formed the basis of the intervenors' resource-diversion interests in this case. *See* Order Granting Interv. (Doc. 70) at 4 ("The link between an earlier mail ballot receipt deadline and Petitioners' financial interests is thus clear and direct.").

Courts across the country have found standing in situations like this one. The Democratic Party had standing to challenge ballot-counting procedures because it would have to "retool [its] [get-out-the-vote] strategies and divert more resources to ensure that low-efficacy voters are returning their early mail ballots." *DNC v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018), *rev'd and remanded sub nom. on other grounds*, *Brnovich*, 141 S. Ct. 2321. The Texas Democratic Party had standing to challenge the removal of a *Republican* candidate from the ballot because the removal would have required the Democrats to revise their campaign against a new opponent. *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006). "[M]ultiple courts have held" that the Democratic Congressional Campaign Committee had standing to challenge laws that cause it to "divert resources away from engaging and mobilizing voters." *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 45 (S.D.N.Y. 2022) (collecting cases). These cases are legion.[1] In these circumstances, courts "have no difficulty concluding that Plaintiffs have adequately alleged that the

---

[1] *E.g.*, *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1335 (N.D. Ga. 2018); *Harding v. Edwards*, 484 F. Supp. 3d 299, 315 (M.D. La. 2020) (finding standing when organizations' missions were "rendered more onerous" by the challenged law); *La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 504, 549-52 (W.D. Tex. 2022); *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1177-85 (N.D. Ga. 2022); *Ark. United v. Thurston*, 626 F. Supp. 3d 1064, 1080-81 (W.D. Ark. 2022); *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1286 (N.D. Ga. 2020).

Opposition to Secretary's Motion to Dismiss

1    injury they suffer is attributable to the State." *La Raza*, 800 F.3d at 1041.

2         Just today, the Supreme Court confirmed this understanding. The Court

3    explained that an organization did not have standing merely because it would

4    "expend[] money to gather information and advocate against a defendant's action."

5    *FDA v. All. for Hippocratic Medicine*, No. 23-235, slip op. 22. But the Court contrasted

6    that situation with one where the challenged action "directly affected and interfered

7    with" the "core business activities" of an "issue-advocacy organization." *Id*. Thus,

8    *Alliance for Hippocratic Medicine* illustrates that the organizational Plaintiffs are

9    injured by a diversion of resources to address a post-election deadline that directly

10   interferes with their core goals of electing their candidates.

11
12   **B. The post-election receipt deadline imposes competitive injuries on Republican candidates.**

13        "A second basis for the [political party's] direct standing is harm to its election

14   prospects." *Tex. Democratic Party*, 459 F.3d at 586. The RNC, NVGOP, and the Trump

15   Campaign are Republican organizations that represent Republican candidates in

16   upcoming Nevada elections. Compl. ¶¶12, 15, 19. They have standing in their own

17   right and on behalf of their members whose electoral chances are injured by the post-

18   election deadline.[2] The complaint alleges that the post-election deadline favors

19   Democrats in Nevada, whose voters disproportionately vote by mail. ¶¶56-59. The

20   Democratic National Committee, at least, recognizes these competitive injuries. *See*

21   DNC Mot. to Interv. 10 ("Interference with a political party's electoral prospects

22   constitutes a particularized interest."). That's unsurprising, as the Ninth Circuit just

23   recently held that "the DNC, as the operational arm of the Democratic Party" had

24   standing to challenge Arizona's facially neutral ballot-order statute because the law

25
26   [2] Associational standing has three requirements, and the Secretary challenges only one: whether a member would have standing to sue in their own right. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Secretary does not contest the other two requirements probably because
27   they are easily satisfied here. This suit is at the core of the organizational Plaintiffs' mission and member participation is not necessary because Plaintiffs seek only injunctive and declaratory relief.
28   *See, e.g., Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004).

Opposition to Secretary's Motion to Dismiss

resulted in a marginal benefit "to their rival candidates." *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022).

The "principle" of competitive electoral harms "is neither novel nor unique to the realm of the electoral." *Id.* "[C]andidates … have a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast. An inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020). When election rules "illegally structure a competitive environment … parties defending concrete interests (e.g., retention of elected office) in that environment suffer legal harm under Article III." *Shays v. FEC*, 414 F.3d 76, 82 (D.C. Cir. 2005) (upholding standing of congressional candidates "waging reelection contests governed by" the challenged law). "Voluminous" authority shows that candidates and parties suffer injury when their "chances of victory would be reduced." *Tex. Democratic Party*, 459 F.3d at 587 & n.4 (collecting cases).

Political parties have competitive standing regardless of whether the post-election deadline actually favors one party over another. Republican candidates "'are at the very least harmed by having to anticipate other actors taking advantage of the regulations to engage in activities that otherwise would be barred.'" *Shays*, 414 F.3d at 87. As the DNC has argued in this case, courts have "found qualifying interests where a lawsuit threatens to interfere with a political party's electoral prospects." DNC Mot. to Interv. 7 (citing *Owen*, 640 F.2d at 1132). That is because ballot-receipt deadlines, like most election rules, "necessarily affect the way these politicians will run their campaigns." *Shays*, 414 F.3d at 87 (cleaned up). It is thus sufficient that the post-election deadline forces both parties to work "to prevent their opponent from gaining an unfair advantage in the election process." *Owen v. Mulligan*, 640 F.2d 1130, 1133 (9th Cir. 1981).

In any event, the complaint raises at least two inferences of harm to Republican candidates. First, rules that favor mail-in voting necessarily benefit Democrats, whose

Opposition to Secretary's Motion to Dismiss

voters overwhelmingly tend to vote by mail. The MIT Election Lab reported that "46% of Democratic voters in the 2022 General Election mailed in their ballots, compared to only 27% of Republicans." Compl. ¶56. Nevada is even more polarized. The Secretary's own data shows that in Nevada's 2020 general election, 60.3% of Democratic voters voted by mail, compared to just 36.9% of Republican voters. ¶57 (citing *See* Nev. Sec'y of State, *2020 General Election Turnout*). And in the 2022 general election, 61.3% of Democrats and just 40% of Republicans voted by mail in Nevada. *Id.* The Secretary disputes the inferences drawn from those facts. Sec'y Mot. 13-14. But those inferences must be drawn in Plaintiffs' favor. *Iqbal*, 556 U.S. at 678. The Secretary also introduces *other evidence* that allegedly shows that "the gap between Republican and Democratic voters voting by mail has been narrowing significantly over time." Sec'y Mot. 13. But courts cannot take "judicial notice of disputed facts," *id.*, or use outside materials to contradict the factual allegations or inferences in the complaint. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003, 1014 (9th Cir. 2018). An outside document that "merely creates a defense to the well-pled allegations in the complaint" cannot "defeat otherwise cognizable claims." *Id.*

Plaintiffs also allege that late ballots in particular tend to favor Democrats, whose voters tend to mail their ballots later than Republicans. Compl. ¶58. And in the primary elections from this election cycle, Democrats disproportionately voted by mail compared to Republicans *and* Democrats had significantly more mail ballots rejected for not being returned correctly. ¶59. The Secretary's only argument is that the Plaintiffs "cite nothing" indicating that late-arriving mail-in ballots tend to favor Democrats. Sec'y Mot. 14. But Plaintiffs' burden at the pleading stage is to "allege facts," not cite them. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). In any event, they have cited sources—many from the Secretary's own reports—indicating that Democratic voters tend to vote by mail and vote late. Taking the allegations as true, the complaint shows that the "allegedly unlawful election regulation makes the competitive landscape worse for a candidate or that candidate's party than it would

Opposition to Secretary's Motion to Dismiss

otherwise be if the regulation were declared unlawful." *Mecinas*, 30 F.4th at 898.

The Secretary next argues that Plaintiffs must allege facts "suggesting that late-arriving mail ballots could change the results of an election." Sec'y Mot. 14-15. Not so. Plaintiffs are seeking "forward-looking" relief, so Article III allows them to sue over the "risk of harm," not just actual harm. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021). And "[b]ecause a head-to-head election has a single victor, any benefit conferred on one candidate is the effective equivalent of a penalty imposed on all other aspirants for the same office." *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 38 (1st Cir. 1993); *see also Schulz v. Williams*, 44 F.3d 48, 52-53 (2d Cir. 1994) (affidavit satisfied the competitive-injury test by stating that election rules "could siphon votes from the Conservative Party line and therefore adversely affect the interests of the Conservative Party"); *DNC v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018) (Democratic Party had standing because the challenged laws affected voters "who tend to vote disproportionately for Democratic candidates"), *rev'd and remanded sub nom. on other grounds*, *Brnovich*, 141 S. Ct. 2321. Court have thus "uniformly rejected" the argument that "the potential loss of an election" is "too remote, speculative and unredressable to confer standing." *Owen*, 640 F.2d at 1132.

Finally, the Secretary recasts these competitive injuries into vote-dilution injuries. *See* Sec'y Mot. at 13-15. But the two injuries are distinct, as all of the competitive-injury cases demonstrate. Indeed, *Cegavske* shows that this complaint properly alleges a competitive electoral injury independent of any vote-dilution injury. *Cegavske* recognized—as it must, under Ninth Circuit precedent—that "'[c]ompetitive standing' can exist when a state action will lead to the 'potential loss of an election.'" *Cegavske*, 488 F. Supp. 3d at 1003 (quoting *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011)). But the court declined to find competitive standing in that case only because "[t]he pleadings ma[d]e no showing of 'an unfair advantage in the election process.'" *Id.* (quoting *Drake*, 664 F.3d at 783). These pleadings *do* make that showing. Taking the competitive allegations as true, Plaintiffs "have the requisite concrete,

Opposition to Secretary's Motion to Dismiss

non-generalized harm to confer standing." *Mecinas*, 30 F.4th at 898.

### C. Elections conducted in violation of federal law injure candidates and voters.

Voters have standing, too. After all, the plaintiffs who successfully enforced the election-day statutes in *Foster v. Love* were "Louisiana voters" who sued "the State's Governor and secretary of state," challenging the state election rules "as a violation of federal law." *Foster*, 522 U.S. at 70. That describes this case. Vote dilution is the most obvious form of injury suffered by voters when unlawful votes are counted. Courts recognize that "vote dilution can be a basis for standing." *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020). This most often occurs in "the racial gerrymandering and malapportionment contexts," where one block of voters is "harmed compared to 'irrationally favored' voters from other districts." *Id.* But Plaintiffs here, no less than redistricting plaintiffs, "are asserting 'a plain, direct and adequate interest in maintaining the effectiveness of their votes,' not merely a claim of 'the right possessed by every citizen to require that the government be administered according to law.'" *Baker v. Carr*, 369 U.S. 186, 208 (1962) (quoting *Coleman v. Miller*, 307 U.S. 433, 438 (1939)); *cf. Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." (citations omitted)).

The Supreme Court has extended the "equal weight for equal votes" principle beyond redistricting. *Bush v. Gore*, 531 U.S. 98, 104 (2000). "Equal protection applies as well to the manner of [the] exercise" of the right to vote. *Id.* "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-05. And Plaintiffs here have alleged that the casting of invalid ballots would dilute their legally-cast votes. *Baker*, 369 U.S. at 208 (1962) (citing *Coleman*, 307 U.S. at 438). This Court has rejected vote dilution "due to ostensible election fraud." *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020). But vote dilution injures voters in at least three

14

other ways that this Court has not considered.

*First*, the post-election deadline harms voters in particular by damaging the relative weight of their ballot. That is not an injury "common to all members of the public," *Ex parte Levitt*, 302 U.S. 633, 636 (1937), or one that "all citizens share," *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974). A Nevadan who didn't vote in the last election or didn't plan to vote in the upcoming election would not share that injury—they could not claim that *their vote* has been harmed. The "impairment resulted from dilution by a false tally" is an injury unique to the voters included in the tally for that specific election. *Baker*, 369 U.S. at 208. The mathematical "disadvantage" in the effectiveness of a vote that is the basis for standing in redistricting is the *same injury* that is the basis for standing here. *Id.* at 206. That "disadvantage to [voters] as individuals," however slight, is an injury in fact, *id.*, "even if [those] harms may be difficult to prove or measure," *Spokeo*, 578 U.S. at 341. And that the injury "is widely shared" by other voters does not mean that it "is abstract." *Akins*, 524 U.S. at 24. If an injury were generalized merely because other voters shared it, no court could hear redistricting cases.

*Second*, the post-election deadline imposes different rules for mail-in ballots over in-person ballots. All in-person ballots must be received by election officials on election day. But mail-in ballots can continue to come in—and be counted—up to a week after election day. This has nothing to do with fraud. Ballots received after election day are necessarily invalid because they violate the federal "day for the election." 2 U.S.C. §7; 3 U.S.C. §1. The Secretary disputes that conclusion, but "[f]or standing purposes, [courts] accept as valid the merits of [the plaintiff's] legal claims." *FEC v. Cruz*, 596 U.S. 289, 298 (2022). And "[i]f correct on the merits, as [the court] must assume for standing purposes, [Plaintiffs'] challenge presents a clearly redressable injury." *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012); *see also Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1189 (9th Cir. 2023) ("That petitioners' theory may fail on the merits does not mean petitioners lack

Opposition to Secretary's Motion to Dismiss

1 standing to raise it.").

2 **Third**, the post-election deadline favors Democrats over Republicans. Plaintiffs

3 have detailed the partisan disadvantage above. *See supra* Section I.B. Laws that

4 result in partisan disadvantage also injure voters by "dilut[ing] the vote of political

5 groups." *Davis v. Bandemer*, 478 U.S. 109, 119 (1986) (reviewing law that "diluted the

6 votes of Indiana Democrats"), *abrogated by Rucho v. Common Cause*, 139 S. Ct. 2484

7 (2019). The Supreme Court has held that partisan redistricting is nonjusticiable on

8 other grounds, but the Court has never questioned that "diluting the electoral

9 strength of Democratic voters" is a legitimate Article III injury. *Rucho*, 139 S. Ct. at

10 2492. Partisan injury is a concrete injury to Republican voters represented by the RNC

11 and NVGOP.

12 The cases dismissing vote-dilution allegations are not persuasive for several

13 reasons. First, even courts that rejected vote-dilution standing did so because those

14 plaintiffs "never describe[d] how their member voters will be harmed by vote dilution

15 where other voters will not." *Cegavske*, 488 F. Supp. 3d at 1000; *see also Wood*, 981

16 F.3d at 1315 (plaintiff conceded that "he is affected by Georgia's alleged violations of

17 the law in the same way as every other Georgia voter"); *Bognet v. Sec'y Commonwealth

18 of Penn.*, 980 F.3d 336, 358 n.13 (3d Cir. 2020) ("[T]he Voter Plaintiffs have not alleged

19 that their votes are less influential than any other vote…."), *judgment vacated sub

20 nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). Even under the reasoning of

21 those cases, Plaintiffs have standing. Second, the plaintiffs in those cases primarily

22 relied on predictions of future voter fraud for their theory of injury, which courts held

23 was too speculative. *E.g.*, *Paher*, 457 F. Supp. 3d at 925; *Way*, 492 F. Supp. 3d at 374;

24 *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 609 (E.D. Wis. 2020); *Bowyer

25 v. Ducey*, 506 F. Supp. 3d 699, 711 (D. Ariz. Dec. 9, 2020). But Plaintiffs' dilution

26 injuries do not depend on predictions of fraud. It's the fact that *all* of those ballots are

27 *late* under federal law that produces the injury. Third, more recent cases have

28 recognized that plaintiffs who allege that "illegitimate votes dilute their own" vote

16

have standing because their injuries "have 'a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts.'" *Green v. Bell*, 2023 WL 2572210, at *4 (W.D.N.C. Mar. 20, 2023).

Well-established precedent shows that parties, candidates, and voters have standing when their political effectiveness is diminished by the effects of a law. That conclusion is hardly surprising. *Foster* was brought by voters, and the Supreme Court has a long history of such cases. *E.g.*, *Foster*, 522 U.S. at 70; *Smiley v. Holm*, 285 U.S. 355, 361 (1932) ("citizen, elector and taxpayer"); *Wood v. Broom*, 287 U.S. 1, 4 (1932) ("citizen of Mississippi, a qualified elector under its laws"). Moreover, "political parties and candidates have standing to represent the rights of voters." *Bay Cnty. Democratic Party v. Land*, 347 F. Supp. 2d 404, 422 (E.D. Mich. 2004) (collecting cases). Parties, candidates, and voters are those most affected by election rules. All have standing.

## III.  Plaintiffs have plausibly stated a claim that counting ballots received after election day violates federal law.

Congress has the final say over the timing of federal elections. The Elections Clause gives States initial authority to determine the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, §4. Where Congress has not acted, the clause "imposes the duty" on state legislatures to regulate congressional elections. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013). But "Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, §4. Through this superintendent power, Congress can "preempt state legislative choices" over the conduct of congressional elections. *Foster*, 522 U.S. at 69.

Congress also has the final say over the timing of presidential elections. The Electors Clause vests in "Congress" the power to "determine the Time of chusing the Electors" for the offices of President and Vice President. U.S. Const. art. II, §1. State legislatures have power only to "appoint" presidential electors "in such Manner" as they choose. *Id*. The Elections Clause and the Electors Clause are "counterpart[s]" that give Congress authority over the timing of federal elections. *Foster*, 522 U.S. at

17

69. And when Congress speaks on the timing of federal elections, it "*necessarily displaces some element of a pre-existing legal regime erected by the States.*" *Inter Tribal Council*, 570 U.S. at 15 & n.6.

Exercising these two constitutional powers, Congress has established a uniform federal election day. For members of the House of Representatives, "the day for the election" is the "Tuesday next after the 1st Monday in November" in "every even numbered year." 2 U.S.C. §7. Senatorial elections occur at the same time, and Senators are elected "[a]t the regular election held in any State next preceding the expiration of the term for which any Senator was elected." *Id.* §1. Likewise, "[t]he electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day." 3 U.S.C. §1. This trio of statutes "mandates holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70.

### A. The consummation of the election—casting and receiving ballots— must end on election day.

"The day for the election" means the final day ballots are received by election officials. In its simplest form, the act of electing requires actions by two parties: a citizen casting the vote, and a state official receiving the vote. These two actions comprise the "election." A voter's desire to elect a particular candidate is ineffective until an election official receives the vote. For this reason, "voting necessarily requires some effort and compliance with some rules." *Brnovich*, 141 S. Ct. at 2338. Among other things, those rules ensure that ballots are received by election officials on time. And until the proper state official receives the vote, the voter has not "elected" anybody, and an "election" has not occurred. These intuitive rules flow from the plain meaning of the election-day statutes.

The Supreme Court understands these statutes the same way. "When the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the *combined actions* of voters and officials meant to make a final selection of

18

an officeholder….” *Foster*, 522 U.S. at 71 (emphasis added). That is, the “final selection” requires the “combined actions” of voters and election officials. A “final selection” does not occur when the voter merely marks the ballot or delivers the ballot to the post office because those events do not involve an election official. Only once the ballot is in the custody of an election official has the “final selection” occurred. In *Foster*, the Supreme Court confronted Louisiana’s “open primary” statute, which provided an opportunity to fill federal offices during the month before election day, without any action to be taken on election day itself. *Id.* at 69-70. The Supreme Court held that closing the election before election day violates the statutes “establishing a particular day as ‘the day’ on which these actions must take place, … a matter on which the Constitution explicitly gives Congress the final say.” *Id.* at 71-72. And when the two acts of election—casting and receiving ballots—are “concluded as a matter of law before the federal election day,” the system violates the federal election-day statutes. *Id.* at 72. By the same logic, extending either of those two acts *beyond* election day likewise violates those statutes.

In other words, the election must be “consummated” on election day. *Id.* at 72 n.4. Because consummation of the election requires the “combined actions of voters and officials,” *id.* at 71, a ballot is cast not when it is marked, but only when it is actually deposited “in the custody of election officials,” *Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944). “[V]oting is done not merely by marking the ballot but by having it delivered to the election officials and deposited in the ballot box before the closing of the polls on election day.” *Id.* And just as the election “may not be consummated prior to federal election day,” neither may it be “consummated” *after* election day. *Foster*, 522 U.S. at 72 n.4. After election day, election officials go about various duties: counting ballots, disqualifying voters, hearing challenges, and certifying the election. These actions don’t implicate the election-day statutes because they are not acts of consummation—they are not the “final selection” resulting from the “combined actions” of voters and election officials. *Id.* at 72. Election day is thus

19

1    the final day for voters to vote *and* for election officials to receive those votes.

2          When Congress says, "the day for the election," 2 U.S.C. §7, Congress "says in

3    [the] statute what it means and means in [the] statute what it says," *Conn. Nat. Bank*

4    *v. Germain*, 503 U.S. 249, 253-54 (1992). Other provisions of the election-day statutory

5    scheme confirm this plain reading. Having established a single national election day,

6    Congress carved out exceptions to the rule. "Title 2 U.S.C. §8, which was enacted along

7    with §7, provides that a State may hold a congressional election on a day other than

8    the uniform federal election day," but only in narrow circumstances. *Foster*, 522 U.S.

9    at 72 n.3. First, when a "vacancy is caused by a failure to elect at the time prescribed

10   by law," States can hold runoff elections after the uniform federal election day. 2

11   U.S.C. §8(a). Second, when the vacancy is caused "by the death, resignation, or

12   incapacity of a person elected," States can hold special elections to fill the vacancy. *Id.*;

13   *see also Pub. Citizen, Inc. v. Miller*, 813 F. Supp. 821, 830 (N.D. Ga.) (holding that

14   Georgia's statute mandating a runoff in the event that no candidate achieves a

15   majority vote does not violate 2 U.S.C. §8), *aff'd*, 992 F.2d 1548 (11th Cir. 1993).

16         These exceptions prove the scope of the election-day rule. Congress didn't need

17   to carve out exceptions for post-election acts such as counting ballots or certifying

18   results because those acts occur *after* the election has been consummated between the

19   voter and election official. But runoffs and vacancies renew the opportunity for

20   consummation by allowing election officials to receive additional ballots, which is why

21   "section 8 creates an exception to section 7's absolute rule in [that] limited class of

22   cases." *Busbee v. Smith*, 549 F. Supp. 494, 526 (D.D.C. 1982), *aff'd*, 459 U.S. 1166

23   (1983).

24         Congress also carved out exceptions for certain absentee voters in special

25   elections. "[I]n the case of an individual who is an absent uniformed services voter or

26   an overseas voter" States "shall accept" their ballots "so long as the ballot … is received

27   by the appropriate State election official not later than 45 days after the State

28   transmits the ballot or other material to the voter." 2 U.S.C. §8(b)(5)(B). In that

Opposition to Secretary's Motion to Dismiss

1   circumstance, Congress requires absentee ballots to be counted even if received after

2   the date of the special election. That exception proves that Congress can prescribe

3   exceptions for the receipt of absentee ballots when it wants to—and it has done so only

4   for a specific class of voters in narrow circumstances. It also demonstrates that

5   Congress understands the consummation of an "election" as the *receipt* of the ballots

6   by election officials. Outside those exceptions, state statutes must "respect[] section

7   7's formula for determining the date for general elections," and may not "circumvent

8   holding an authentic general election on that date." *Pub. Citizen*, 813 F. Supp. at 830.

9        **B. The Secretary's counterarguments don't rebut *Foster*.**

10       The Secretary points to a handful of administrative acts that only underscore

11   that "the day" for the election is the final day ballots are received by election officials.

12   The Secretary points out that the election-day statutes permit early voting and

13   counting ballots after the election. Sec'y Mot. 16-17. But neither of those

14   administrative acts are the "combined actions of voters and officials meant to make a

15   final selection of an officeholder." *Foster*, 522 U.S. at 74. States have always canvassed

16   votes, conducted recounts, heard election challenges, and announced results days or

17   weeks after election day. None of those administrative acts involves the casting of

18   ballots. And when voters *do* have to cast ballots after election day—in runoffs and

19   vacancies—Congress carved out explicit exceptions. *See* 2 U.S.C. §8(a) (permitting

20   States to conduct elections when a "vacancy is caused by a failure to elect at the time

21   prescribed by law" or "by the death, resignation, or incapacity of a person elected").

22   Unlike administrative acts such as counting ballots and certifying results, runoffs and

23   vacancies renew the opportunity for consummation by allowing election officials to

24   receive additional ballots. That is why Congress had to "create[] an exception to

25   section 7's absolute rule in [that] limited class of cases." *Busbee*, 549 F. Supp. at 526.

26       The Secretary next argues that the election-day statutes "are silent" about

27   when ballots may be received. Sec'y Mot. 17-18. But that just avoids interpreting the

28   meaning of "the day for the election," 2 U.S.C. §7, which "*necessarily* displace[]" state

21

law, *Inter Tribal Council*, 570 U.S. at 15 & n.6. The election-day statutes say nothing about open primaries, but that didn't deter the Supreme Court from its duty to interpret the law in *Foster*. The Secretary implies that the Supreme Court *should have* held in *Foster* that the election-day statutes are silent about open primaries, and dismissed the case. But *Foster* is binding law, and it provides important holdings on the meaning of an "election" and what it means to "consummate" an election outside of election day. *Foster*, 522 U.S. at 74.

Finally, the Secretary argues that the Uniformed Overseas Citizens Absentee Voting Act (UOCAVA) permits counting ballots received after election day. *See* Mot. 18-19. That is false. Other courts have erroneously relied on UOCAVA to conclude that Congress "allow[s] ballots received after Election Day to be counted." *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 737 (N.D. Ill. 2023). UOCAVA merely requires overseas voters to mail in their ballots in compliance with the law of the State in which they're voting. 52 U.S.C. §20304(b)(1). It doesn't adopt, incorporate, or approve of those deadlines—it just declines to set a deadline itself. And it did so in 1986, long before most States adopted their post-election mail-in deadlines. UOCAVA also requires States to send ballots to overseas voters "not later than 45 days before the election." 52 U.S.C. §20302(a)(8)(A). In rare circumstances, States miss that deadline. When that happens, the Justice Department has obtained court-ordered extensions to the receipt deadline as an *equitable remedy* for the State's violation of UOCAVA. *E.g.*, *United States v. West Virginia*, 2014 WL 7338867 (S.D. W. Va. Dec. 22, 2014). That judicial practice says nothing about the meaning of the election-day statutes. UOCAVA does not extend the deadline for the receipt of ballots.

Even if UOCAVA did permit post-election receipt, that would be an exception to the election-day rule. Where Congress has not acted, States have authority to determine the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, §4. But "Congress may at any time by Law make or alter such Regulations." *Id.* Congress could permit an exception for some ballots if

22

1    it wanted to. In fact, it has considered and rejected such proposals. *See Keisling*, 259

2    F.3d at 1171-74 (detailing the legislative history of the election-day statute).

3    Regardless, even if Congress had carved out an exception for overseas ballots, it would

4    not mean it had carved out an exception for all ballots in Nevada.

5    **C. Defendants' violation of federal law violates Plaintiffs' rights.**

6    This is not an *Anderson-Burdick* case. The Secretary argues that the Court

7    should apply the *Anderson-Burdick* balancing test, but that makes no sense—the test

8    applies only to claims that a law "unfairly or unnecessarily burdens" the right to vote.

9    *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983). That is, voters have a unique cause

10   of action to challenge otherwise valid laws that "impermissibly burden the right to

11   vote." *Burdick v. Takushi*, 504 U.S. 428, 430 (1992). Under those undue-burden

12   claims, "a court 'must weigh the character and magnitude of the asserted injury' to

13   voting rights 'against the precise interests put forward by the State as justifications

14   for the burden imposed by its rule.'" *Tex. League of United Latin Am. Citizens*, 978

15   F.3d at 143 (citation omitted). Plaintiffs' claim is not that the Nevada law "burdens"

16   their right to vote and stand for office, but that it *violates* those rights because it

17   violates federal law. The violation of Plaintiffs' rights depends entirely on whether

18   Nevada's ballot-receipt deadline conflicts with federal law.

19   The Court need look no further than *Foster* to see that elections conducted in

20   violation of federal law violate the rights of candidates and voters. Plaintiffs here, just

21   like the plaintiffs in *Foster*, seek "declaratory and injunctive relief … under 42 U.S.C.

22   §1983." *Love v. Foster*, 90 F.3d 1026, 1028 (5th Cir. 1996), *aff'd*, 522 U.S. 67; *see also*

23   *Keisling*, 259 F.3d at 1170 & n.2 (same); *Voting Integrity Project, Inc. v. Bomer*, 199

24   F.3d 773, 774 (5th Cir. 2000) (same); *Millsaps v. Thompson*, 259 F.3d 535, 542 (6th

25   Cir. 2001) (same). The Supreme Court in *Foster* did not apply the *Anderson-Burdick*

26   test. It did not analyze whether Louisiana's open-primary statute imposed a burden

27   on voters or made "voting and receiving votes easier." Sec'y Mot. 20. Neither did the

28   Ninth Circuit in *Keisling*. The question in all election-day cases is simply whether the

Opposition to Secretary's Motion to Dismiss

state statute conflicts with federal law. If it does, relief for voters and candidates is appropriate under 42 U.S.C. §1983.

In any event, this Court has the inherent power to review and enjoin violations of federal law by state officials. *Ex parte Young*, 209 U.S. 123 (1908). The Secretary makes no argument that Plaintiffs lack a claim under the *Ex parte Young* cause of action, or that the named Defendants are not responsible for enforcing the ballot-receipt deadline. *See* Compl. ¶¶62-71.

## IV.    Plaintiffs' complaint for prospective relief is not barred by laches.

Plaintiffs seek forward-looking injunctive relief, and they are harmed each election cycle by the post-election deadline. Laches thus does not apply. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959 (9th Cir. 2001) ("A prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm. Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches." (citation omitted)). The Secretary cites *Danjaq* but overlooks the rule that "laches typically does not bar prospective injunctive relief." *Id. Danjaq* discusses a limited exception "in the trademark context" that applies when "the feared future infringements are subject to the same prejudice that bars retrospective relief." *Id.* The Secretary does not argue that this or any other exception applies. Even if he did, this is not a trademark case. And even if it were, Plaintiffs do not seek retrospective relief. Thus, "the general rule that laches does not bar future injunctive relief" applies. *Id.*

The Secretary's only other case proves these principles remain true "in the election context." Sec'y Mot. 21 (citing *Soules v. Kauaians for Nukolii Campaign Committee*, 849 F.2d 1176 (9th Cir. 1988)). In *Soules*, the plaintiffs sought retrospective relief to *overturn* a special election. 849 F.2d at 1180. The Secretary cites no election case seeking *prospective* relief based on ongoing and future harms. And whether the Court should enter judgment in Plaintiffs' favor before the 2024 general election is irrelevant at the pleading stage. *See* Sec'y Mot. 22-23.

Opposition to Secretary's Motion to Dismiss

## CONCLUSION

The Court should deny the motion to dismiss.


Dated: June 14, 2024                                   Respectfully submitted,

Thomas R. McCarthy*                              /s/ Jeffrey F. Barr
    VA Bar No. 47145
Conor D. Woodfin*                                Jeffrey F. Barr (NV Bar No. 7269)
    VA Bar No. 98937                             ASHCRAFT & BARR LLP
Thomas S. Vaseliou*                              8275 South Eastern Ave., Suite 200
    TX Bar No. 24115891                          Las Vegas, NV 89123
CONSOVOY MCCARTHY PLLC                            (702) 631-4755
1600 Wilson Boulevard, Suite 700                 barrj@ashcraftbarr.com
Arlington, VA 22209
(703) 243-9423                                   Counsel for the RNC, Donald J.
tom@consovoymccarthy.com                         Trump for President 2024, Inc., and
conor@consovoymccarthy.com                       Donald J. Szymanski
tvaseliou@consovoymccarthy.com

Counsel for Plaintiffs                           /s/ Sigal Chattah

                                                 Sigal Chattah (NV Bar No. 8264)
David A. Warrington*                             CHATTAH LAW GROUP
    VA Bar No. 72293                             5875 S. Rainbow Blvd #204
Gary M. Lawkowski*                               Las Vegas, NV 89118
    VA Bar No. 82329                             (702) 360-6200
DHILLON LAW GROUP, INC.                           sigal@thegoodlawyerlv.com
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314                             Counsel for the Nevada Republican
703-574-1206                                     Party
DWarrington@dhillonlaw.com
GLawkowski@dhillonlaw.com

Michael A. Columbo*
    CA Bar No. 271283
DHILLON LAW GROUP, INC.
177 Post Street, Suite 700
San Francisco, California 94108
MColumbo@dhillonlaw.com

Counsel for Donald J. Trump for
President 2024, Inc.

*admitted pro hac vice


## CERTIFICATE OF SERVICE

This filing was served on all appearing parties on the 13th day of June 2024 by

electronic service by way of the Court's ECF System.

25

*/s/ Jeffrey F. Barr*
An employee of Ashcraft & Barr LLP

Opposition to Secretary's Motion to Dismiss