SADMIRA RAMIC, ESQ.
Nevada State Bar No. 15984
**AMERICAN CIVIL LIBERTIES**
**UNION OF NEVADA**
4362 W. Cheyenne Ave.
North Las Vegas, NV 89032
Telephone: (702) 366-1226
Email: ramic@aclunv.org
*Counsel of Record for Amici Curiae*

ASEEM MULJI, ESQ.
*Pro Hac Vice Forthcoming*
**CAMPAIGN LEGAL CENTER**
1101 14th St. NW, Suite 400
Washington, DC 20005
Phone: (202) 868-4777
Email: amulji@campaignlegalcenter.org

HAYDEN JOHNSON, ESQ.
*Pro Hac Vice Forthcoming*
**THE PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
Phone: (202) 870-3210
Email: hayden.johnson@protectdemocracy.org

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

REPUBLICAN NATIONAL COMMITTEE;
NEVADA REPUBLICAN PARTY; DONALD J.
TRUMP FOR PRESIDENT 2024, INC.; and
DONALD J. SZYMANSKI

     *Plaintiffs*,

     vs.

CARI-ANN BURGESS, in her official capacity as
the Washoe County Registrar of Voters; JAN
GALASSINI, in her official capacity as the Washoe
County Clerk; LORENA PORTILLO, in her official
capacity as the Clark County Registrar of Voters;
LYNN MARIE GOYA, in her official capacity as
the Clark County Clerk; FRANCISCO
AGUILAR, in his official capacity as
Nevada Secretary of State,

     *Defendants*.

Case No. 3:24-cv-00198-MMD-CLB

**MOTION FOR LEAVE TO FILE**
**BRIEF AS *AMICI CURIAE* OF**
**AMERICAN CIVIL LIBERTIES**
**UNION OF NEVADA, CAMPAIGN**
**LEGAL CENTER, AND THE**
**PROTECT DEMOCRCY PROJECT**

The American Civil Liberties Union of Nevada ("ACLUNV"), Campaign Legal Center ("CLC"), and The Protect Democracy Project, through their counsel of record, attorney Sadmira Ramic of ACLUNV, move this Honorable Court for an order granting this request for leave to file a brief as *amici curiae* in the above-captioned action.

This Motion is made and based on the papers and pleading on file herein, the Points and Authorities submitted herewith, and any further evidence and argument as may be adduced at a hearing on this matter.

Dated this 18th day of June, 2024.

*/s/ Sadmira Ramic*
Sadmira Ramic, Esq.
Nevada Bar No. 15984
**American Civil Liberties**
**Union of Nevada**
4362 W. Cheyenne Ave.
North Las Vegas, NV 89032
*Counsel of Record for Amici Curiae*

# INTRODUCTION

Proposed *amici curiae* American Civil Liberties Union of Nevada ("ACLUNV"), Campaign Legal Center ("CLC"), and The Protect Democracy Project are nonpartisan, nonprofit organizations that work to ensure all eligible voters can effectively participate in elections, and that the electoral process functions fairly and accurately. Proposed *amici* have knowledge and experience concerning the Electoral Count Reform Act (ECRA) and litigation involving vote-by-mail practices that could assist the Court in resolving the matters presented in the pending Motions to Dismiss. Proposed *amici*'s brief is also timely because it affords all parties sufficient opportunity to respond to the arguments raised, including both Plaintiffs and Defendants ahead of their forthcoming Motions to Dismiss briefing deadlines.

A proposed brief of *amici curiae* is attached hereto as Exhibit A.

# POINTS AND AUTHORITIES

District courts in the Ninth Circuit have broad discretion to allow *amicus curiae* briefs. *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). Though the Local Rules do not address *amici* participation, *see* LR IA 1-1–81-1, the Court has significant discretion "grant leave to appear as *amicus* if the information offered is timely and useful." *League to Save Lake Tahoe v. Tahoe Reg'l Plan. Agency*, No. 3:09-CV-478-RCJ-RAM, 2011 WL 3847185, at *15 (D. Nev. Aug. 30, 2011), *vacated and remanded on other grounds*, 497 F. App'x 697 (9th Cir. 2012) (quoting *Long v. Resorts, Inc.*, 49 F. Supp. 2d 1177, 1178 (D. Nev. 1999)). This Court often exercises that discretion favorably "in a case of public interest." *Wild Horse Educ. v. U.S. Dep't of Interior*, No. 3:23-CV-00372, 2023 WL 5918077, at *1 (D. Nev. Aug. 7, 2023); *see also, e.g.*, *Chrzanowski v. Assad*, No. CVS050418, 2006 WL 8441257, at *1 (D. Nev. Feb. 22, 2006) (granting ACLUNV's motion to file *amicus* brief). This matter presents issues of significant public importance that could affect Nevada voters and the administration of the 2024 General Election.

The proposed brief is useful because it provides the Court with relevant arguments and context concerning core issues presented here. First, the brief explains that Plaintiffs, in the abstract, have properly brought their claim seeking to enforce 3 U.S.C. § 1 through an equitable cause of action attributed to *Ex parte Young*, 209 U.S. 123 (1908). On these arguments, proposed *amici* seek to provide additional support to the Court by "draw[ing] the court's attention to law that escaped consideration" in the parties' briefing. *Wild Horse Educ.*, 2023 WL 5918077, at *1. Second, the brief explains that though Plaintiffs have a cognizable cause of action, they nonetheless fail to state a claim in Count I and should be dismissed because Nevada's ballot-receipt deadlines are not preempted under federal law. The brief provides added context concerning the imperfections and delays in postal service in Nevada that frame why Congress has left it to particular jurisdictions to set their own appropriate ballot-receipt deadlines based on local conditions. In this manner, the proposed brief "fulfills the classic roles of *amici*" and does not "improperly expand the subject matter of the litigation." *Id.*

The proposed *amici curiae* brief is also timely. Briefing on the Motions to Dismiss is ongoing. Both Plaintiffs and Defendants will have an opportunity to consider the arguments of proposed *amici* and respond, if necessary, in their respective forthcoming response and reply briefs.

## CONCLUSION

The undersigned respectfully request that the Court grant their Motion for Leave to File Brief as *Amici Curiae.*

Dated this 18th day of June 2024.

/s/ *Sadmira Ramic*
Sadmira Ramic, Esq.
Nevada Bar No. 15984
**American Civil Liberties Union of Nevada**
4362 W. Cheyenne Ave.
North Las Vegas, NV 89032
*Counsel of Record for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of June 2024, I filed the foregoing Motion for Leave to File Brief as *Amici Curiae* with the Clerk of the Court for the United States Federal District Court for the District of Nevada by using the CM/ECF system and that the proper parties were served by way of electronic service.


*/s/ Sadmira Ramic*
Sadmira Ramic, Esq.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# EXHIBIT A

**[PROPOSED] BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION OF NEVADA, CAMPAGN LEGAL CENTER, AND THE PROTECT DEMOCRACY PROJECT IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS**

SADMIRA RAMIC, ESQ.
Nevada State Bar No. 15984
**AMERICAN CIVIL LIBERTIES**
**UNION OF NEVADA**
4362 W. Cheyenne Ave.
North Las Vegas, NV 89032
Telephone: (702) 366-1226
Email: ramic@aclunv.org
*Counsel of Record for Amici Curiae*

ASEEM MULJI, ESQ.
*Pro Hac Vice Forthcoming*
**CAMPAIGN LEGAL CENTER**
1101 14th St. NW, Suite 400
Washington, DC 20005
Phone: (202) 868-4777
Email: amulji@campaignlegalcenter.org

HAYDEN JOHNSON, ESQ.
*Pro Hac Vice Forthcoming*
**THE PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
Phone: (202) 870-3210
Email: hayden.johnson@protectdemocracy.org

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

REPUBLICAN NATIONAL COMMITTEE;
NEVADA REPUBLICAN PARTY; DONALD J.
TRUMP FOR PRESIDENT 2024, INC.; and
DONALD J. SZYMANSKI

　　　　　　*Plaintiffs*,

　　　　vs.

CARI-ANN BURGESS, in her official capacity as
the Washoe County Registrar of Voters; JAN
GALASSINI, in her official capacity as the Washoe
County Clerk; LORENA PORTILLO, in her official
capacity as the Clark County Registrar of Voters;
LYNN MARIE GOYA, in her official capacity as
the Clark County Clerk; FRANCISCO
AGUILAR, in his official capacity as
Nevada Secretary of State,

　　　　　　*Defendants*.

Case No. 3:24-cv-00198-MMD-CLB

**MOTION FOR LEAVE TO FILE BRIEF AS *AMICI CURIAE* OF AMERICAN CIVIL LIBERTIES UNION OF NEVADA, CAMPAIGN LEGAL CENTER, AND THE PROTECT DEMOCRCY PROJECT**

## INTRODUCTION

Absent congressional intervention, states may enact certain laws to facilitate voting by mail and ensure that voters who timely cast their ballot will have their vote successfully processed and counted. *Amici*—nonpartisan, pro-democracy organizations—submit this brief to explain that while Plaintiffs engage the correct equitable mechanism to pursue their statutory claims in Count I, the Court should grant Defendants' Motions to Dismiss because those claims lack merit. Although Plaintiffs can pursue their federal statutory claim through an equitable cause of action attributed to *Ex parte Young*, 209 U.S. 123 (1908), their arguments fail because Nevada's laws governing the receipt of mail ballots (the "Mailbox Deadline") represent appropriate regulation of mail voting in a manner that Congress has not preempted.

The Court should explicitly hold that private parties may seek prospective injunctive relief for alleged violations of the Electoral Count Reform Act (ECRA), including but not limited to the provisions in 3 U.S.C. § 1, through the Court's traditional equitable cause of action. However, the Court should grant Defendants' Motions to Dismiss here because Plaintiffs misapply the statutes setting election day for federal elections.

## STATEMENT OF INTEREST

*Amici curiae* American Civil Liberties Union of Nevada ("ACLUNV"), Campaign Legal Center ("CLC"), and The Protect Democracy Project respectfully submit this brief in support of Defendants' Motions to Dismiss.[1]

ACLUNV is a non-profit, non-partisan organization dedicated to defending civil liberties and civil rights guaranteed by the federal and state constitutions. This includes assuring that all eligible Nevada voters can register to vote and cast their ballot, and that any actions related to elections comply with federal

---

[1] This brief was not authored in whole or in part by counsel for any party, and no person or entity other than *Amici* made any monetary contribution intended to fund its preparation or submission.

and Nevada state law. The counting of eligible votes cast in Nevada elections and assuring that election related statutes are interpreted and applied accurately and consistently is of paramount importance to ACLUNV and its members as it implicates the constitutional rights of Nevadans and will have a direct impact on their ability to cast their ballots during the upcoming 2024 General Election, and those beyond.

CLC is a nonpartisan, nonprofit organization that has been working for more than fifteen years to advance democracy through law. CLC has litigated many cases in federal courts, including several related to mail voting such as *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548 (6th Cir. 2021) (challenging restrictions on mail voting in Tennessee), *Splonskowski v. White*, No. 1:23-CV-00123, 2024 WL 402629 (D.N.D. Feb. 2, 2024) (defending North Dakota's mail ballot receipt deadlines), and several suits regarding signature and witness requirements for mail ballots. CLC also has particular interest in the proper application and enforcement of laws governing election administration and certification, including the ECRA.

The Protect Democracy Project is a cross-ideological nonprofit organization dedicated to ensuring the proper functioning of the electoral process. It litigates and advocates for the rights of all voters to effectively participate in elections, free from voter intimidation or efforts to undermine the democratic process. It has a particular interest in the application of the ECRA, which is the federal law providing a framework for the presidential election process and is implicated in Plaintiffs' Count I claims concerning 3 U.S.C. § 1.

**ARGUMENT**

This case implicates questions about the scope and application of the ECRA, which Congress passed, and the President signed, in late 2022 to modernize the provisions governing the electoral college process. *Amici* submit this brief to assist the Court in applying this new statute on two fronts. First, an *Ex parte Young* action is a proper mechanism for parties to remedy alleged ECRA violations. Accordingly,

the Court should confirm the availability of the equitable cause of action that Plaintiffs pursue to enjoin governmental actors from violating the ECRA. Second, however, Plaintiffs here misinterpret the ECRA's election day provisions in 3 U.S.C. § 1. That statute does not prohibit state laws that allow timely cast ballots to be received and counted in the days following election day. Nevada's Mailbox Deadline laws represent a legitimate exercise of the State's authority to regulate elections and facilitate voting, which Congress has not preempted. The prevalence of mail voting and heightened risks of mail delays in Nevada underscore the value and basis for these regulations.

## I.   Private plaintiffs have a cognizable equitable cause of action to enjoin violations of the ECRA's mandatory provisions

Although Plaintiffs are wrong about the substantive force of the federal statutes setting Election Day, *see infra* Part II, they are conceptually correct about one threshold issue: there is a cognizable cause of action to seek equitable relief for violations of the ECRA. *See* Compl. ¶ 70.[2] Private parties can enforce the ECRA's mandatory provisions—including but not limited to the section at issue here, 3 U.S.C. § 1— through the traditional federal equitable cause of action described in *Ex parte Young*.

### A.   The Court has broad equitable power to enjoin violations of federal law

The Court has inherent—and broad—authority to decide federal claims seeking equitable relief to prohibit state officials from violating the ECRA's mandatory provisions governing the presidential election process.

Article III extends the federal judicial power "to all Cases[] in . . . Equity." U.S. Const. art. III, § 2, cl. 1.[3] As the Supreme Court recognized in *Armstrong v. Exceptional Child Ctr., Inc.*, a private

---

[2] The existence of a cognizable federal cause of action does not mean that Plaintiffs have Article III standing to confer federal jurisdiction. This brief does not address standing issues.

[3] "Article III is best understood as establishing a constitutional default rule for federal equitable remedies," which "empowers every federal court to issue equitable relief unless Congress expressly provides

plaintiff's "ability to sue to enjoin" unlawful actions by state (and federal) "officers is the creation of courts of equity"; it represents a "judge-made remedy" that "reflects a long history of judicial review of illegal executive action, tracing back to England." 575 U.S. 320, 327 (2015) (citation omitted). An equitable cause of action against a state officer to prevent violations of federal law is often called an *Ex parte Young* action, with historical roots in a "bill in equity" to enforce a private party's "right to enjoin a state officer from executing a state law in conflict with the Constitution or a statute of the United States." 209 U.S. at 150-51.[4] Accordingly, the Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Armstrong*, 575 U.S. at 326; *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) ("It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." (citing *Ex parte Young*, 209 U.S. at 160-62)). "To obtain" equitable "relief, plaintiffs do not need a statutory cause of action" because "[t]hey can rely on the judge-made cause of action

otherwise." Owen W. Gallogly, *Equity's Constitutional Source*, 132 Yale L.J. 1213, 1278 (2023). Additionally, the Judiciary Act of 1789 also provides that federal courts have "original cognizance" over "suits of a civil nature at common law or in equity," and "suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate and complete remedy may be had at law." Judiciary Act of 1789, ch. 20, §§ 11, 16, 1 Stat. 73, 78, 82. This further supports the original understanding of the federal judiciary's broad equitable power to enforce federal law. *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888) (the Judiciary Act "is contemporaneous and weighty evidence of [the Constitution's] true meaning").

[4] Despite its *Ex parte Young* namesake, precedent recognizing the inherent federal equitable cause of action long predates that case. *See, e.g.*, *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845) (expressing "no doubt" that an equity court may "prevent an injurious act by a public officer"); *Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat) 738, 839, 847 (1824) (holding it is "cognizable in a Court of equity" and "proper" to grant equitable relief to prevent actions "repugnant" to federal law); *see also Armstrong*, 575 U.S. at 326-27 (citing both *Osborn* and *Ex parte Young*).

recognized in *Ex parte Young*, . . . which permits courts of equity to enjoin" state officials from violating federal law. *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018).[5]

The availability of an *Ex parte Young* action seeking equitable relief for violations of federal law includes but is not limited to the circumstances of *Ex parte Young*, which concerned an injunction to prevent state enforcement proceedings against the private plaintiff. 209 U.S. at 150-51. As the Supreme Court has explained, an *Ex parte Young* action "permits federal courts to enjoin state officials to conform their conduct to requirements of federal law," regardless of the presence of a state enforcement proceeding. *Milliken v. Bradley*, 433 U.S. 267, 289 (1977) (upholding an affirmative injunction against state officials); *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (stating that *Ex parte Young* is available "when a federal court commands a state official to . . . refrain from violating federal law"). The Ninth Circuit also reinforces that a plaintiff "has an equitable *ultra vires* cause of action to challenge" an official's unlawful exercise of authority in a manner that violates federal law. *Sierra Club*, 963 F.3d at 890.

The plaintiffs in *Armstrong*, for example, sought an injunction to require state executive officials to conform their conduct to the Medicaid Act's reimbursement rate-setting provision. *See* 575 U.S. at 323-24. Instead of ruling that an equitable action was unavailable there because the plaintiffs sought an affirmative change to state conduct, the Court more broadly ruled that "federal courts may . . . grant injunctive relief against state officers who are violating, or planning to violate, federal law," subject to statutory limitations. *Id.* at 326. The Court then focused on whether Congress intended the Medicaid Act to preclude such an equitable action by devising an alternative remedial scheme. *See* 575 U.S. at 328-29. If the type of equitable relief sought in *Armstrong* was categorically unavailable because it was not within

---

[5] *See also Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019); *Sierra Club v. Trump*, 963 F.3d 874, 890 (9th Cir. 2020), *vacated as moot Biden v. Sierra Club*, 142 S. Ct. 46 (2021); *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 472-75 & n.27 (5th Cir. 2020) (en banc).

the exact scope of *Ex parte Young*, then the Court would have said so rather than perform the statutory interpretation analysis of whether limitations specific to the Medicaid Act precluded *Ex parte Young*'s availability.

Additionally, although the *Ex parte Young* cause of action challenging federal statutory violations is available and frequently pursued in the federal preemption context, as Plaintiffs style their 3 U.S.C. § 1 claim here, private parties can similarly enforce mandatory ECRA provisions that are not based on a preemption theory. Indeed, *Ex parte Young* itself "was a suit against state officials . . . to enjoin enforcement of a railroad commission's order requiring a reduction in rates" based on a federal law violation. *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 646 (2002). Far from being limited to preemption, an *Ex parte Young* action is broadly available to effectuate the "power of federal courts of equity to enjoin unlawful executive action" by state officers, subject to specific statutory limitations. *Armstrong*, 575 U.S. at 327; *see also Ex parte Young*, 209 U.S. at 150-51.

**B.    Violations of the ECRA are remediable under an *Ex parte Young* action**

An equitable *Ex parte Young* action is among the causes of action at hand to remedy ECRA violations. Such relief is available here based on the considerations that (1) the complaint seeks prospective relief for ongoing violations of federal law, (2) Congress did not enact a detailed remedial scheme to preclude an *Ex parte Young* action, and (3) there is no adequate remedy at law. Each consideration favors holding that an *Ex parte Young* action is available for an ECRA claim.

First, Plaintiffs' statutory claims in Count I fit within the *Ex parte Young* action framework based on the "straightforward inquiry" that the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland*, 535 U.S. at 645 (citation omitted). Critically, this "inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the

merits of the claim." *Id.* at 646. It asks instead whether the federal law claimed to be violated is enforceable by prospective injunctive relief against the responsible government official(s). *See id.*

Violations of 3 U.S.C. § 1 can be remedied through prospective injunctive relief. For example, if a state closes voting and completes the appointment of presidential electors *before* the statutorily designated Election Day, the executing official violates the ECRA and can be enjoined to reopen the polls. *See, e.g.*, *Foster v. Love*, 522 U.S. 67, 72 (1997) (evaluating related congressional election day statutes, but citing 3 U.S.C. § 1, to uphold prospective injunctive relief barring enforcement of an election system where "a contested selection of candidates for a congressional office . . . is concluded as a matter of law before the federal election day"). Moreover, if a hypothetical election official reopened voting weeks after election day—without adhering to the limited election emergency provisions of 3 U.S.C. § 21(1)—a plaintiff could seek injunctive relief to prevent that violation of the ECRA. *See* 3 U.S.C. § 1. Accordingly, an *Ex parte Young* action is, in concept, available for ECRA claims under this "straightforward inquiry" about the nature of the alleged violation and relief sought. *See Verizon Maryland*, 535 U.S. at 645.

Second, the ECRA does not indicate a congressional objective to create an alternative statutory remedial scheme that precludes the default *Ex parte Young* equitable action. While "Congress may displace the equitable relief that is traditionally available to enforce federal law" in an *Ex parte Young* action, the statutory text must establish Congress's "intent to foreclose equitable relief." *Armstrong*, 575 U.S. at 328-29 (citations and quotations omitted); *see also Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 73-74 (1996) (ruling that a "carefully crafted and intricate remedial scheme" passed "in conjunction with" the substantive statute precludes "the traditional *Ex parte Young* action"). But the existence of *some* alternative remedial option is not alone sufficient. *See Armstrong*, 575 U.S. at 328 (an alternative remedy "might not, *by itself*, preclude the availability of equitable relief" (emphasis in original)); *Verizon Maryland*, 535 U.S. at 647 (ruling that an alternative remedial scheme was not preclusive); *Stewart*, 563

7

U.S. at 256 & n.3 (similar). The alternative scheme must be sufficiently detailed to show Congress's objective to preclude *Ex parte Young* because "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946). The Supreme Court has indicated that a "judicially unadministrable" statutory text in combination with an alternative remedial scheme can weigh on the availability of *Ex parte Young*. *Armstrong*, 575 U.S. at 328.

Here, Congress did not manifest a clear objective to preclude an *Ex parte Young* action to enforce the ECRA, in part because it neither created an exclusive alternative remedial scheme nor is the text judicially un-administrable under the reasoning from *Armstrong*. To the contrary, the ECRA explicitly states, in its provision regarding the ECRA's specific judicial review mechanism available in some circumstances, that it "shall not be construed to preempt or displace any existing . . . Federal cause of action." 3 U.S.C. § 5(d)(2)(B). By its plain terms, this includes the default *Ex parte Young* equitable action.

Although the ECRA retains Congress's limited ability to enforce some provisions when counting electoral votes during the joint session, *see* 3 U.S.C. § 15(d)(2) (providing for Congress's limited "[c]onsideration of objections and questions" to electoral votes), that mechanism does not preclude traditional equitable relief. *See also, e.g.*, *McPherson v. Blacker*, 146 U.S. 1, 23-24 (1892) (adjudging validity of a state's method of elector appointment as raising "a judicial question," rejecting that the issue was left to Congress). The ECRA's provisions in 3 U.S.C. § 15(d) are not sufficiently detailed and comprehensive to displace *Ex parte Young*. *Compare Armstrong*, 575 U.S. at 328-29 (clear alternative provision for enforcing statute by withholding federal funding combined with judicially unadministrable nature of the text supported congress's intent to displace *Ex parte Young*); *Seminole Tribe*, 517 U.S. at 73-74 (detailed executive regulatory scheme).

Moreover, by the time of Congress's joint session to count electoral votes, Election Day (and any disputes associated with it) will be long past Congress's ability to consider objections and questions would prove insufficient to provide the type of effective equitable relief to remedy violations of the ECRA. The ECRA's overall scheme recognizes that parties obtaining equitable relief earlier in the process will affect Congress's subsequent joint session duties. *See* 3 U.S.C. § 5(c)(2). It therefore lacks an alternative remedial scheme that displaces *Ex parte Young*.[6]

The ECRA is judicially administrable under an *Ex parte Young* action. In *Armstrong*, the Court ruled that the Medicaid Act "mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care'" was too indeterminate to be judicially administrable, which proved significant in the Court's ruling that Congress devised an alternative remedial scheme to preclude an *Ex parte Young* action. 575 U.S. at 328. The ECRA, by contrast, creates definite and enforceable duties. For 3 U.S.C. § 1, for example, courts may enjoin violations of the provision if an official flouts preexisting state law or reopens voting *after* election day without a sufficient election emergency under 3 U.S.C. § 21(1). And federal courts can administer the statute to reject ECRA claims, such as Plaintiffs', that misapply the provision in an effort to more broadly prohibit the post-election day receipt and processing of timely cast ballots. *Ex parte Young* thus provides the equitable cause of action to enforce them.

---

[6] Although the Vet Voice Intervenor-Defendants also examine the availability of a cause of action to enforce the 3 U.S.C. § 1 election day provision under 42 U.S.C. § 1983, that issue is not before the Court. Plaintiffs pursue their statutory claims in Count I only under *Ex parte Young*. Accordingly, the Court need not address § 1983 for Count I. *See, e.g.*, *Green Valley*, 969 F.3d at 472-75 & n.27 (examining causes of action separately and ruling that a plaintiff "has a cause of action . . . *at equity*, regardless of whether it can invoke § 1983"); *Armstrong*, 575 U.S. at 327-32 (examining claims separately); *id.* at 340 (Sotomayor, J., dissenting) (further explaining that "the principles that [the Supreme Court] ha[s] developed to determine whether a statute . . . is enforceable through § 1983 [] are not transferable to the *Ex parte Young* context"). Moreover, Plaintiffs' claims in Counts II and III that separately invoke § 1983 hinge on the success of their perception of the election day statutes at issue in claim in Count I—which, as described *infra*, fails.

A final consideration is that there is no adequate remedy at law for violations of the ECRA that would lessen the need for an *Ex parte Young* action for equitable relief. *See* 209 U.S. at 163-64. The remedy for an ECRA violation—preventing the state official from transgressing the statute—has only an equitable nature; a violation cannot be compensated through monetary damages. *See, e.g.*, *Mort v. United States*, 86 F.3d 890, 892-93 (9th Cir. 1996); *Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988). Because such actions seek simply "to halt or prevent" a violation of federal law "rather than the award of money damages," they are equitable in nature and do "not ask the Court to imply a new kind of cause of action." *United States v. Stanley*, 483 U.S. 669, 683 (1987) (quotations omitted). Thus, an *Ex parte Young* action for prospective injunctive relief is an appropriate and adequate remedy to enforce the ECRA.

### C.   Precedent supports an *Ex parte Young* action to prevent ECRA violations

Precedent supports that private parties can enforce the ECRA in an *Ex parte Young* action. In 2022, Congress enacted the ECRA by amending the Electoral Count Act of 1887 (ECA), which had a similar framework governing the electoral college process but was less certain about the mandatory and enforceable nature of the duties imposed. Still, courts evaluated claims for injunctive relief seeking to enforce the ECA, including the prior 3 U.S.C. § 1 (2022), without questioning the plaintiffs' equitable cause of action. *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 366 (D.N.J. 2020) (Count IV); *Armstrong*, 575 U.S. at 338 (Sotomayor, J., dissenting) (citing *Foster*, which evaluates 3 U.S.C. § 1, as an example of precedent in which the Court approved a private party seeking "equitable protection from an injurious and preempted state law without regard to whether the federal statute at issue itself provided a right to bring an action").

A similar conclusion applies to the requirements in the prior 3 U.S.C. § 5 (2022), which provided a safe harbor provision instructing Congress to count the electoral votes that a state submitted after timely

resolving any post-election controversies under state law. For instance, the petitioners in the *Bush v. Gore* litigation pursued an equitable, non-statutory cause of action to vindicate the perceived violations of federal law in the ECA.[7] The Supreme Court ruled that "§ 5 contains a principle of federal law that would assure finality of the State's determination if made pursuant to a state law in effect before the election," and stated that the lack of adherence to 3 U.S.C. § 5 (2022) was among "the federal questions asserted to be present." *Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 78 (2000). It later also ruled that the ECA's safe harbor deadline restrained the Court's appropriate equitable relief to resolve the recount dispute. *See Bush v. Gore*, 531 U.S. 98, 110-11 (2000); *see also Stein v. Thomas*, 222 F. Supp. 3d 539, 545 (E.D. Mich. 2016) (treating 3 U.S.C. § 5(d) (2022) as judicially enforceable in exercising the court's equitable power over a recount), *aff'd,* 672 F. App'x 565, 568 (6th Cir. 2016).

Thus, cases concerning the prior 3 U.S.C. § 1 and 3 U.S.C. § 5 support that federal equitable relief was available to remedy violations of the ECA, the likely basis for which is the traditional, non-statutory cause of action described in *Ex parte Young*. Although courts have not yet had an opportunity to reach that conclusion specifically in the new ECRA context, this Court should do so because "the principles undergirding the *Ex parte Young* doctrine" are present here to "support its application" to remedy violations of the ECRA through an equitable cause of action, "novelty notwithstanding." *Stewart*, 563 U.S. at 261.

//

//

//

---

[7] *See* Brief of Petitioners, *Bush v. Gore*, No. 00-949, 2000 WL 1810102, at *33-40 (Dec. 10, 2000) (pursuing claim that recount procedures under state supreme court's order violated 3 U.S.C. § 5 (2022) and should be enjoined); Brief of Petitioners, *Bush v. Palm Beach Cty. Canvassing Bd.*, No. 00-836, 2000 WL 1761134, at *17-36 (Nov. 28, 2000) (similar).

II. **Plaintiffs nevertheless fail to state a claim because federal law does not preempt Nevada's Mailbox Deadline laws**

Federal law does not preempt the Mailbox Deadline laws. Such laws are a valid exercise of the State's delegated authority over federal elections, including to implement Nevada's policy choice to facilitate universal mail voting by accounting for imperfections in the U.S. postal system.

A. **Absent any direct conflict with federal law, Nevada has authority to facilitate mail voting in federal elections under the U.S. Constitution's Elections and Electors Clauses**

Because Nevada's Mailbox Deadline laws facilitate mail voting in a manner that does not conflict with federal law, Nevada is free to implement those provisions.

The U.S. Constitution delegates certain authority to the States to regulate federal elections, subject to other constitutional protections and Congress's authority to displace such state regulation. For example, the Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of ch[oo]sing Senators." U.S. Const. art. I, § 4, cl. 1. The Electors Clause sets up a similar dynamic for presidential elections. *Id.* art. II, § 1, cl. 2; *see also Foster*, 522 U.S. at 71 (evaluating the two provisions *in pari materia*); *Buckley v. Valeo*, 424 U.S. 1, 13 n.16, 90-91 (1976). Subject to Congress's legislative power and limitations in "pertinent provisions of the Constitution," states thus have "discretion in the formulation of a system for the choice by the people" for federal elections. *United States v. Classic*, 313 U.S. 299, 311 (1941); *see also, e.g.*, *Ex parte Siebold*, 100 U.S. 371, 384 (1879) (Congress has overriding authority to displace state regulations through federal preemption). The basic limitation is that a "state system cannot directly conflict with federal election laws on the subject." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000); *accord Arizona v. ITCA*, 570 U.S. 1, 14 (2013).

Here, there is no direct conflict of federal and state law. While voters must cast and mail their ballots by Election Day, Nevada's Mailbox Deadline laws permit the receipt, processing, and counting of timely cast ballots received by 5:00 P.M. on the fourth day after the election (or the third day if the date of the postmark cannot be determined). N.R.S. § 293.269921(1)(b), (2). There is no federal law that bars such a system and the statutes setting a uniform federal Election Day are silent on when timely cast ballots must be received and counted.

The Supreme Court in *Foster* ruled that those statutes barred a state system that, in effect, mandated the "consummation" of the election—the point at which the voters' choices have been made and can no longer change—*before* Election Day. *Foster*, 522 U.S. at 72 & n.4. But that does not equate to limiting the timeline for when ballots may be received, processed, and counted. The Court in *Foster* acknowledged that some aspects of the election process will naturally occur before and after Election Day itself. *See id*. As numerous courts have concluded, *Foster* "clear[ly] signal[ed]" that state laws allowing the post-Election Day processing and counting of validly cast ballots are permissible. *Bomer*, 199 F.3d at 776; *see also Millsaps v. Thompson*, 259 F.3d 535, 546 n.5 (6th Cir. 2001) (holding that it is a necessary reality that "official action to confirm or verify the results of the election extends well beyond federal election day"). Plaintiffs' contrary fixation on the "single act of receiving a ballot from a voter presents an unnatural and stilted conception of the actions taken by officials under [state] election laws and loses sight of the fact that an official's mere receipt of a ballot without more is not an act meant to make a final selection." *Millsaps*, 259 F.3d at 546; *Bomer*, 199 F.3d at 776 (rejecting "hyper-technical meaning to 'election,'" that Congress did not intend (quoting *Foster*, 522 U.S. at 72)).

Moreover, laws akin to Nevada's Mailbox Deadline are nothing new or rare. Over a third of states plus several territories have laws that allow timely cast ballots to be received and counted after Election Day. *See Bost v. Illinois State Bd. of Elections*, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023) (citing state

13

laws); Nat'l Conf. of State Legislatures, *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (Mar. 18, 2024), https://perma.cc/B4GC-VL54. Despite Congress's awareness of these state policies, it has not exercised its overriding power to require anything different. "[L]ong-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent." *Dames & Moore v. Regan,* 453 U.S. 654, 686 (1981) (citation omitted). The fact that Congress has "never stepped in and altered the rules" reinforces its policy decision to leave the regulation of mail ballot receipt deadlines to the specific states. *Bost*, 684 F. Supp. 3d at 736.

Congress's treatment of 3 U.S.C. § 1 itself supports this point. If Congress disapproved of state laws such as Nevada's Mailbox Deadline, it could have exercised its authority to expressly preempt them when it amended the ECRA in 2022. *See ITCA*, 570 U.S. at 13-14. Instead of doing so, Congress retained the standardized election day provision under which states have long administered their own ballot receipt deadline policies without issue. And far from expressing Congress's objective to displace existing state laws concerning ballot-receipt deadlines, the ECRA adds that there is a federal duty for the state to appoint its electors "in accordance with the laws of the State enacted prior to election day." 3 U.S.C. § 1.

Finally, the context of other federal statutes regulating federal elections points the same direction. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (reaffirming the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination" (citation omitted)). Under the Uniformed Overseas and Absentee Voters Act ("UOCAVA"), for example, Congress exercised its authority to regulate federal elections to reinforce that although ballots must be *initially cast* by Election Day, rules concerning the subsequent receipt and processing of ballots remain largely up to the states. UOCAVA contemplates states using mail ballots to provide an effective right to vote for overseas voters. *See, e.g.*, 52 U.S.C. § 10502(a)(1) (declaring that UOCAVA is designed to prevent the denial or abridgment of the "inherent constitutional right of citizens to vote"); § 20302(a)(1)

(providing that states must make absentee voting available to military and overseas voters for all federal elections). The statute then recognizes the difference between the voter timely casting and mailing the ballot and the election official subsequently receiving and counting it. *Id.* § 20304(a) (establishing procedures for "collecting" absentee ballots of overseas voters and "delivering" them to election officials for tabulation). It defers to compliance with state law requirements concerning the latter, providing that procedures must exist for ballots of overseas voters to arrive to the appropriate election official "not later than the date by which an absentee ballot must be received in order to be counted in the election." *Id.* § 20304(b)(1); *see also id.* § 10502(c) (similarly deferring to compliance with state law concerning ballot receipt). While UOCAVA establishes a deadline in advance of Election Day by which overseas voters must mail their marked ballots, *see id.* § 20304(b)(3), this provision applies only to the overseas voters UOCAVA covers, and there is no analogous statute that would displace state laws concerning domestic voters.

Thus, Congress has acknowledged that states have the authority to set reasonable ballot receipt deadlines in the days after Election Day, as suited to the needs of a particular state's mail voting processes. *See Bost*, 684 F. Supp. 3d at 737. While Congress could enact legislation to the contrary, the "notable lack of federal law governing the timeliness of mail-in ballots" in general, *see id.* at 736, demonstrates that Nevada's Mailbox Deadline is a permissible exercise of discretion.

**B.     Nevada's Mailbox Deadline is a reasonable exercise of its authority under the Elections and Electors Clauses to administer voting by mail**

Subject to requirements in the U.S. Constitution and federal direction from Congress, states have discretion to facilitate the "mechanics" of voting by mail, including the procedures used to determine the timeliness of mail ballots. *See Foster*, 522 U.S. at 69. Nevada's Mailbox Deadline is a sensible policy

choice under this authority, given the prevalence of mail voting and the challenges of mail service in Nevada.

The Mailbox Deadline laws are a key feature of Nevada's multi-year effort to expand access to voting by mail. The Legislature first adopted a version of the laws in AB 345 (2019), which was designed to "make voting and everything related to voting convenient and easy for every eligible voter." *See* Mins. of the Meeting of the Assemb. Comm. on Legis. Operations & Elections, 80th Sess., at 15 (Apr. 19, 2019), https://perma.cc/5ZRL-JF88 (remarks of bill sponsor Rep. Frierson). It did so by expanding mail voting access, extending the deadline to request a mail ballot, and extending the ballot receipt deadline. *Id.* at 17-18. In 2020, the Legislature built upon these policy changes to expand mail voting to all eligible Nevadans in response to the COVID-19 pandemic. *See* AB 4 (2020), https://perma.cc/KHR5-SB26.[8]

In 2021, the Legislature enacted AB 321 and confirmed that universal mail voting is a fixture of Nevada elections. For ballots returned by mail, AB 321 adopted the Mailbox Deadline, which shortened the receipt deadline for postmarked ballots from seven to four days after the election and retaining the presumption that a ballot without a determinate postmark was timely cast if received within three days. *See* Mins. of the Meeting of the Assemb. Comm. on Legis. Operations & Elections, 81st Sess., at 5 (Apr. 1, 2021), https://perma.cc/5ZRL-JF88 (remarks of Rep. Frierson). The shortened deadline was a "compromise" to promote quicker determination of the results while setting a timeframe in which "most mail ballots were received." *Id.*

Nevadans have embraced vote by mail under these laws, which has increased in use since 2020. *See* Eric Neugeboren, *Analysis: Nevada primary turnout down, but mail voting again reigns supreme*, The

_____

[8] Some private parties, including the Plaintiffs here, sued to invalidate those policies in 2020, but the Court dismissed for lack of standing. *See Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1004 (D. Nev. 2020).

16

Nevada Independent (June 17, 2024), thenevadaindependent.com/article/analysis-nevada-primary-turnout-down-but-mail-voting-again-reigns-supreme (aggregating state data); *see also* Nev. Sec'y of State, *2024 Election Information* (accessed June 17, 2024), https://perma.cc/XC5E-FQ2C. Under these conditions, the Mailbox Deadline helps ensure that voters who return their ballot by mail by Election Day will have their votes counted. It also unifies the voting process by aligning the participation deadline for mail voters with that of in-person voters. For the population of voters who can only participate because of vote by mail, the Mailbox Deadline affords the same amount of time as other voters—up to and including Election Day—to consider the issues and hear candidates' final appeals before casting their ballot.

The Mailbox Deadline laws also account for practical shortcomings of USPS policies and practices concerning postmarking and mail delivery times. Nevada, like several states, primarily relies on USPS postmarks to indicate that a ballot was placed in the mail by Election Day, consistent with the longstanding Postal Service policy "to try to ensure that every return ballot mailed by voters receives a postmark." USPS, *Postmarking Guidelines, Kit 600 – Your 2024 Official Election Mail* (Jan. 2024), https://perma.cc/Z8GY-U4VY. However, the reality is that our national mail system is imperfect, including when it comes to election mail.

USPS's continued postmarking and delivery issues are well-known. To start, postmarks "'are intended to be a revenue protection mechanism to prevent reuse of postage' and generally 'are not required on all mailings.'" *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 370-71 (D.N.J. 2020) (citing USPS, Office of Inspector General, Election Readiness Report 3 (Aug. 31, 2020)). They are not designed to be a complete, errorproof timestamp for election mail. So, although USPS tries to postmark all ballots, it itself has found "there can be breakdowns or exceptions to this process which would prevent a ballot from receiving a postmark." *See* USPS Office of Inspector General, *Timeliness of Ballot Mail in the Milwaukee Processing & Distribution Center Service Area*, at 7 (July 7, 2020),

https://perma.cc/M4DL-UZAY. This includes, for example, when ballots are double fed on a machine, machines run out of ink, or ballots are commingled with mail that is not automatically processed on machinery that applies a postmark. *Id.* Even when timely applied, the date of postmarks may become smudged or illegible by the time they reach an election office for processing. *Id.*

To avoid the arbitrary disenfranchisement of voters who timely cast their mail ballots on or close to election day within the realities of an imperfect mail system, Nevada sensibly deems the small number of ballots with indeterminate postmarks that arrive by 5 p.m. on the third day after the election as presumptively timely postmarked. *See* N.R.S. § 293.269921(2).

The timing for this policy is also supported in USPS's own delivery expectations. In a letter to mail service providers in August 2020, prior to Nevada's adoption of AB 321, USPS stated that "domestic First-Class mail," which must be applied to ballots sent by voters to election officials, "is delivered in 3 to 5 days." *See Letter from USPS to Mail Service Providers*, at 1 (Aug. 18, 2020), https://perma.cc/9PNB-8CCX. One month earlier, in a letter sent to state election officials, USPS inconsistently stated that "most domestic First-Class Mail is delivered 2-5 days after it is received by the Postal Service." *Letter from USPS to State Election Officials*, at 24 (July 31, 2020), https://perma.cc/P6U6-AUZK. And USPS has recommended that "domestic voters should generally mail their completed ballots at least *one week* before the state's due date," *id.* at 25, advice which remains on the USPS website today, *see* USPS, *Election Mail*, https://perma.cc/2M7M-3G4H (last accessed June 11, 2024). Given this information and uncertainty, the Nevada Legislature enacted a sensible policy to presume that ballots arriving without a determinate postmark within three days are timely cast. At the least, such presumptions are "not preempted by the Federal Election Day Statutes because the [statutes] are silent on methods of determining the timeliness of ballots." *Way*, 492 F. Supp. 3d at 372.

The continuing risk of postal service delays specifically in Nevada further underscore the policy decisions the State made, which is consistent with Congress's deference to the needs of the particular jurisdiction on ballot-receipt issues, provided it complies with federal law. Currently, USPS is planning changes to mail delivery service that would continue to threaten timely ballot delivery in Nevada. Last month, Washoe County sued to halt USPS plans to close Reno's mail processing and distribution center and transfer its operations across the Sierra Nevadas to Sacramento. Complaint, *Washoe Cty. v. Louis DeJoy*, No. 3:24-cv-00224 (D. Nev. May 28, 2024). As Washoe County alleges, consolidation would substantially delay the delivery of mail ballots to voters in the twelve Northern Nevada counties the Reno processing center currently serves. *Id.* at 10-14; *see also* USPS, *Mail Processing Facility Review*, https://perma.cc/F55H-AM3T (noting "Decision to Proceed" with consolidation of Reno processing facility, though the implementation could be delayed to 2025). In 2020, numerous courts intervened to order USPS, under Postmaster General Louis DeJoy, to cease planned reorganizations or other changes to mail delivery service that would threaten the timely delivery of ballots. *See NAACP v. USPS*, 496 F. Supp. 3d 1, 20 (D.D.C. 2020); *NAACP v. USPS*, No. 20-CV-2295, 2020 WL 6441317, at *1 (D.D.C. Oct. 27, 2020); *Jones v. USPS*, 488 F. Supp. 3d 103, 141 (S.D.N.Y. 2020); *Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 893 (E.D. Pa. 2020).

In light of these concerns with mail processing and delivery imperfections, Nevada's decision to enact its Mailbox Deadline as part of its universal vote-by-mail policies is a reasonable exercise of its powers to administer federal elections, which Congress has not preempted.

## CONCLUSION

For the foregoing reasons, *amici* urge the Court to explicitly hold that private plaintiffs have a cognizable cause of action for their claim seeking equitable relief concerning the ECRA, but to grant

Defendants' Motions to Dismiss because Plaintiffs fail to state a claim that federal law preempts the Mailbox Deadline.

Dated this 18th day of June, 2024.

/s/ Sadmira Ramic
SADMIRA RAMIC, ESQ.
Nevada State Bar No. 15984
**AMERICAN CIVIL LIBERTIES UNION OF NEVADA**
4362 W. Cheyenne Ave.
North Las Vegas, NV 89032
Telephone: (702) 366-1226
Facsimile: (702) 830-9205
Email: ramic@aclunv.org
*Counsel of Record for Amici Curiae*

ASEEM MULJI, ESQ.
*Pro Hac Vice Forthcoming*
**CAMPAIGN LEGAL CENTER**
1101 14th St. NW, Suite 400
Washington, DC 20005
Phone: (202) 868-4777
Fax:     (202) 736-2222
Email: amulji@campaignlegalcenter.org

HAYDEN JOHNSON, ESQ.
*Pro Hac Vice Forthcoming*
**THE PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
Phone: (202) 870-3210
Email: hayden.johnson@protectdemocracy.org