AARON D. FORD
  Attorney General
LAENA ST-JULES (BAR NO. 15156)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
T: (775) 684-1265
E: lstjules@ag.nv.gov

*Attorneys for Secretary of State*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; NEVADA REPUBLICAN PARTY; DONALD J. TRUMP FOR PRESIDENT 2024, INC.; and DONALD J. SZYMANSKI,<br><br>Plaintiffs,<br><br>vs.<br><br>CARI-ANN BURGESS, *in her official capacity as the Washoe County Registrar of Voters;* JAN GALASSINI, *in her official capacity as the Washoe County Clerk;* LORENA PORTILLO, *in her official capacity as the Clark County Registrar of Voters;* LYNN MARIE GOYA, *in her official capacity as the Clark County Clerk;* FRANCISCO AGUILAR, *in his official capacity as Nevada Secretary of State,*<br><br>Defendants. | Case No. 3:24-cv-00198-MMD-CLB<br><br>**DEFENDANT SECRETARY OF STATE'S REPLY IN SUPPORT OF MOTION TO DISMISS** |

Defendant the Secretary of State[1] replies here to Plaintiffs' Response in Opposition to Secretary's Motion to Dismiss, ECF No. 74 ("Opposition").

**I.      INTRODUCTION**

Plaintiffs fail to raise any argument in their Opposition that would save their deficient Complaint from dismissal. The Organizational Plaintiffs claim that there is some

---

[1] Defined terms have the same meanings as set forth in the Secretary of State's Motion to Dismiss, ECF No. 60 ("Motion").

important distinction between the law challenged in this case and *Donald J. Trump for President, Inc v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020) that would bar application of issue preclusion, despite the laws being indistinguishable in all material aspects and application. They also claim that by simply creating a new entity, Donald Trump's principal committee for his campaign can continue litigating an issue that was already decided against it. The doctrine of issue preclusion is not so easily surmounted.

Regardless, Plaintiffs have not remedied their standing problem. They fail to distinguish this case from the overwhelming weight of authority that establishes that vote dilution is generalized and speculative. The Organizational Plaintiffs also cannot base a diversion of resources theory on a speculative injury that does not directly or perceptibly impair their core activities, nor can establish standing by spending money on things that do nothing to counteract the alleged injury caused by the Mailbox Deadlines.

Beyond Plaintiffs' inability to establish standing, Plaintiffs also fail to establish that Congress preempted the Mailbox Deadlines. They do not grapple with Congress's decision not to act in the face of the majority of states counting at least some ballots received after election day. And their argument that receiving mail ballots constitutes official action that must be completed on election day ignores that receiving mail ballots is not an action.

## II.   ARGUMENT

### A.   Plaintiffs Lack Standing

#### 1.   Issue Preclusion Bars the Organizational Plaintiffs' Claims

Plaintiffs raise only two arguments against issue preclusion: (1) that the issues are not identical; and (2) that the plaintiffs are not the same. Opp. at 3-6. Both fail.

##### (i)   The Issues in the Two Actions Are Identical

Plaintiffs claim that the law challenged in *Cegavske* and the Mailbox Deadlines are different, and issue preclusion is inappropriate based on this change in law. *See* Opp. at 4-5. As the Supreme Court has explained, however, issue preclusion applies "unless there have been *major* changes in the law." *Montana v. United States*, 440 U.S. 147, 161 (1979) (emphasis added). It does not matter that the change in law relates to a statute as opposed

to case law. *Cf. Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1339 (9th Cir. 1992) (collateral estoppel would bar a party from challenging a regulation that was judicially amended). There's been no major change in law here, and "[b]ecause the factual and legal context in which the issues of this case arise has not materially altered since [*Cegavske*], normal rules of preclusion should operate to relieve the [Secretary of State] of 'redundant litigation [over] the identical question of'" standing. *Montana*, 440 U.S. at 162 (citations omitted). AB 4 applied to the 2020 general election, and under AB 4, county clerks counted (1) ballots with postmarks if received within seven days after election day and (2) ballots with no or illegible postmarks if received no more than 3 days after election day. *See* AB 4 §§ 8(1), 20(1)(b), 20(2). The Mailbox Deadlines in effect for the 2024 general election are identical in all material aspects and application. Apart from identifying small differences between AB 4 and the Mailbox Deadlines, Plaintiffs do not explain how the Mailbox Deadlines create a new issue from the one decided in *Cegavske*.

To the extent Plaintiffs are claiming that the Secretary of State should have provided a detailed analysis of factors showing the self-evident identity of the issues, *see* Opp. at 4 (quoting *Steen v. John Hancock Mut. Life Ins.*, 106 F.3d 904, 912 (9th Cir. 1997)), those four factors all weigh in favor of preclusion. Applying the *Steen* factors, 106 F.3d at 912: (1) the argument and evidence that would be advanced in the two cases would be identical; (2) the evidence and argument involve the application of the same standing laws; (3) pretrial preparation and discovery in *Cegavske* would have embraced the matters asserted here; and (4) the Organizational Plaintiffs claimed in *Cegavske* and claim here that they have standing to challenge the counting of mail ballots received after election day as violative of the Federal Election Day Statutes, *see* Mot. at 4-5.

Plaintiffs' cited cases, Opp. at 4-5, are all inapposite. They address situations where there was (1) a change in legal climate and controlling legal principles, *Comm'r v. Sunnen*, 333 U.S. 591, 599, 606 (1948); (2) a different legal standard for state law versus bankruptcy law, *Peterson v. Clark Leasing Corp.*, 451 F.2d 1291, 1292 (9th Cir. 1971); (3) a difference in requested remedies, *Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading*, 873 F.2d

1 229, 233 (9th Cir. 1989); (4) application of different states' laws, *Sw. Pet Prods., Inc. v. Koch Indus., Inc.*, 32 F. App'x 213, 215 (9th Cir. 2002)[2]; and (5) a difference in purpose, issues, and statutes, *Artukovic v. INS*, 693 F.2d 894, 899 (9th Cir. 1982). Here, there has been no change in legal climate; the legal standards for standing are the same; the requested relief is the same, *see* Compl. at 16; Cegavske Amended Complaint at 28-29; the issues raised are the same; and the statutes are materially identical.

Finally, Plaintiffs argue that applying issue preclusion here would mean that the Organizational Plaintiffs could never sue "a government official again, for any legal violation." Opp. at 4-5. Not so. The Secretary of State's issue preclusion argument is limited to the Organizational Plaintiffs' standing to bring a second challenge to counting mail ballots received after election day as it is identical to the issue decided in *Cegavske*.

**(ii)  Issue Preclusion Applies to All of the Organizational Plaintiffs**

Plaintiffs claim that Plaintiff Donald J. Trump for President 2024, Inc. is not precluded here because in *Cegavske*, it was a different Trump campaign entity that was a plaintiff, *see* Opp. at 5-6, even though both entities have been the "principal committee" for Donald Trump's campaign, Compl. ¶ 18; Cegavske Amended Complaint ¶ 11. Under Plaintiffs' argument, a corporation can avoid application of issue preclusion simply by re-incorporating under a new name, with no change in mission, activities, or interests. The privity doctrine is not so limited.

"[P]rivity is a flexible concept dependent on the particular relationship between the parties in each individual set of cases." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1081-82 (9th Cir. 2003). It "exists between parties who adequately represent the same legal interests. It is the identity of interest that controls in determining privity, not the nominal identity of the parties." *Va. Sur. Co. v. Northrop Grumman Corp.*, 144 F.3d 1243, 1247 (9th Cir. 1998) (citation omitted). Traditional definitions of privity, *see* Opp. at 5-6, need not apply to find privity, *see Richards v. Jefferson*

---

[2] Because this is an unpublished Ninth Circuit decision from 2002, Plaintiffs impermissibly cite it "to the courts of this circuit." 9th Circuit Rules 36-3(c); *see also* FRAP 32.1.

*Cnty.*, 517 U.S. 793, 798 (1996) ("[T]he term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term."). Indeed, "it has come to be recognized that the privity label simply expresses a conclusion that preclusion is proper." 18A C. Wright, A. Miller & E. Cooper, Fed. Prac. & Proc., Juris. § 4449 (3d ed.). Because the interests between the two Trump campaigns are identical, issue preclusion applies to Plaintiff Donald J. Trump for President 2024, Inc.

### 2. Plaintiffs Lack Standing

#### a. Vote Dilution Cannot Support Standing

Plaintiffs attempt to rehabilitate their vote dilution theory of standing by claiming that their particular flavor of alleged vote dilution is unlike vote dilution in other cases, Opp. at 14-17, and is not speculative, *id.* at 11-12. Their arguments fail.

#### (i) There is Nothing Distinguishing About Plaintiffs' Vote Dilution Theory

Plaintiffs contend, *see* Opp. at 14-17, that there is some pertinent distinction between their allegations of vote dilution based on illegitimate votes versus the theory of vote dilution based on fraud that has been rejected as generalized and speculative by this Court, *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020) (Du, J.), and in a "veritable tsunami of decisions," *O'Rourke v. Dominion Voting Sys. Inc.*, Civil Action No. 20-cv-03747-NRN, 2021 WL 1662742, at *9 (D. Colo. Apr. 28, 2021), *aff'd* No. 21-1161, 2022 WL 1699425 (10th Cir. May 27, 2022). There is not. It is a distinction without a difference. Plaintiffs' vote dilution theory does not confer standing.

Plaintiffs first claim that their alleged injury is not common to all members of the public because not all members of the public might vote. *See* Opp. at 15. The exact same argument would be true for a theory of vote dilution premised on alleged voter fraud. As this Court recognized in *Paher*, a purported injury is generalized in the election context when any Nevada voter could raise it. 457 F. Supp. 3d at 926 ("Plaintiffs' purported injury of having their votes diluted . . . may be conceivably raised by any Nevada voter."); *see also Wood v. Raffensperger*, 981 F.3d 1307, 1314-15 (11th Cir. 2020) (vote dilution where "'no

single voter is specifically disadvantaged' if a vote is counted improperly" is "a paradigmatic generalized grievance that cannot support standing"). Next, Plaintiffs claim that the Court must accept as true their allegations that votes received after election day are illegal. *See* Opp. at 15 ("Ballots received after election day . . . violate the federal 'day for the election.'"), 16 ("It's the fact that *all* of those ballots are *late* under federal law that produces the injury."). But just as they allege that those votes are illegal, so too are fraudulent votes. There is no meaningful difference, as Plaintiffs recognize. *See, e.g.*, Compl. ¶ 51 ("Dilution of honest votes, to any degree, by the casting of fraudulent or illegitimate votes violates the right to vote."). An injury is insufficient if a plaintiff claims "only harm to his and every citizen's interest in proper application of the Constitution and laws." *Lance v. Coffman*, 549 U.S. 437, 439 (2007). Plaintiffs' final argument that their injury is distinguishable because it is not speculative, *see* Opp. at 16-17, fails as discussed below.

Plaintiffs' scattershot citations to inapplicable cases also do nothing to remedy their inability to plead a particularized vote dilution injury. *See id.* at 14-17. For instance, Plaintiffs lead with a discussion of *Foster v. Love*, *id.* at 14, but the Supreme Court did not examine standing there, 522 U.S. 67 (1997). Moreover, as the Secretary of State explained, vote dilution can be a basis for standing where there are "irrationally favored" voters. Mot. at 13 (quoting *Baker v. Carr*, 369 U.S. 186, 207-08 (1962)). Plaintiffs' citations to *Baker* and *Bush v. Gore*, Opp. at 14, are entirely distinguishable from this case because in both, certain counties were disfavored or treated differently. *See Baker*, 369 U.S. at 207-08; *Bush*, 531 U.S. 98, 107 (2000). There are no irrationally favored or differently treated voters here. All voters can avail themselves of the Mailbox Deadlines.

At bottom, apart from a lone, out-of-circuit district court decision that (1) addressed alleged vote dilution based on voter fraud (and not Plaintiffs' purportedly different theory of vote dilution) and (2) stands in stark contrast with the crush of decisions that hold that vote dilution is generalized, *see* Opp. at 16-17 (quoting *Green v. Bell*, Case No. 3:21-cv-00493-RJC-DCK, 2023 WL 2572210, at *4 (W.D.N.C. Mar. 20, 2023)), Plaintiffs cite nothing that suggests that their theory of vote dilution is sufficiently particularized. It is not.

### (ii) Vote Dilution Is Speculative

Plaintiffs attempt to avoid the conclusion that their theory of diluted Republican votes is speculative by citing *Bell Atlantic Corp. v. Twombly* to argue that they need only "'allege facts,' not cite them" in support of their claim. *See* Opp. at 12 (quoting *Twombly*, 550 U.S. 544, 563 n.8 (2007)). But Plaintiffs' allegation that late-arriving mail ballots favor Democrats is not a fact; it is a "[n]aked assertion" lacking "some further factual enhancement" that would permit it to cross "the line between possibility and plausibility." *Twombly*, 550 U.S. at 557; *see also Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (Courts "discount[] conclusory statements, which are not entitled to the presumption of truth, before determining whether a claim is plausible."). Indeed, Plaintiffs explicitly base their *conclusion* that "late-arriving mail ballots that are counted disproportionately break for Democrats" on facts that do not support that conclusion. *See* Compl. ¶ 56. The Court need not "accept as true . . . unwarranted deductions of fact." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (citation omitted).

As the Secretary of State explained, it is speculative that Democrats will cast more mail ballots than Republican voters in the 2024 general election because the gap in voting by mail has been narrowing significantly in Nevada. Mot. at 13-14; *see also Daniels-Hall*, 629 F.3d at 998 (Courts need not "accept as true . . . unreasonable inferences."). Plaintiffs do not dispute this. Instead, they bafflingly claim that the Secretary of State improperly introduced other, outside evidence. *See* Opp. at 12. Each of the Secretary of State reports cited in the Motion was cited and relied upon in Plaintiffs' Complaint. *Compare* Mot. at 13-14 *with* Compl. ¶¶ 57, 59. The Secretary of State explained that these reports were therefore both incorporated by reference and subject to judicial notice. Mot. at 14 n.7.

"[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself. The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (citation omitted). Under the

incorporation-by-reference doctrine, Plaintiffs cannot cite only the portions of the reports that they like and preclude the Secretary of State from citing portions that they don't like. Moreover, as agency reports, the reports are "generally susceptible to judicial notice." *Id.* at 1001 (citation omitted). They would not be subject to judicial notice if "there is a reasonable dispute as to what the report[s] establish[]." *Id.* But if Plaintiffs want to claim that there is a dispute about what their own cited reports establish, they would thereby be admitting that their allegations are unsupported and lack plausibility. They can't have it both ways.

Next, Plaintiffs claim that "they have cited sources . . . indicating that Democratic voters tend to . . . vote late." Opp. at 12. The sources they cite do not plausibly establish this. Plaintiffs' reference to more Democratic mail ballots being rejected for being returned incorrectly says nothing. *See id.* (citing Compl. ¶ 59). The source they rely on does not indicate that any Democratic mail ballot was rejected because it was returned late, and it is irrelevant. *See* Compl. ¶ 59 (citing Office of Nev. Sec'y of State, *2024 Presidential Preference Primary Turnout: Mail Ballot Information – Cumulative Totals* (Feb. 20, 2024), perma.cc/7NTN-JV6L).[3] And Plaintiffs' article, *see* Opp. at 12 (citing Compl. ¶ 59), is explicitly based on supposition, *see* Mot. at 14. At bottom, Plaintiffs fail to support their foundational assertion that late-arriving mail ballots come disproportionately from Democratic voters with facts. Plaintiffs' theory of vote dilution is untenably speculative.

### b. The Organizational Plaintiffs Do Not Have Organizational Standing

Last week, the Supreme Court clarified organizational standing in its decision in *Food and Drug Administration v. Alliance for Hippocratic Medicine*, Nos. 23-235, 23-236, 2024 WL 2964140 (U.S. June 13, 2024) ("*FDA*"). In *FDA*, medical association plaintiffs claimed they had standing to challenge FDA's approval of an abortion pill because it

---

[3] Specifically, Plaintiffs' cited source identifies rejected mail ballots based on "wrong envelope, ballot missing, identifying marks, etc." *See* Office of Nev. Sec'y of State, 2024 Presidential Preference Primary Turnout: Mail Ballot Information – Cumulative Totals (Feb. 20, 2024), perma.cc/7NTN-JV6L. Lest there be any doubt, because this is an agency report, and because Plaintiffs cite and rely on it in their Complaint, this report is also incorporated by reference and subject to judicial notice.

1  "'impaired' their 'ability to provide services and achieve their organizational missions." *Id.* at *13. The plaintiffs further claimed they were required to divert resources to oppose FDA's actions, including "conduct[ing] their own studies . . . so that [they could] better inform their members and the public about [the drug's] risk," "'expend[ing] time, energy and resources' drafting citizen petitions to FDA, [and] engaging in public advocacy and public education." *Id.*

The Court explained that organizational standing is found in "unusual case[s]," and requires that an organizational plaintiff's core business activities be "perceptibly impaired." *Id.* at *13-14. The *FDA* plaintiffs did not have standing because they could not show "far more than simply a setback to [their] abstract social interests." *Id.* at *13 (citation omitted). They also could not "spend [their] way into standing," because that "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* It is not enough to "divert[] resources in response to a defendant's actions." *Id.* And it also is not enough for a plaintiff to "have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at *6.

The Court considered an "unusual case" where organizational standing was appropriately found: *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *FDA*, 2024 WL 2964140, at *13-14. In *Havens*, Havens had provided black employees of HOME, an organization that provided housing counseling services, with false information about apartment availability. *Id.* at *13 (citing *Havens*, 455 U.S. at 366 & n.1, 367, 368, 378). By giving HOME false information about apartment availability, "Havens's actions directly affected and interfered with HOME's core business activities" of providing "counseling and referral services for low- and moderate-income home seekers." *Id.* (quoting *Havens*, 455 U.S. at 379).

There is no such direct effect or interference with Plaintiffs' core activities here, contrary to Plaintiffs' assertions. *See* Opp. at 10. "[O]rganizations must satisfy the usual standards for injury in fact . . . that apply to individuals." *FDA*, 2024 WL 2964140, at *13 (citation omitted),

Page **9** of **13**

And as the Supreme Court held in *Clapper v. Amnesty International USA*, plaintiffs do not "have standing because they incur[] certain costs as a reasonable reaction to a risk of harm" if that harm "is not certainly impending." 568 U.S. 398, 416 (2013). The alleged harm to Plaintiffs here is the speculative risk of vote dilution that supposedly "interferes with their core goals of electing their candidates." *See* Opp. at 10. Because this harm is speculative, Plaintiffs' core activities are not "directly" and "perceptibly impaired" as in *Havens*. *See FDA*, 2024 WL 2964140, at *13 (citation omitted). Instead, the "links in the chain of causation" are "too speculative or too attenuated" to confer standing. *Id.* at *7 (citations omitted). Organizational standing would hardly be found only in "unusual case[s]" if an organizational plaintiff could base standing on a speculative impact to organizational activities. *Id.* at *14.

Moreover, as the Secretary of State explained, Plaintiffs were required to "show that [they] would have suffered some other injury if [they] had not diverted resources to counteracting the problem." Mot. at 9 (quoting *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)). Plaintiffs offer only conclusory assertions that expenditures for ballot-chase programs, mail-ballot-specific get-out-the-vote operations, and representation and observation (whether for training or counting activities), *counteract* a speculative injury caused by the Mailbox Deadlines. *See e.g.*, Opp. at 9 ("[Plaintiffs] are diverting resources to combat the law's *actual effect* of extending the time for voters to return ballots.") There is no explanation of *how*, absent those expenditures, Plaintiffs would be injured by the Mailbox Deadlines. *See id.* at 6-10.

       **c.   The Organizational Plaintiffs Do Not Allege an Unfair Advantage and Do Not Have Associational Standing**

A cognizable competitive injury requires a showing of "an unfair advantage in the election process." *Cegavske*, 488 F. Supp. 3d at 1003 (quoting *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011)); *see also Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (candidate or candidate's party has standing "[i]f an allegedly unlawful election regulation makes the competitive landscape worse . . . than it would otherwise be if the regulation were declared unlawful"). But as explained above, Plaintiffs have failed to show that the

Mailbox Deadlines result in an unfair advantage because it is speculative that the Mailbox Deadlines advantage Democrats.

Finally, for all the reasons set forth above, Plaintiffs have failed to establish associational standing, *see* Opp. at 10 & n.2, because they do not have members who "would otherwise have standing to sue in their own right," *see* Mot. at 11 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

### B. The Mailbox Deadlines Are Not Preempted

Plaintiffs' core argument that the Mailbox Deadlines violate the Federal Election Day Statutes is that an official receiving a mail ballot is part of the combined actions of voters and officials that must be completed on election day. *See* Opp. at 18-19. But Plaintiffs advance an untenable definition of official action to support their argument. An official action requires *action*. Receiving a ballot is passive. It's not a "process of doing something; conduct or behavior," or "a thing done." *See Action*, Black's Law Dictionary (11th ed. 2019); *Action,* Merriam Webster, https://www.merriam-webster.com/dictionary/action. It happens independent of any effort on an official's part. To the extent receiving ballots is an action at all, it would be indistinguishable from the "administrative acts" that Plaintiffs concede can occur after election day, including counting ballots. *See* Opp. at 19, 21.

The combined actions here, instead, are election officials administering the election by providing voters ballots by election day, and voters casting them by election day. *Foster* does not provide support for Plaintiffs' argument otherwise; the Supreme Court explicitly identified that "there is room for argument about just what may constitute the final act of selection within the meaning of the law, [and its] decision [did] not turn on any nicety in isolating precisely what acts a State must cause to be done on federal election day." 522 U.S. at 72. The issue in *Foster* was that Louisiana's rules allowed for Congressional candidates to be elected during an open primary before election day. 522 U.S. at 70. Thus, elections subject to the Federal Election Day Statutes could be concluded before election day, with no act in law or in fact to take place on election day. *Id*. at 72-73. Nothing in *Foster* suggests that mail ballots must be received by election day.

Nor should the *Foster* Court have held that the Federal Election Day Statutes are silent as to open primaries and dismissed the case, as Plaintiffs argue the Secretary of State implies. *See* Opp. at 21-22. The Secretary of State implied no such thing. The Secretary of State agrees that elections subject to the Federal Election Day Statutes must not be consummated before election day, but that doesn't mean that the Federal Election Day Statutes preempt more than what they say. And the Federal Elections Day Statutes do not say that ballots must be received by election day. *See Bost v. Illinois State Bd. of Elections*, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023) ("There is a notable lack of federal law governing the timeliness of mail-in ballots."); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020) ("The Court finds that New Jersey's law permitting the canvassing of ballots lacking a postmark if they are received within forty-eight hours of the closing of the polls is not preempted by the Federal Election Day Statutes because the Federal Election Day Statutes are silent on methods of determining the timeliness of ballots.").

Finally, Plaintiffs ignore that Congress has not found it necessary to modify the Federal Election Day Statutes to specify that ballots must be received by election day, despite the District of Columbia and most states counting at least some ballots that arrive after election day. *See* Mot. at 17-18. In fact, Congress explicitly tied receipt of military-overseas ballots to state law in UOCAVA, rather than simply saying that the ballots must be received by election day. *See* 52 U.S.C. § 20303(b)(3). And Congress even amended UOCAVA through the Military and Overseas Voter Empowerment Act passed in 2009, National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, div. A, tit. V., subtit. H, § 580(a), 123 Stat. 2190 (2009), and confirmed that absentee ballots could be received after election day if a state's law so provided. *See* 52 U.S.C. § 20304(b)(1). This can only be understood as Congressional endorsement of states' ability to set ballot receipt deadlines. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989) ("The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless

decided to 'stand by both concepts and to tolerate whatever tension there [is] between them.'"); *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001) ("What persuades us of the proper outcome in this difficult case is the long history of congressional tolerance, despite the federal election day statute, of absentee balloting and express congressional approval of absentee balloting when it has spoken on the issue."); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 776 (5th Cir. 2000) ("We are unable to read the federal election day statutes in a manner that would prohibit such a universal, longstanding practice of which Congress was obviously aware.").

### C. Laches Applies to Prospective Injunctive Relief

Plaintiffs' only argument against laches is that it should not apply to prospective injunctive relief. Opp. at 24. But the Ninth Circuit has explained that the rule that laches does not typically apply to prospective injunctive relief is not "an absolute one." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959 (9th Cir. 2001). And this Court has found laches barred a request for prospective injunctive relief to stop the implementation of an all-mail election. *Paher v. Cegavske*, Case No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301, at *5-6 (D. Nev. May 27, 2020) (Du, J.).

## III. CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.

DATED this 20th day of June 2024.

AARON D. FORD
Attorney General

By: */s/ Laena St-Jules*
LAENA ST-JULES (Bar No. 15156)
Senior Deputy Attorney General
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
T: (775) 684-1100
E: lstjules@ag.nv.gov

*Attorneys for Secretary of State*
