UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CAROL BURGESS, *et al.*,<br><br>Defendants. | Case No. 3:24-cv-00198-MMD-CLB<br><br>ORDER |

**I.   SUMMARY**

A few years ago, the Nevada legislature changed the deadlines by which county clerks' offices must receive mail ballots. *See* Act of June 2, 2021, ch. 248, §8, 2021 Nev. Laws 1213, 1214 (2021). Current law generally allows for mail ballots to be received up to four days after an election if they are mailed on or before the date of the election. *See* NRS § 293.269921. Republican organizations and voters[1] initiated this action to challenge this post-election mail ballot receipt deadline as unconstitutional and in violation of federal law. (ECF No. 1 ("Complaint").)

Pending before the Court are three motions to dismiss Plaintiffs' Complaint for a lack of Article III standing and for failure to state a claim. (ECF Nos. 59 (DNC), 60

---

[1]Plaintiffs are the Republican National Committee ("RNC"); the Nevada Republican Party ("Nevada GOP"); Donald J. Trump for President 2024, Inc. ("Trump Campaign") (collectively, "Organizational Plaintiffs"); and Donald Szymanski, a registered Republican and Nevada voter. They are suing in their official capacities Washoe County Registrar of Voters Cari-Ann Burgess, Washoe County Clerk Jan Galassini, Clark County Registrar of Voters Lorena Portillo, Clark County Clerk Lynn Marie Goya, and Nevada Secretary of State Francisco Aguilar (collectively, "Government Defendants"). The Vet Voice Foundation, Nevada Alliance for Retired Americans ("NARA") (collectively, "Non-Profit Intervenors"), and the Democratic National Committee ("DNC") are intervenor-defendants. (ECF Nos. 56, 70.)

(Government), 71 (Vet Voice and NARA).[2]) The American Civil Liberties Union of Nevada has also submitted a motion for leave to file an amicus curiae brief advising the Court on the merits of Plaintiffs' claims. (ECF No. 76.) The Court finds that Plaintiffs lack standing to challenge the Nevada mail ballot receipt deadline and dismisses this case for lack of subject-matter jurisdiction.

## II.    BACKGROUND

For a mailed ballot to be counted in Nevada, it must be postmarked on or before the day of an election and received by the county clerk before 5:00 p.m. on the fourth day after the election. *See* NRS § 293.269921(1)(b). A mail ballot whose date of postmark cannot be determined will be deemed timely if received no later than 5:00 p.m. on the third day following the election *See id.* at (2). Plaintiffs assert that these post-election receipt deadlines contravene federal law establishing a uniform Election Day[3] and thus allow Nevada to count invalid votes, which violates the Fourteenth Amendment rights to stand for office and to vote. They seek a declaratory judgement that Nevada's post-Election Day mail ballot receipt deadline is unlawful, as well as injunctive relief prohibiting the Government Defendants from counting mail ballots for federal office received after Election Day in November 2024. (ECF No. 1 at 17.)

## III.    DISCUSSION

Defendants have filed three separate motions to dismiss Plaintiffs' claims, both for lack of Article III standing and on the merits. (ECF Nos. 59, 60, 69.) Standing is a threshold issue, so the Court will address these arguments first. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024); *Lance v. Coffman*, 549 U.S. 437, 439 (2007) ("Federal courts must determine that they have jurisdiction before proceeding to the merits.").

---

[2]The Court has reviewed the parties' responses and replies. (ECF Nos. 73, 74, 77, 78, 81, 87.) All Government Defendants have joined Aguilar's motion to dismiss and response. (ECF Nos. 61, 63, 79, 82.)

[3]The Tuesday after the first Monday in November is the federal Election Day for electing members of Congress and appointing presidential electors. *See* 2 U.S.C. § 7; 3 U.S.C. §1.

To establish standing, Plaintiffs must clearly demonstrate that (1) they have suffered, or will likely suffer, an injury in fact that is concrete, particularized, and actual or imminent—not abstract, generalized, or speculative; (2) the injury was likely caused, or will be caused, by Nevada's post-election mail ballot receipt deadline; and (3) the injury will likely be redressed by their requested relief. *See All. for Hippocratic Med.*, 602 U.S. at 380-81; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs advance several theories to support their standing to challenge Nevada's post-Election Day mail ballot receipt deadline, each of which the Court addresses below but none of which meets the threshold requirements of Article III.

### A. Threat to Electoral Prospects

Candidates and political parties may possess 'competitive standing' stemming from "their shared interest in 'fair competition.'" *Mecinas v. Hobbs*, 30 F.4th 890, 898 n.3 (9th Cir. 2022). Plaintiffs asserting competitive standing in the Ninth Circuit have two means through which they may fulfill the injury-in-fact requirement. First, they can allege that they have been injured by the "potential loss of an election." *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011) (quoting *Owen v. Mulligan*, 640 F.2d 1130, 1132 (9th Cir. 1981)); *accord Townley v. Miller*, 722 F.3d 1128, 1135 (9th Cir. 2013). Or, alternatively, their alleged injury may simply be that they are "forced to compete under the weight of a state-imposed disadvantage," in which case they need not show that the challenged law "has changed (or will imminently change) the actual outcome of a partisan election." *Mecinas*, 30 F.4th at 899; *accord City of Los Angeles v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019) ("[The] inability to compete on an even playing field constitutes a concrete and particularized injury."). Organizational Plaintiffs cannot establish standing under either avenue.

#### 1. Potential Loss of Election

Any harm to Organizational Plaintiffs' electoral success from the Nevada mail ballot receipt deadline "arises from the government's allegedly unlawful regulation" of a third party: Nevada voters. *Lujan*, 504 U.S. at 562. Causation and redressability therefore

hinge on the response of those voters, "and perhaps on the response of others as well," to the deadline. *Id.* But Organizational Plaintiffs "cannot rely on speculation about the unfettered choices made by independent actors" to establish standing. *All. for Hippocratic Med.*, 602 U.S. at 383 (quotation marks omitted). Accordingly, regardless of whether the potential loss of the November 2024 election due to the Nevada mail ballot receipt deadline could fulfill the injury-in-fact requirement, Organizational Plaintiffs "have not established that the *other* standing requirements are met." *Townley*, 722 F.3d at 1135.

The causal link between counting mail ballots received after Election Day in Nevada and Organizational Plaintiffs' alleged electoral injuries is too speculative to support standing. Plaintiffs argue that Democrats are more likely to vote by mail and to vote later; thus, they are more likely to cast mail ballots that are received after Election Day. (ECF No. 1 at 13.) Even if the first two points have been adequately pled—which is not altogether clear[4]—it does not necessarily follow that mail ballots arriving after Election Day will skew Democratic. And even if later-arriving mail ballots have favored Democrats past elections, it is far from guaranteed that Nevada voters will behave similarly this November. (ECF No. 1 at 13.) *See O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974) (finding that, although past harm can have predictive value as to the likelihood of repeated injury, the repetition of plaintiffs' past injury was too speculative to support standing). Nevadans exercise "broad and legitimate discretion" over whether, when, and how they cast their ballots, and their choices will be informed by a cacophony of influences from

---

[4] Democrats in Nevada have returned more mail ballots than Republicans in the past two general elections (42.7% versus 29.2% of all mail ballots in 2022, and 46.2% versus 26.2% in 2020), but around 27.6% of mail voters in each of those elections did not identify as Democrats or Republicans. (ECF No. 1 at 13 (citing data from the Office of the Nevada Secretary of State).) *See also* OFF. OF NEV. SEC'Y OF STATE BARBARA K. CEGAVSKE, 2022 GENERAL ELECTION TURNOUT: CUMULATIVE ELECTION TURNOUT (2022), https://perma.cc/N7G7-RUQ9; OFF. OF NEV. SEC'Y OF STATE BARBARA K. CEGAVSKE, 2020 GENERAL ELECTION TURNOUT (2020), https://perma.cc/Z6F3-SM4N. The partisan lean of the unaffiliated mail ballots is unknown.

The claim that Democrats vote later is based on a 2020 magazine article's suggestion that "Democratic get-out-the-vote drives—which habitually occur shortly before election day—may delay maximum Democratic voting across-the-board." *See* Ed Kilgore, *Why Do the Last Votes Counted Skew Democratic?*, INTELLIGENCER (Aug. 10, 2020), https://perma.cc/R78D-3Q58. Plaintiffs offer no more specific information about the timing of mail voting in Nevada.

4

political parties, candidates, voter advocacy groups, media outlets, friends, family, neighbors, and countless others. *Lujan*, 504 U.S. at 562. It is therefore "inherently speculative" that mail ballots received in Nevada after Election Day will favor Democratic candidates and that, if they do, such votes will be "sufficient in number to change the outcome of the election to [Republicans'] detriment." *Bognet v. Sec'y Commonwealth Pa.*, 980 F.3d 336, 351-52 (3d Cir. 2020), *cert. granted* 131 S. Ct. 2508 (2021) (dismissed as moot). The effect of the Nevada mail ballot receipt deadline on electoral outcomes is "not sufficiently predictable" to meet Article III's causation requirement. *All. for Hippocratic Med.*, 602 U.S. at 383.

By the same logic, Organizational Plaintiffs have not shown that any harm to their electoral prospects will "likely" be redressed by enjoining Nevada from counting ballots received after Election Day. *Id.* at 380. This Court "cannot presume either to control or to predict" how Nevada voters would respond if their mail ballots were required to arrive by Election Day. *Lujan*, 504 U.S. at 562 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.)). Some affected voters might choose to forgo voting altogether, while others might decide to vote by different means. Still others might choose to continue voting by mail, with varying degrees of success dependent upon their own timing, the speed of the U.S. Postal Service, and a host of other factors. How this all would play out for Republican candidates in Nevada this November is entirely uncertain. Because it is "merely speculative" that requiring mail ballots to arrive earlier will affect Republican electoral success, Organizational Plaintiffs have not met the redressability requirement either. *Lujan*, 504 U.S. at 561 (quotation marks omitted).

Organizational Plaintiffs cannot claim competitive standing based upon the Nevada mail ballot receipt deadline's threats to Republican electoral prospects.

### 2. State-Imposed Disadvantage

Nor have Organizational Plaintiffs shown that the Nevada mail ballot receipt deadline forces them to "compete under the weight of a state-imposed disadvantage." *Mecinas*, 30 F.4th at 899.

As a threshold matter, the Court disagrees with the contention that "being forced to participate in an 'illegally structured competitive environment,'" without more, is sufficient to confer competitive standing. (ECF No. 1 at 12.) *Mecinas*, 30 F.4th at 898 (quoting *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 87 (D.C. Cir. 2005)) (brackets omitted). In each context in which the Ninth Circuit has recognized competitive standing without assessing the actual effects of a policy on a plaintiff's success in a competitive process, it was not the mere illegality of the competitive environment but instead the resultant unfair disadvantage from that illegality which constituted an injury in fact. *See, e.g.*, *Mecinas*, 30 F.4th at 899 (the DNC had standing to challenge a party-based ballot ordering statute which constituted a "state-imposed disadvantage"); *Owen*, 640 F.2d at 1133 (candidate had standing to challenge the U.S. Postal Service giving his opponent a preferential mailing rate which was "an unfair advantage in the election process"); *Barr*, 929 F.3d at 1173 (city had standing to challenge federal grant policy that rendered it unable to compete for funding "on an even playing field"); *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1108-09 (9th Cir. 2020) (nonprofit had standing to challenge grant-making criteria which "impermissibly tilted the playing field" for federal funding against it); *Preston v. Heckler*, 734 F.2d 1359, 1365-66 (9th Cir. 1984) (candidate had standing to challenge federal hiring standards which "deprived [her] of a fair opportunity to be evaluated for employment"). To hold otherwise would contravene core tenets of the case-or-controversy requirement: plaintiffs must suffer a concrete and particularized harm to have Article III standing, and a belief that the government is acting illegally does not suffice. *See Lance*, 549 U.S. at 442; *All. for Hippocratic Med.*, 602 U.S. at 381; *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) ("[Congress] may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is.").

In the instant case, Organizational Plaintiffs have failed to establish that the

Nevada mail ballot receipt deadline gives their Democratic opponents[5] some "unfair advantage in the election process," *Owen*, 640 F.2d at 1133, or otherwise renders Republicans unable to "compete on an even playing field," *Barr*, 929 F.3d at 1173. Any 'advantage' that Democrats may gain from the four-day grace period is one that appears to be equally available to, but simply less often employed by, Republicans. (ECF No. 1 at 13.) *See also Bognet*, 980 F.3d at 351 (no competitive standing where plaintiffs did not "explain how counting *more* timely cast votes would lead to a *less* competitive race"). In other words, Republican candidates "face no harms that are unique from their electoral opponents" when all Nevada voters are uniformly given greater access to the ballot box. *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1003 (D. Nev. 2020); *see also Bognet*, 980 F.3d at 351 (candidate suffered no particularized injury when all candidates in the state were subject to the same rules); *cf. Mecinas*, 30 F.4th at 898-99 (competitive standing where statute mandated that candidates in the incumbent governor's party would be listed first on ballots); *Owen*, 640 F.2d at 1132-33 (same, where U.S. Postal Service gave incumbents a preferential mailing rate). Extending the timeline for mail voting does not have particularized effects upon Organizational Plaintiffs.

Organizational Plaintiffs do not have competitive standing to challenge the Nevada mail ballot receipt deadline.

**B.  Diversion of Resources**

Organizational Plaintiffs may also have direct standing if they can establish that the Nevada mail ballot receipt deadline frustrates their mission and causes them to "divert resources in response to that frustration of purpose." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 682 (9th Cir. 2023) (en banc) (quoting *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 879 (9th Cir. 2022)). "[M]erely continuing ongoing activities does not satisfy this requirement." *Friends of the*

---

[5] Plaintiffs repeatedly refer to Democratic candidates as their electoral opponents. (ECF Nos. 1 at 12-13; 74 at 11-13, 17.) The Court will employ the same terms for the sake of simplicity, while recognizing that other partisan groups are also running candidates in the November 2024 election.

*Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021). Organizational Plaintiffs must instead show that the Nevada mail ballot receipt deadline will cause them to "expend[] additional resources that they would not otherwise have expended, and in ways that they would not have expended them." *Id.* (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015)). According to Organizational Plaintiffs, the Nevada mail ballot receipt deadline requires them to "spend money on mail ballot chase programs and post-election activities," as opposed to "in-person voting activities and election-integrity measures." (ECF No. 1 at 4-5.) Neither of these alleged additional expenditures amounts is a cognizable diversion-of-resources injury.

### 1. Chasing Mail Ballots Through Election Day

Any diversion of resources to an Election Day 'mail ballot chase' program appears to be nothing more than "business as usual" for Organizational Plaintiffs. *Friends of the Earth*, 992 F.3d at 943. Organizational Plaintiffs claim that, by allowing voters to cast mail ballots up through Election Day, Nevada law effectively requires them to divert funding from corralling in-person voters on Election Day so that they can keep running mail ballot collection operations. (ECF Nos. 1 at 11; 74 at 8.) The record is devoid of evidence, however, that Organizational Plaintiffs would not round up mail ballots in substantially the same manner if they were due at county clerks' offices on Election Day instead of four days later; they would just conduct those same activities a few days earlier in November or over a shortened period of time. *See Trump for President v. Cegavske*, 488 F. Supp. 3d at 1001-02 (diversion of resources toward voter education efforts is not needed to counteract voter confusion when a law extends the time for casting a ballot). Engaging in the same mail ballot collection push with slightly different timing is a "continuation of existing advocacy," not an "affirmative diversion of resources." *Friends of the Earth*, 992 F.3d at 943. Organizational Plaintiffs have not shown that having *more* time to conduct the same mail ballot collection activities has caused them any concrete harm.

### 2. Post-Election Activities

Organizational Plaintiffs further maintain that the Nevada mail ballot receipt

deadline makes post-election mail ballot activities more time-consuming and expensive, both by lengthening the timeframe during which mail ballots may be received and complicating the mail ballot authentication process. (ECF No. 1 at 11.) Though these activities may theoretically divert Organizational Plaintiffs' resources, they cannot constitute a resource diversion injury because that additional time and money will not be expended "*in response to*" some impediment to achieving Plaintiffs' mission posed by the mail ballot receipt deadline. *Sabra*, 44 F.4th at 879 (emphasis added).

The Court first recognizes that Nevada's mail ballot receipt deadline may require Organization Plaintiffs to devote more resources to poll watching and election-integrity trainings. Adding an additional step to the mail ballot verification process could lengthen the average processing time for each ballot, which in turn would require Organizational Plaintiffs to hire poll watchers for more total hours than they otherwise would have. Likewise, teaching poll watchers and members of mail ballot central counting boards to check postmarks and determine whether they are legible could make their training more time-consuming and expensive. Extending the receipt period for mail ballots might also lengthen the ballot counting process,[6] and the resources allocated to these activities could be put toward campaigning or other critical programs.[7]

These additional expenditures appear to be made in pursuit of ensuring that ballots are counted correctly. *See* NRS §§ 293.269921 (setting postmark and receipt deadlines for mail ballots), 293.269933 (outlining how mail ballot central counting boards must

---

[6]The Court assumes, without deciding, that this is a sufficiently imminent harm. *But see* NRS § 293.269931(1) (stating that the Nevada "mail ballot central counting board may begin counting the received mail ballots 15 days before the day of the election" and "must complete the count of all mail ballots on or before the seventh day following the election").

[7]The Court is not fully convinced that Organizational Plaintiffs have adequately pled that they have imminent plans to hold these trainings and hire poll workers. (ECF No. 1 at 11 (stating that Plaintiffs have the right to engage in these activities, without clearly alleging that they intend to engage in these activities in Nevada this November).) While this could be a dispositive issue, Organizational Plaintiffs' underlying argument is not meritorious and cannot be remedied by additional factual allegations. The Court will thus resolve this dispute by addressing the merits of Organizational Plaintiffs' theory of standing.

process mail ballots). However, Organizational Plaintiffs have made no allegations that the Nevada mail ballot receipt deadline harms the integrity of the mail ballot counting process, such as by increasing the risk of error or fraud. They merely allege that the process itself is invalid. Organizational Plaintiffs therefore are not engaging in additional poll watching and mail ballot counting activities to identify or counteract any harms from the Nevada mail ballot receipt deadline. *Cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (non-profit had direct standing to challenge racial steering practices which impeded its "efforts to assist equal access to housing" because it "had to devote significant resources to identify and counteract" the discriminatory behavior); *Sabra*, 44 F.4th at 879-80 (Muslim civil rights organization had direct standing to challenge Islamophobic materials that caused it to divert resources to "create a campaign correcting the Islamophobic information").

As a result, the causal chain is too attenuated to support Article III standing. Just as physicians do not have standing to challenge the approval of a drug "simply because more individuals might then show up . . . in doctors' offices with follow-on injuries," organizations who train and hire poll watchers and ballot counters do not have standing to challenge the expansion of access to mail voting merely because it might create more work for them. *All. for Hippocratic Med.*, 602 U.S. at 391-92. Such a theory of standing would be too expansive to "screen[] out plaintiffs who were not injured by" a challenged law and ensure that courts are not "virtually continuing monitors of the wisdom and soundness of government action." *Id.* at 383-84 (quotation marks and citation omitted).

### C. Harm to Individual Voters: Vote Dilution

Plaintiffs finally argue that parties, candidates, and voters all have standing to challenge the Nevada mail ballot receipt deadline because it dilutes the relative weight of their ballots, reduces Republican voting power, and sets different rules for in-person and mail-in voting. (ECF No. 74 at 15-18.) None of these alleged injuries is cognizable.

#### 1. Associational Standing

The Court regards vote dilution claims by Organizational Plaintiffs as requests for

associational standing on behalf of their members who vote in Nevada, as their competitive standing arguments have already been rejected. An organizational plaintiff has associational standing to sue on behalf of its members if: "(1) at least one of its members would have standing to sue in his own right, (2) the interests the suit seeks to vindicate are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Fellowship of Christian Athletes*, 82 F.4th at 681.

The Trump Campaign cannot establish associational standing on behalf of Nevada voters because the Campaign does not allege that it has any members who live or vote in Nevada. (ECF No. 1 at 5.) Regardless of whether an individual voter *could* have standing under the theories Plaintiffs advance, the Trump Campaign has not established that it has a potentially qualifying member in the first place. Moreover, the purpose of the Trump Campaign—electing Donald J. Trump to public office—is not "germane" to vindicating individual voting rights. *See Fellowship of Christian Athletes*, 82 F.4th at 681. Nevada voters may be a means through which the Trump Campaign achieves its purpose; however, Nevadans' individual interests in their voting rights are "wholly distinct" from the interests of the Campaign. *Trump for President v. Cegavske*, 488 F. Supp. 3d at 999 (explaining that the Trump Campaign is only "a reserve of funds set aside for that campaign"); *accord Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899, 915 (M.D. Pa. 2020), *aff'd sub nom. Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 F. App'x 377 (3d Cir. 2020).

The associational standing of the RNC and Nevada GOP does not suffer from the same defects. *See Trump for President v. Cegavske*, 488 F. Supp. 3d at 999. Both groups stated that they have members who are registered to vote in Nevada and "vital interests in protecting the ability of Republican voters to cast . . . effective votes in Nevada elections." (ECF No. 1 at 4-5.) But the Court rejects their associational standing argument for the reasons stated below.

/ / /

### 2. Individual Standing

The Court will now turn to whether Szymanski and the individual members of the RNC and Nevada GOP (collectively, "Voter Plaintiffs") have standing to sue in their own right under the theory of vote dilution.

Vote dilution has been repeatedly rejected by federal courts, including this Court, as an insufficient injury in fact to support standing when the alleged harm is predicated upon the counting of illegitimate or otherwise invalid ballots and equally affects all voters in a state. *See, e.g.*, *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020); *Trump for President v. Cegavske*, 488 F. Supp. 3d at 1000; *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711-12 (D. Ariz. 2020); *Bognet*, 980 F.3d at 352-60; *Wood v. Raffensperger*, 981 F.3d 1307, 1314-15 (11th Cir. 2020); *O'Rourke v. Dominion Voting Sys., Inc.*, No. 21-1161, 2022 WL 1699425, at *2 (10th Cir. May 27, 2022), *cert. denied*, 143 S. Ct. 489 (2022); *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 609-10 (E.D. Wis. 2020); *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 731-33 (N.D. Ill. 2023); *Moore v. Circosta*, 494 F. Supp. 3d 289, 312-13 (M.D.N.C. 2020); *Martel v. Condos*, 487 F. Supp. 3d 247, 253 (D. Vt. 2020). *But see Green v. Bell*, No. 3:21-CV-00493-RJC-DCK, 2023 WL 2572210, at *4-5 (W.D.N.C. Mar. 20, 2023) (vote dilution and loss of confidence in elections were concrete injuries where violations of the National Voter Registration Act allegedly allowed ineligible persons to vote).

Today's holding is no different. Just because the number of actual Nevadan voters is smaller than the population of all eligible voters in the state does not mean that the undifferentiated dilution of each vote cast in Nevada is a particularized injury. Counting ballots received after Election Day does not specifically disadvantage any one voter, "even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'" *Wood*, 981 F.3d at 1314 (quoting *Bognet*, 980 F.3d at 359-60); *see also Moore*, 494 F. Supp. 3d at 312-13. Reductions in individual voting power from counting 'late' mail ballots are felt equally by all voters in Nevada and do not present "an individual and personal injury of the kind required for Article III standing." *Gill*

*v. Whitford*, 585 U.S. 48, 68 (2018). Voter Plaintiffs cannot avoid this conclusion "by describing one group of voters as 'those who lawfully vote in person and submit their ballots on time' and the other group of voters as those whose mail-in ballots arrive after Election Day." *Bognet*, 980 F.3d at 358 (ellipses and parentheses omitted).

Nor can framing vote dilution in terms of Republican voting power in Nevada render the injury particularized. Partisan vote dilution can, of course, confer standing when the injury "arises from the particular composition of the voter's *own* district, which causes his vote . . . to carry less weight than it would carry in another, hypothetical district." *Gill*, 585 U.S. at 67 (emphasis added). In contrast, a *statewide* detriment to the Voter Plaintiffs' collective interests in Republican representation is not sufficiently particularized to confer standing. *See id.* at 68. The Nevada mail ballot receipt deadline does not have an "individual and personal" effect on the voting power of Republican voters; it neither undermines their access to the polls nor disproportionately diminishes the weight of their votes relative to other Nevada voters. *Id.* at 67; *see also Toth v. Chapman*, No. 1:22-CV-00208, 2022 WL 821175, at *7 (M.D. Pa. Mar. 16, 2022). Any remaining theory of partisan vote dilution boils down to the fact that Democrats have used an equally available process for casting ballots more often. (ECF No. 1 at 13.) That Democrats' mail ballots are counted, and that this inherently reduces Republicans' political power in the state, is an incognizable generalized grievance about the "composition and policymaking" of elected officials. *Gill*, 585 U.S. at 68.

The existence of different rules for mail and in-person voting likewise is not an injury in fact. Voter Plaintiffs do not assert that the difference in voting regulations has harmed them in some concrete way. Now that the Court has rejected their theories of vote dilution, the sole remaining alleged harm is that mail ballots received after Election Day are "necessarily invalid" under federal law but can still be counted. (ECF No. 1 at 16.) Even assuming Plaintiffs are correct on the merits, the "only injury [they] allege is that the law . . . has not been followed." *Lance*, 549 U.S. at 442. This is "precisely the kind of undifferentiated, generalized grievance about the conduct of government" that the

Supreme Court refuses to recognize as an injury in fact. *Id.* As "Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law," Voter Plaintiffs have not established that they have standing to challenge Nevada's mail ballot receipt deadline. *All. for Hippocratic Med.*, 602 U.S. at 382.

None of Plaintiffs' theories of standing meets the threshold requirements of Article III, and consequently the Court does not have subject-matter jurisdiction over this case. *See City of Oakland v. Lynch*, 798 F.3d 1159, 1163 (9th Cir. 2015). Article III thus leaves the "crucial" decision as when mail ballots must be received in Nevada "to the political processes, where democratic debate can occur and a wide variety of interests and views can be weighed." *All. for Hippocratic Med.*, 602 U.S. at 380 (quotation marks omitted).

The Government Defendants' and Non-Profit Intervenors' motions to dismiss are granted as to Plaintiffs' standing. All other motions are denied as moot for lack of subject-matter jurisdiction.

## IV.   CONCLUSION

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion, as they do not affect the outcome of the motions before the Court.

It is therefore ordered that the Government Defendants' and Non-Profit Intervenors' motions to dismiss (ECF Nos. 60, 69) are granted under Federal Rule of Civil Procedure 12(b)(1) because Plaintiffs have failed to demonstrate that the Court has standing to exercise jurisdiction over this case.

It is further ordered that the DNC's motion to dismiss (ECF No. 59) and the American Civil Liberties Union of Nevada's motion for leave to file an amicus curiae brief (ECF No. 76) are denied as moot because the Court lacks subject-matter jurisdiction to resolve them.

The Clerk of Court is directed to close this case and enter judgment accordingly.

DATED THIS 17th Day of July 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE